**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND / ODESSA DIVISION**

|  |  |
|---|---|
| KEVYN ANNONIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEW ERA ENERGY & DIGITAL, INC., EVERETT WILLARD GRAY II, and MICHAEL J. RUGEN,<br><br>Defendants. | Case No. 7:26-cv-00120<br><br><br><br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Kevyn Annonio ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by New Era Energy & Digital, Inc. ("New Era Energy" or the "Company") f/k/a New Era Helium Inc., with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by New Era Energy; and (c) review of other publicly available information concerning New Era Energy.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired New Era Energy securities between November 6, 2024 and December 29, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. New Era Energy, formerly known as New Era Helium,[1] is an oil and natural gas company. On or about December 9, 2024, New Era Energy became a public entity via business combination with Roth CH Acquisition V Co. (the "Business Combination").

3. At the time of the Business Combination and throughout the relevant period, New Era Energy's primary revenue source has been its oil and gas wells located in Chaves County, New Mexico. The Company's oil and gas wells are operated by its subsidiary, Solis Partners. New Mexico requires inactive wells, meaning wells which no longer actively produce oil and gas, to be

---

[1] On August 13, 2025, the Company renamed itself from New Era Helium Inc., which had traded on the NASDAQ under the ticker NEHC, to New Era Energy, and began trading on the NASDAQ under the ticker NUAI.

plugged and remediated. Failure to plug and remediate oil and gas wells poses a significant risk of air and water pollution. The duty to plug and remediate inactive wells falls to the well operator and are often referred to as "asset retirement obligations." The costs of complying with these obligations are reasonably calculable, foreseeable, and should be accounted for by oil and gas operators from the moment a well is drilled.

4.    Additionally, throughout the relevant period the Company has been engaged in a pivot to providing power and infrastructure for artificial intelligence ("AI") companies. The Company's purported flagship venture for this pivot is the Texas Critical Data Center, a reported large-scale AI and high-performance computing data center campus located in Ector County, outside Odessa, Texas.

5.    On December 12, 2025, at approximately 10:00 AM EST, market research media outlet Fuzzy Panda Research published a report (the "FP Report").[2]  The FP Report alleges, among other things, that "of NUAI's 406 gas wells, 346 were acquired from companies that went bankrupt operating the very same wells, ***including 87 wells from the company E. Will Gray II was CEO of and bankrupted himself, Remnant Oil.***" The FP Report states this was in line with prior companies run by New Era Chief Executive Officer ("CEO"), Everett Willard Gray II ("Gray," also known as "E. Will") who "has a long history (~20 years) of incinerating value at oil & gas pink sheet companies" some seemingly on purpose to effectuate his own financial benefit. For example, the report details how "Gray was Co-Founder & CEO of Remnant Oil, a private co, which went bankrupt in 2019 after ***hundreds of 'regulatory violations'***" but that Remnant's wells were "***acquired in bankruptcy by a related party, Acacia Resources, and were then sold to Solis***

---

[2] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

*Partners, a subsidiary of New Era Energy*." The FP Report states it "uncovered that Gray's playbook includes financial tricks to enrich insiders, like converting related party loans to equity or paying fees to friends and family."

6.      The FP Report further calls the Company's pivot to fueling AI companies a "fantasy." The FP Report alleges that, among other things, that despite the Company "telling investors it's made significant progress" with its regulatory permitting, including the submission of air quality permits, "*no applications have even been submitted*." The FP states that according to "Texas, New Mexico and Federal government databases for the construction and environmental permits that NUAI will need to start building its data centers and power plants" the Company had not submitted *any* of its required permits, "*not even an application*."

7.      On this news, New Era's stock price fell $0.25 per share, or 6.9%, to close at $3.35 on December 12, 2025, on unusually heavy trading volume.

8.      On December 29, 2025, at approximately 12:30 PM EST, a research firm named Hunterbrook Media reported that the New Mexico Attorney General filed a lawsuit against New Era Energy, its subsidiary Solis Partners, LLC, and Gray, among others, (the "HBM Report"). The HBM Report publicized that New Mexico had recently filed a complaint alleging New Era Energy, Gray, and a network of affiliated companies, had orchestrated a "fraudulent oil-and-gas scheme" to "*siphon revenue from wells that produce fossil fuels while abandoning environmental cleanup obligations.*" The HBM Report details how the complaint "alleges a broader *pattern of fraudulent transfers, self-dealing, and false statements to regulators, including the use of shell entities and strategic bankruptcies to evade responsibility*."

9.      According to the HBM Report, the scheme reportedly involved the Company, Gray, and a network of affiliated companies transferring wells among related entities, including New Era

Energy and its subsidiary, Solis Partners "selling" wells to themselves, and then placing liability-bearing companies into bankruptcy to avoid plugging and remediation costs. Reportedly, New Era Energy was core to the scheme, in part by receiving and operating the most valuable gas wells, 87 in total, which were transferred from Acacia to Solis Partners, while leaving Acacia with the bulk of plugging and remediation liabilities. That transfer reportedly occurred in July, 2021. According to the complaint, the defendants, including New Era Energy, thus subsequently "*received significant revenue (possibly into the millions of dollars) that they knew would otherwise be required to address*" plugging and remediation costs.

10. On this news, New Era's stock price fell $1.87, or 41%, to close at $2.69 per share on December 29, 2025, on unusually heavy trading volume.

11. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company overstated its progress in its permitting and regulatory filings for its flagship Texas Critical Data Centers project; (2) the Company was involved in a fraudulent scheme "to pocket revenues from hundreds of oil and gas wells in New Mexico" by transferring wells among related entities and then placing liability-bearing companies into bankruptcy to avoid plugging and remediation costs; (3) that, as a result, the Company's financial results were false and/or misleading; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

12. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.    Venue is proper in the Midland / Odessa Division of the Western District of Texas pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

16.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17.    Plaintiff Kevyn Annonio, as set forth in the accompanying certification, incorporated by reference herein, purchased New Era Energy securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

5

18.     Defendant New Era Energy is incorporated under the laws of Nevada with its principal executive offices located at 4501 Santa Rosa Dr., Midland, Texas 79707. New Era Energy's common stock trades on the NASDAQ exchange under the symbol "NUAI."[3]

19.     Defendant Gray has been the Company's CEO at all relevant times. Defendant Gray has also served as the Company's Chief Financial Officer ("CFO") since June 1, 2025.

20.     Defendant Michael J. Rugen ("Rugen") served as the Company's CFO from November, 2023 until May 31, 2025.

21.     Defendants Gray and Rugen (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

---

[3] On August 13, 2025, the Company was renamed from New Era Helium Inc. (NASDAQ: NEHC) to New Era Energy (NASDAQ: NUAI).

6

## SUBSTANTIVE ALLEGATIONS

### Background

22.     New Era Energy, formerly known as New Era Helium, is an oil and natural gas company. On or about December 9, 2024, New Era Energy became a public entity via the Business Combination with Roth CH Acquisition V Co.

23.     New Era Energy's oil and gas wells are located in Chaves County, New Mexico. The Company's oil and gas wells are operated by its subsidiary, Solis Partners.

24.     The average productive life cycle of a conventional oil and gas well is between 20 and 30 years. Once a well's oil and gas production dwindles it becomes "marginal," and eventually "inactive." Inactive wells pose a significant risk of air and water pollution and must be plugged and remediated promptly. In New Mexico, where New Era Energy operates its wells, it is the oil and gas operator's duty to plug an oil and gas well and remediate the site at the end of its productive life. The duty to plug and remediate inactive wells falls to the well operator and are often referred to as "asset retirement obligations" or "AROs." The costs of complying with these AROs are reasonably calculable, foreseeable, and should be accounted for by oil and gas operators from the moment a well is drilled.

25.     The Company is also expanding its business to providing power and infrastructure for AI companies. The Company's purported flagship venture for this pivot is the Texas Critical Data Center, a reported large-scale AI and high-performance computing data center campus located in Ector County, outside Odessa, Texas.

**Materially False and Misleading**

**Statements Issued During the Class Period**

26. The Class Period begins on November 6, 2024. On that day, the Company filed its proxy statement/prospectus on a Form 424B3 soliciting stockholder approval of the Business Combination (the "Proxy Statement"). The Proxy Statement purported to report the Company's historical financial results, including its revenue, operating expenses, and the Company's ARO liability. The Proxy Statement further purported to describe the manner in which the Company records its ARO liabilities, including the following, in relevant part:

| | Holdings (Historical) | NEH (Historical) | ROCL (Historical) | Scenario 1: No Additional Redemption Scenario | | Scenario 2: Maximum Redemption Scenario | |
|---|---|---|---|---|---|---|---|
| | | | | Transaction Accounting Adjustments | Pro Forma Combined | Transaction Accounting Adjustments | Pro Forma Combined |
| Revenue | $— | $ 612,192 | $ — | $ — | $ 612,192 | $— | $ 612,192 |
| Costs and expenses | | | | | | | |
| Lease operating expenses | — | (1,332,548) | — | — | (1,332,548) | — | (1,332,548) |
| Depletion, depreciation, amortization, and accretion | — | (885,832) | — | — | (885,832) | — | (885,832) |
| General and administrative expenses | — | (4,519,811) | (1,764,792) | (1,219,376) **CC** | (8,253,979) | — | (8,253,979) |
| | | | | (750,000) **FF** | | | |
| Stock-based compensation expense | | | | (6,463,000) **DD** | (7,251,900) | — | (7,251,900) |
| | | | | (788,900) **EE** | | | |
| Total costs and expenses | — | (6,738,191) | (1,764,792) | (9,221,276) | (17,724,259) | — | (17,724,259) |
| Gain on sale of assets | — | 5,834,293 | — | — | 5,834,293 | — | 5,834,293 |
| Income (loss) from operations | — | (291,706) | (1,764,792) | (9,221,276) | (11,277,774) | — | (11,277,774) |
| Other income (expense) | | | | | | | |
| Interest income | — | 46,437 | — | — | 46,437 | — | 46,437 |
| Interest expense | — | (172,143) | — | — | (172,143) | — | (172,143) |
| Other, net | — | (180,943) | — | — | (180,943) | — | (180,943) |
| Change in the fair value of due to non-redeeming stockholders | — | — | (480,000) | — | (480,000) | — | (480,000) |
| Interest income on marketable securities held in Trust Account | — | — | 2,967,733 | (2,967,733) **AA** | — | — | — |
| Total other income (expenses) | — | (306,649) | 2,487,733 | (2,967,733) | (786,649) | — | (786,649) |
| Income (loss) before income tax expense | — | (598,355) | 722,941 | (12,189,009) | (12,064,423) | — | (12,064,423) |
| Income tax benefit (expense) | — | 608,500 | (810,659) | 810,659 **BB** | 608,500 | — | 608,500 |
| Net income (loss) | $— | $ 10,145 | $ (87,718) | $(11,378,350) | $(11,455,923) | $— | $(11,455,923) |
| Basic and diluted net income per share, common stock subject to possible redemption | | | | $ 0.17 | | | |
| Basic and diluted net loss per share, non-redeemable common stock | | | | $ (0.33) | | | |
| Pro forma weighted average number of shares outstanding – basic and diluted | | | | | 14,450,140[2] | | 13,580,632[2] |
| Pro forma earnings per share – basic and diluted | | | | | $ (0.79) | | $ (0.84) |

\*                    \*                    \*

8

The following table shows the change in the Company's ARO liability for the years ended December 31, 2023, and 2022:

| | |
|---|---:|
| Asset retirement obligations, January 1, 2022 | $ 5,097,225 |
| Liabilities incurred | 50,419 |
| Liabilities settled | (297,244) |
| Change in estimates | 140,331 |
| Accretion expense | 495,184 |
| Asset retirement obligations, December 31, 2022 | $ 5,485,915 |
| Liabilities incurred | 85,802 |
| Liabilities sold | (3,510,966) |
| Change in estimates | (497,407) |
| Accretion expense | 91,624 |
| Asset retirement obligations, December 31, 2023 | $ 1,654,968 |

\*          \*          \*

The Company recorded a gain on sale of asset of $5,834,293 during the year ended December 31, 2023. This gain related to the sale of certain oil and gas properties and related assets, including the gathering system, located in Chaves County, New Mexico. The Company received $2.5 million in cash and was relieved of the asset retirement obligations associated with the properties. As a full cost company, proceeds from the sale of oil and gas properties are normally accounted for as a reduction to capitalized costs unless such treatment causes a significant change in the relationship between costs and the estimated value of proved reserves, in which case a gain or loss is recognized. The normal treatment of this specific sale would have reduced the value of the capital costs to zero even though reserves still existed on the remaining properties, therefore it was necessary to record a gain on the sale. ***Of the gain recognized, $3,407,818 was related to the relief of asset retirement obligations associated with the assets sold.***

\*          \*          \*

***Asset Retirement Obligations.*** The Company has significant obligations to remove tangible equipment and facilities and to restore the land at the end of oil and natural gas production operations. The Company's removal and restoration obligations are primarily associated with plugging and abandoning wells. Estimating the future restoration and removal costs is difficult and requires management to make estimates and judgments because most of the removal obligations are many years in the future and in some cases have vague descriptions of what constitutes removal. Asset removal technologies and costs are constantly changing, as are regulatory, political, environmental, safety and public relations considerations. Inherent in the present value calculation are numerous assumptions and judgments including the ultimate settlement amounts, credit-adjusted discount rates, timing of settlement and changes in the legal, regulatory, environmental and political environments. ***To the extent future revisions to these assumptions impact the present value of the existing***

9

*asset retirement obligations, a corresponding adjustment is generally made to the crude oil and natural gas property balance*.

27.    On December 6, 2024, the Company issued a press release announcing the consummation of the closing of the Business Combination, and touted the Company's progress on its purported new data center projects and AI pivot, as follows, in relevant part:

The trading of the Company's shares on Nasdaq represents a pivotal milestone in New Era Helium's mission to establish itself as a leading consolidator of helium and natural gas production. With over 137,000 acres in Southeast New Mexico and 1.5 billion cubic feet of proved and probable helium reserves, NEH is well-positioned to drive growth in this critical sector, *expected to see a surge in demand amid growth in data centers powering artificial intelligence.*

Last month [read here], NEH announced a non-binding joint venture with Sharon AI, Inc. ("Sharon AI") to build a 90MW net-zero Tier 3 data center to be located within the Permian Basin. This joint venture combines Sharon AI's expertise in high-performance computing with NEH's extensive helium and natural gas reserves. *The state-of-the-art facility will feature a liquid-cooled Tier 3 data center powered by sustainable energy, offsetting approximately 250,000 metric tons of CO$_2$ annually through carbon capture technology.*

$$* \qquad\qquad * \qquad\qquad *$$

E. Will Gray II, Chairman and Chief Executive Officer of New Era Helium, said: "Our Nasdaq listing marks a significant moment in our corporate journey, enhancing our public profile within the industry, and *broadening our reach to institutional investors in the AI datacenter,* and Helium markets. Thank you to all of our shareholders and partners whose unwavering support has been instrumental in driving our ongoing success."

28.     On March 31, 2025 the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K announced the Company's financial results, including its revenue, operating expenses as follows, in relevant part:

| | | For the year ended December 31, | | Variance | Variance |
|---|---|---|---|---|---|
| | | 2024 | 2023 | ($) | (%) |
| Revenue, net: | | | | | |
| Oil, natural gas, and product sales, net | $ | 532,780 | 612,192 | (79,412) | (13.0)% |
| Total Revenues, Net | | 532,780 | 612,192 $ | (79,412) | (13.0)% |
| | | | | | |
| Costs & Expenses: | | | | | |
| Lease Operating Expenses | | 1,179,729 | 1,332,548 | (152,819) | (11.5)% |
| Depletion, depreciation, amortization, and accretion | | 890,372 | 885,832 | 4,540 | 0.5 % |
| General & Administrative Expenses | | 11,195,409 | 4,519,811 | 6,675,598 | 147.7 % |
| Total Costs & Expenses | | 13,265,510 | 6,738,191 | 6,527,319 | 96.9 % |
| | | | | | |
| Gain on sale of assets | | — | 5,834,293 | (5,834,293) | 100 % |
| Loss from operations | | (12,732,730) | (291,706) | (6,447,907) | (2,210.4)% |
| | | | | | |
| Other income (expense): | | | | | |
| Interest Income | | 50,951 | 46,437 | 4,514 | 9.7 % |
| Interest Expense | | (759,300) | (172,143) | (587,157) | 341.1 % |
| Other, Net | | 267,195 | (180,943) | 448,138 | (247.7)% |
| Total other loss | | (441,154) | (306,649) | (134,505) | 43.9 % |
| Loss before income taxes | | (13,173,884) | (598,355) | (6,582,412) | 1,100.1 % |
| Benefit (provision) for income taxes | | (608,500) | 608,500 | (1,217,000) | 200.0 % |
| | | | | | |
| Net loss | $ | (13,782,384) $ | 10,145 $ | (13,792,529) | N/A % |

\*                    \*                    \*

| | Year Ended December 31, | | Change | Change % |
|---|---|---|---|---|
| | 2024 | 2023 | | |
| Costs and expenses: | | | | |
| Lease operating expenses | $ 1,179,729 | $ 1,332,548 | $ (152,819) | (11.5)% |
| Depletion, depreciation, amortization and accretion | 890,372 | 885,832 | 4,540 | 0.5 % |
| General and administrative expenses | 11,195,409 | 4,519,811 | 6,675,598 | 147.7 % |
| Total costs and expenses | $ 13,265,510 | $ 6,738,191 | $ 6,527,319 | 96.9 % |

29.     The FY24 10-K further purported to describe the company's liabilities, including its asset retirement obligations, as well as the manner in which the Company accounted for its asset retirement obligations. The FY24 10-K alleged that "*[t]o the extent future revisions to these assumptions impact the present value of the existing asset retirement obligations, a corresponding adjustment is generally made to the crude oil and natural gas property balance.*" Specifically, the FY24 10-K stated as follows, in relevant part:

11

| LIABILITIES AND STOCKHOLDERS' (DEFICIT) EQUITY | | | | |
|---|---|---|---|---|
| **Current liabilities** | | | | |
| Accounts payable | | 1,730,610 | | 1,472,961 |
| Accrued liabilities | | 319,327 | | 259,131 |
| Excise taxes payable | | 1,155,726 | | — |
| Withholding taxes payable | | 594,561 | | — |
| Share issuance liability | | 423,750 | | — |
| Convertible note, net of discount | | 2,233,712 | | — |
| Notes payable – current | | — | | 469,968 |
| Due to related parties | | 1,354 | | 886,113 |
| Lease liabilities – current | | — | | 12,690 |
| Other current liabilities | | 47,577 | | 45,059 |
| **Total current liabilities** | $ | 6,506,617 | $ | 3,145,922 |
| | | | | |
| Embedded derivative liability | | 309,181 | | — |
| Asset retirement obligation | | 2,198,064 | | 1,654,968 |
| Notes payable – noncurrent | | 2,217,823 | | 2,053,013 |
| **Total liabilities** | $ | 11,231,685 | $ | 6,853,903 |

\*                    \*                    \*

### Asset Retirement Obligations

The Company has significant obligations to remove tangible equipment and facilities and to restore the land at the end of oil and natural gas production operations. The Company's removal and restoration obligations are primarily associated with plugging and abandoning wells. Estimating the future restoration and removal costs is difficult and requires management to make estimates and judgments because most of the removal obligations are many years in the future and in some cases have vague descriptions of what constitutes removal. Asset removal technologies and costs are constantly changing, as are regulatory, political, environmental, safety and public relations considerations. Inherent in the present value calculation are numerous assumptions and judgments including the ultimate settlement amounts, credit-adjusted discount rates, timing of settlement and changes in the legal, regulatory, environmental and political environments. ***To the extent future revisions to these assumptions impact the present value of the existing asset retirement obligations, a corresponding adjustment is generally made to the crude oil and natural gas property balance.***

12

30.     On May 15, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC. The quarterly report announced the Company's financial results, including its revenue, operating expenses, and AROs. The quarterly report also purported to describe the manner in which the Company purportedly accounted for asset retirement obligations. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended March 31, | |
| | 2025 | 2024 |
|---|---:|---:|
| **Revenues, net** | | |
| Oil, natural gas, and product sales, net | $ 326,455 | $ 329,211 |
| **Total Revenues, net** | 326,455 | 329,211 |
| | | |
| **Costs and expenses** | | |
| Lease operating expenses | 260,480 | 503,560 |
| Depletion, depreciation, amortization, and accretion | 198,409 | 244,044 |
| General and administrative expenses | 1,936,654 | 745,064 |
| **Total Costs and expenses** | 2,395,543 | 1,492,668 |
| | | |
| **Loss from operations** | (2,069,088) | (1,163,457) |
| | | |
| **Other income (expenses)** | | |
| Change in fair value of derivative asset | (15,403) | — |
| Change in fair value of derivative liability | 190,977 | — |
| Interest income | 15,380 | 16,594 |
| Interest expense | (1,442,122) | (60,338) |
| Other, net | — | 66,799 |
| **Total Other income (expenses), net** | (1,251,168) | 23,055 |
| | | |
| **Loss before provision for income taxes** | (3,320,256) | (1,140,402) |
| | | |
| Benefit for income taxes | — | 281,370 |
| **Net loss** | $ (3,320,256) | $ (859,032) |

\*               \*               \*

For the three months ended March 31, 2025, depletion, depreciation, amortization and accretion expense decreased $45,635, as compared to the three months ended March 31, 2024. This decrease was primarily due to a $50,000 decrease in depletion expense related to lower sales volumes and a decrease in the depletion rates, partially offset by a ***$14,000 increase in accretion expense associated with Asset Retirement Obligations.***

\*               \*               \*

**Asset retirement obligations**

*The Company records a liability for asset retirement obligations ("ARO") associated with its oil and gas wells when the well has been completed. The ARO is recorded at its estimated fair value, measured by the expected future cash outflows required to satisfy the abandonment and restoration discounted at our credit-adjusted risk-free interest rate.* The corresponding cost is capitalized as an asset and included in the carrying amount of oil and gas properties and is depleted

13

over the useful life of the properties. Subsequently, the ARO liability is accreted to its then-present value.

The Company records a liability for asset retirement obligations ("ARO") associated with its oil and gas wells when the well has been completed. The ARO is recorded at its estimated fair value, measured by the expected future cash outflows required to satisfy the abandonment and restoration discounted at our credit-adjusted risk-free interest rate. The corresponding cost is capitalized as an asset and included in the carrying amount of oil and gas properties and is depleted over the useful life of the properties. Subsequently, the ARO liability is accreted to its then-present value.

Inherent in the fair value calculation of an ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement, and changes in the legal, regulatory, environmental, and political environments. To the extent future revisions to these assumptions impact the fair value of the existing ARO liability, a corresponding adjustment is made to the oil and gas property balance. Settlements greater than or less than amounts accrued as ARO are recorded as a gain or loss upon settlement. This gain or loss is recorded to the oil and gas property balance.

*    *    *

The following table shows the change in the Company's ARO liability for the three months ended March 31, 2025 and the year ended December 31, 2024:

| | | |
|---|---|---|
| Asset retirement obligations, December 31, 2024 | $ | 2,198,064 |
| Accretion expense | | 54,932 |
| Asset retirement obligations, March 31, 2025 | $ | 2,252,996 |

31. On August 14, 2025, the Company submitted its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC. The quarterly report announced the Company's financial results, including its alleged revenue, operating expenses, and AROs. The quarterly report also reiterated the manner in which the Company purportedly accounted for asset retirement obligations. Specifically, the quarterly report stated as follows, in relevant part:

14

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| **Revenues, net** | | | | |
| Oil, natural gas, and product sales, net | $ 209,114 | $ 20,377 | $ 535,569 | $ 349,588 |
| Total Revenues, net | 209,114 | 20,377 | 535,569 | 349,588 |
| | | | | |
| **Costs and expenses** | | | | |
| Lease operating expenses | 308,385 | 225,368 | 568,865 | 728,927 |
| Depletion, depreciation, amortization, and accretion | 232,018 | 255,149 | 430,427 | 499,193 |
| General and administrative expenses | 1,532,520 | 1,043,122 | 3,469,174 | 1,788,186 |
| Total Costs and expenses | 2,072,923 | 1,523,639 | 4,468,466 | 3,016,306 |
| | | | | |
| Loss from operations | (1,863,809) | (1,503,262) | (3,932,897) | (2,666,718) |
| | | | | |
| **Other income (expense)** | | | | |
| Interest income | 10,948 | 8,074 | 26,328 | 24,668 |
| Interest expense | (1,515,986) | (79,484) | (2,958,108) | (139,822) |
| Change in fair value of derivative asset | 156,659 | — | 141,256 | — |
| Change in fair value of derivative liability | (99,274) | — | 91,703 | — |
| Other, net | (294,542) | 66,799 | (294,542) | 133,597 |
| **Total other (expense) income, net** | (1,742,195) | (4,611) | (2,993,363) | 18,443 |
| Loss before income taxes | (3,606,004) | (1,507,873) | (6,926,260) | (2,648,275) |
| | | | | |
| Income tax expense | — | 418,114 | — | 699,484 |
| Net loss | $ (3,606,004) | $ (1,089,759) | $ (6,926,260) | $ (1,948,791) |

*                    *                    *

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Natural gas | $ 591,188 | $ 198,375 | $ 1,273,349 | $ 708,109 |
| Less gathering and processing | (445,649) | (220,666) | (847,746) | (522,800) |
| Natural gas, net | 145,539 | (22,291) | 425,603 | 185,309 |
| NGL | 63,575 | 73,630 | 109,966 | 139,679 |
| Oil | — | (30,962) | — | 24,600 |
| Total Revenue, net | $ 209,114 | $ 20,377 | $ 535,569 | $ 349,588 |

*                    *                    *

For the three months ended June 30, 2025, depletion, depreciation, amortization and accretion expense decreased $23,131, as compared to the three months ended June 30, 2024. This decrease was primarily due to a $39,000 decrease in depletion expense related to lower sales volumes and a decrease in the depletion rates, partially offset by a ***$14,000 increase in accretion expense associated with Asset Retirement Obligations.***

*                    *                    *

*Asset Retirement Obligations.*

The Company has significant obligations to remove tangible equipment and facilities and to restore the land at the end of oil and natural gas production operations. The Company's removal and restoration obligations are primarily associated with plugging and abandoning wells. Estimating the future restoration and removal costs is difficult and requires management to make estimates and

judgments because most of the removal obligations are many years in the future and in some cases have vague descriptions of what constitutes removal. Asset removal technologies and costs are constantly changing, as are regulatory, political, environmental, safety and public relations considerations. Inherent in the present value calculation are numerous assumptions and judgments including the ultimate settlement amounts, credit-adjusted discount rates, timing of settlement and changes in the legal, regulatory, environmental and political environments. ***To the extent future revisions to these assumptions impact the present value of the existing asset retirement obligations, a corresponding adjustment is generally made to the crude oil and natural gas property balance.***

\*　　　　　　\*　　　　　　\*

The following table shows the change in the Company's ARO liability for the six months ended June 30, 2025 and the year ended December 31, 2024:

| | |
|---|---:|
| Asset retirement obligations, December 31, 2023 | $ 1,654,968 |
| Liabilities sold | (26,780) |
| Liabilities settled | (28,087) |
| Change in estimated | 435,067 |
| Accretion expense | 162,896 |
| Asset retirement obligations, December 31, 2024 | $ 2,198,064 |
| | |
| Asset retirement obligations, December 31, 2024 | $ 2,198,064 |
| Accretion expense | 109,864 |
| Asset retirement obligations, June 30, 2025 | $ 2,307,928 |

32.　　　On October 6, 2025, the Company announced "the commencement of Phase Two engineering for Texas Critical Data Centers LLC ("TCDC"), its flagship data center and power development project located in West Texas." The press release touted that the Company had made "tangible progress across all fronts including engineering, ***permitting, regulatory filings***, and land expansion," "highlighted ***significant progress on obtaining air permits***" and stated that "***TCDC is pursuing a minor source air permit.***" Specifically, the press release stated as follows, in relevant part:

New Era recently announced the completion of Phase One engineering for the TCDC project [read here], its joint venture with Sharon AI Inc. TCDC has now advanced into Phase Two engineering, focusing on detailed site planning, site clearing, and infrastructure integration for the data center campus. TCDC is collecting bids for site clearing, with work expected to begin within the next 60 days.

***TCDC also highlighted significant progress on obtaining air permits.*** The data center site is located in an air-quality attainment zone, a positive factor differentiating it from other data center projects. ***TCDC is pursuing a minor source air permit, a streamlined process that allows up to 250 tons of emissions per year***

16

*and can typically be approved within 90 days.* By comparison, a major source air permit under current air emission standards can take 18 months or longer. TCDC believes its flexibility to develop multiple power islands under minor source air permitting standards provides another key competitive advantage, setting its data center campus apart from other developments.

*        *        *

E. Will Gray II, CEO of New Era Energy & Digital, commented: "*We are making tangible progress across all fronts including engineering, permitting, regulatory filings, and land expansion*. Additionally, our financial status update located within the October 3rd 8-K reflects the Company's continued commitment to transparency and disciplined execution as we advance Phase Two of the TCDC project. I would also like to thank our significant investor who supported the Company during the de-SPAC process through convertible notes, the remaining balance of which management strategically converted during periods of higher trading volume in conjunction with an equity line of credit. These notes are now fully satisfied, strengthening our balance sheet and providing the cash reserves needed to advance through Phase Two and beyond. With the additional 203 acres, we now have the capacity to scale TCDC to 1 gigawatt, positioning New Era at the forefront of AI-powered infrastructure."

33.     On November 4, 2025, New Era Energy filed an investor presentation with the SEC as Exhibit 99.1 to a Form 8-K. The investor presentation touted the Company's alleged progress on its "flagship project" the Texas Critical Data Centers project. The presentation stated that "phase two" of the Company's 4-phase execution model included "*regulatory permitting*" and that phase two was "*underway*" for the Texas Critical Data Centers project. Specifically, the presentation stated as follows, in relevant part:

17



\*        \*        \*



34.     On November 13, 2025, the Company issued a press release announcing its third quarter 2025 results in part, and touting its financial results as follows in relevant part:

***For the quarter ended September 30, 2025, New Era reported total revenue of $159,411,*** primarily reflecting remaining natural gas operations as the Company continues its transition away from legacy energy activities. The Company reported a loss from operations of ($4,203,886) for the quarter. For the nine-month period, revenue totaled $694,980 with a loss from operations of ($8,136,783). These results reflect the Company's development-stage investments in engineering, site preparation, and the advancement of its digital infrastructure platform, as well as the ongoing wind-down of non-core production assets.

35.     On November 13, 2025, the Company submitted its quarterly report for the period ended September 30, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further announced the Company's financial results, including its revenue, operating expenses, and liabilities. The quarterly report also reiterated the manner in which the Company purportedly accounted for asset retirement obligations. Specifically, the quarterly report stated as follows, in relevant part:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| **Revenues, net** | | | | |
| Oil, natural gas, and product sales, net | $ 159,411 | $ 35,143 | $ 694,980 | $ 384,731 |
| **Total Revenues, net** | 159,411 | 35,143 | 694,980 | 384,731 |
| | | | | |
| **Costs & Expenses** | | | | |
| Lease Operating Expenses | 408,716 | 253,496 | 977,581 | 982,423 |
| Depletion, depreciation, amortization, and accretion | 236,096 | 193,712 | 666,523 | 692,906 |
| General & Administrative Expenses | 3,718,485 | 966,227 | 7,187,659 | 2,754,412 |
| **Total Costs & Expenses** | 4,363,297 | 1,413,435 | 8,831,763 | 4,429,741 |
| | | | | |
| Loss from operations | (4,203,886) | (1,378,292) | (8,136,783) | (4,045,010) |
| | | | | |
| **Other income (expenses):** | | | | |
| Interest income | 12,799 | 12,919 | 39,127 | 37,587 |
| Interest expense | (1,830,334) | (128,016) | (4,788,442) | (267,838) |
| Change in fair value of derivative asset | (151,257) | - | (10,001) | - |
| Change in fair value of derivative liability | 456,483 | - | 548,186 | - |
| Loss on Investment in Joint Venture | (66,805) | - | (66,805) | |
| Other, net | (173) | 66,799 | (294,715) | 200,396 |
| **Total other income (expenses)** | (1,579,287) | (48,298) | (4,572,650) | (29,855) |
| | | | | |
| Income (Loss) Before Income Taxes | (5,783,173) | (1,426,590) | (12,709,433) | (4,074,865) |
| | | | | |
| Benefit (provision) for income taxes | - | 349,348 | - | 1,048,832 |
| **Net loss** | (5,783,173) | (1,077,242) | (12,709,433) | (3,026,033) |

*                           *                           *

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Natural gas | $ 476,402 | $ 194,822 | $ 1,749,751 | $ 902,931 |
| Less gathering and processing | (372,191) | (214,129) | (1,219,937) | (736,928) |
| Natural gas, net | 104,211 | (19,307) | 529,814 | 166,003 |
| NGL | 55,200 | 53,028 | 165,166 | 192,706 |
| Oil | - | 1,422 | - | 26,022 |
| Total Revenue, net | $ 159,411 | $ 35,143 | $ 694,980 | $ 384,731 |

*                           *                           *

For the nine months ended September 30, 2025, depletion, depreciation, amortization and accretion expense decreased $26,383, as compared to the nine months ended September 30, 2024. This decrease was primarily due to a $67,000 decrease in depletion expense related to lower sales volumes and a decrease in the depletion rates, a $14,000 decrease in debt amortization costs, partially offset by a *$42,000 increase in accretion expense associated with Asset Retirement Obligations,* and a $13,000 increase in depreciation expense associated with the purchase of equipment during 2025.

*                           *                           *

*Asset Retirement Obligations.*

The Company has significant obligations to remove tangible equipment and facilities and to restore the land at the end of oil and natural gas production operations. The Company's removal and restoration obligations are primarily associated with plugging and abandoning wells. Estimating the future restoration and removal costs is difficult and requires management to make estimates and judgments because most of the removal obligations are many years in the future and in some cases have vague descriptions of what constitutes removal. Asset removal technologies and costs are constantly changing, as are regulatory, political, environmental, safety and public relations considerations. Inherent in the present value calculation are numerous assumptions and judgments including the ultimate settlement amounts, credit-adjusted discount rates, timing of settlement and changes in the legal, regulatory, environmental and political environments. *To the extent future revisions to these assumptions impact the present value of the existing asset retirement obligations, a corresponding adjustment is generally made to the crude oil and natural gas property balance.*

*                           *                           *

The following table shows the change in the Company's ARO liability for the nine months ended September 30, 2025 and the year ended December 31, 2024:

20

| | |
|---|---|
| Asset retirement obligations, December 31, 2023 | $ 1,654,968 |
| Liabilities sold | (26,780) |
| Liabilities settled | (28,087) |
| Change in estimated | 435,067 |
| Accretion expense | 162,896 |
| Asset retirement obligations, December 31, 2024 | 2,198,064 |
| | |
| Asset retirement obligations, December 31, 2024 | 2,198,064 |
| Accretion expense | 164,796 |
| Asset retirement obligations, September 30, 2025 | $ 2,362,860 |

36. The above statements identified in ¶¶26-35 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company overstated its progress in its permitting and regulatory filings for its flagship Texas Critical Data Centers project; (2) the Company was involved in a fraudulent scheme "to pocket revenues from hundreds of oil and gas wells in New Mexico" by transferring wells among related entities and then placing liability-bearing companies into bankruptcy to avoid plugging and remediation costs; (3) that, as a result, the Company's financial results were false and/or misleading; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

37. On December 12, 2025, at approximately 10:00 AM EST, market research media outlet Fuzzy Panda Research published the FP Report. The FP Report alleges among other things, that "of NUAI's 406 gas wells, 346 were acquired from companies that went bankrupt operating the very same wells, *including 87 wells from the company E. Will Gray II was CEO of and bankrupted himself, Remnant Oil.*" The FP Report states this was in line with prior companies run by New Era CEO, Gray, who "has a long history (~20 years) of incinerating value at oil & gas pink sheet companies" some seemingly on purpose to effectuate his own financial benefit. For

21

example, the report details how "Gray was Co-Founder & CEO of Remnant Oil, a private co, which went bankrupt in 2019 after *hundreds of 'regulatory violations'*" but that Remnant's wells were "*acquired in bankruptcy by a related party, Acacia Resources, and were then sold to Solis Partners, a subsidiary of New Era Energy.*" The FP Report states it "uncovered that Gray's playbook includes financial tricks to enrich insiders, like converting related party loans to equity or paying fees to friends and family." Specifically, the FP Report states as follows, in relevant part:

> The company originally came public as New Era Helium (NEHC) via a 2024 Roth SPAC, and we could find only 4 employees on LinkedIn. So shorting NUAI is essentially a bet against its CEO, E. Will Gray II, and its old gas wells, which a 3rd party study deemed uneconomic. *We uncovered that Gray has a long history (~20 years) of incinerating value at oil & gas pink sheet companies.* In fact, Gray was first accused of securities fraud back in 2007. The story of each Gray-led public company is basically the same: sketchy related party dealings, false promises and paid stock promotion often using the same promoters. And each time, retail investors lost big — on average, Gray's companies DECLINE -98%.

> We are short NUAI because we believe it is Gray's next flameout. New Era started off 2025 as a helium company where Gray pitched investors he would extract helium from old gas wells. He failed, so Gray changed the company's name and added the letters "AI" to the stock ticker. NUAI's stock popped 20x only after Gray began its >$1 million stock promotion campaign to push the fantasy that the company's 40+ year old deteriorating & money losing gas wells can power the AI revolution. Clearly, insiders disagreed as the CFO and 3 out of 4 independent board members quit.

> *          *          *

> A bet on New Era Energy (NUAI) is a bet on E. Will Gray II, so it's important to understand that Gray is NOT the successful visionary oil & gas entrepreneur he pretends to be. The reality is that Gray started as a medical device sales rep before pivoting to a long career as a pink-sheets CEO who pushes dreams of oil & gas riches to retail investors. **Gray was first accused of securities fraud back in 2007,** and his career since has been filled with **penny stock implosions that regularly engaged in paid stock promotion** and suspicious related party dealings. *We uncovered that Gray's playbook includes financial tricks to enrich insiders, like converting related party loans to equity or paying fees to friends and family.*

> *          *          *

> **Gray's History of Equity Erosion**

22

The results from Gray's stints as CEO are eerily consistent: Gray makes money while investors get drilled.

**Remnant Oil** *(private)* **= Bankruptcy + Related Party Payments** – *Gray was Co-Founder & CEO of Remnant Oil, a private co, which went bankrupt in 2019 after hundreds of "regulatory violations."* ProPublica uncovered Remnant "paid hundreds of thousands of dollars in consulting fees" to related parties owned by management. Remnant's "deteriorated wells" were described as the "industry dregs," so naturally they were *acquired in bankruptcy by a related party, Acacia Resources, and were then sold to Solis Partners, a subsidiary of New Era Energy (NUAI).*

38.     The FP Report further calls the Company's pivot to fueling AI companies a "fantasy." The FP Report alleges that, despite the Company "telling investors it's made significant progress" with its regulatory permitting, including for its regulatory permitting, "*no applications have even been submitted*." The FP states that according to "Texas, New Mexico and Federal government databases for the construction and environmental permits that NUAI will need to start building its data centers and power plants" the Company had not submitted *any* of its required permits, "*not even an application*." Specifically, the FR Report states as follows, in relevant part:

**Gov't Databases – NUAI's Has NOT Applied for Needed Permits**

We searched Texas, New Mexico and Federal government databases for the construction and environmental permits that NUAI will need to start building its data centers and power plants. *We found NOTHING – not even an application.*

Texas Commission on Environmental Quality would provide the air quality permit. It's supposed to be among the easier permits to get. *Yet searches under all possible permutations of NUAI, their subsidiaries, and project names shows no applications have even been submitted, despite NUAI telling investors it's made significant progress.*

23



Source: *TCEQ NSR Air Permit Search*

Experts in the field told us NUAI or any of its affiliates are required to get an air permit especially because they claim to plan to operate behind the meter, 24/7. "If they don't tie to the grid, they have to get a major source submission or permit for those gas units, no matter where they are in Texas"

39.     On this news, New Era's stock price fell $0.25 per share, or 6.9%, to close at $3.35 on December 12, 2025, on unusually heavy trading volume.

40.     On December 29, 2025, at approximately 12:30 PM EST, Hunterbrook Media published the HBM Report, reporting that the New Mexico Attorney General filed a lawsuit against New Era Energy, its subsidiary Solis Partners, LLC, and Gray, among others. The HBM Report publicized that New Mexico had recently filed a complaint alleging New Era Energy, Gray, and a network of affiliated companies, had orchestrated a "fraudulent oil-and-gas scheme" to "*siphon revenue from wells that produce fossil fuels while abandoning environmental cleanup obligations.*" The HBM Report details how the complaint "alleges a broader *pattern of fraudulent transfers, self-dealing, and false statements to regulators, including the use of shell entities and strategic bankruptcies to evade responsibility*." Specifically, the HBM Report states as follows, in relevant part:

New Mexico Attorney General Raúl Torrez just filed a sweeping enforcement lawsuit seeking to bar New Era from conducting business in New Mexico until certain conditions are met. The requirements include paying civil damages and penalties. This litigation collides with the company's push to develop a large, energy-intensive AI data center in the state.

***The lawsuit accuses New Era, its chief executive Everett Willard Gray II, and a network of affiliated companies of orchestrating a fraudulent oil-and-gas scheme. Allegedly, the defendants sought to siphon revenue from wells that produce fossil fuels while abandoning environmental cleanup obligations.***

\*                    \*                    \*

While the case involves hundreds of unplugged and inactive wells, the Attorney General emphasized that the lawsuit is not merely an environmental enforcement action. ***Instead, the complaint alleges a broader pattern of fraudulent transfers, self-dealing, and false statements to regulators, including the use of shell entities and strategic bankruptcies to evade responsibility.***

41.     According to the HBM Report, the scheme reportedly involved the Company, Gray, and a network of affiliated companies transferring wells among related entities, including New Era Energy and its subsidiary, Solis Partners "selling" wells to themselves, and then placing liability-bearing companies into bankruptcy to avoid plugging and remediation costs. Reportedly, New Era Energy was core to the scheme, in part by receiving and operating the most valuable gas wells, 87 in total, which were transferred from Acacia to Solis Partners, an entity the New Mexico complaint says was "dominated and controlled" by Gray, while leaving Acacia with the bulk of plugging and remediation liabilities. That transfer reportedly occurred in July, 2021. According to the complaint, the defendants, including New Era Energy, "thus received significant revenue (possibly into the millions of dollars) that they knew would otherwise be required to address" plugging and remediation costs. Specifically, the HBM Report stated as follows, in relevant part:

"New Era's sole revenue source is its producing gas wells in New Mexico, which are composed, in part, of the gas wells Solis Partners received from Remnant via Acacia," reads the lawsuit, referring to a series of companies tied to the alleged scheme.

25

Several of the entities named in the complaint were controlled directly by Gray, who purportedly deployed them in an elaborate corporate shell game. The scheme left New Mexico holding the bag and responsible for the plugging costs associated with hundreds of wells, the Attorney General alleges.

*           *           *

**How Gray Allegedly Masterminded the Scheme**

The complaint places Everett Willard Gray II at the center of the alleged activity, portraying him as the mastermind and primary beneficiary of the scheme.

According to the lawsuit, Gray was a founder and CEO of the original Remnant companies, a managing member behind Solis Partners, and the CEO of New Era Helium — now New Era Energy & Digital — creating what the state describes as a continuous chain of insider control across each stage of the alleged asset transfers. ProPublica reported that Remnant failed due to "regulatory violations, bad bets and the oil fields' age," leading to bankruptcy as "its leadership shuffled assets and liabilities between companies the executives managed."

The complaint alleges that Gray formed Solis Partners in June 2020 "to receive Remnant's best wells," at the same time his partners formed Acacia to take on Remnant's marginal and inactive wells, "thus ensuring that Acacia would not be able to meet its environmental obligations."

New Mexico further alleges that the most valuable gas wells — 87 in total — were transferred from Acacia to Solis Partners, an entity the complaint says was "dominated and controlled" by Gray, leaving Acacia with the bulk of plugging and remediation liabilities.

The complaint states that the bill of sale for those 87 gas wells listed a purchase price of just "$10," and that it is "currently unknown what consideration Acacia actually received" for the transfer.

The lawsuit alleges that Gray believed Remnant owed him at least $400,000, and that the transfer of the 87 gas wells was intended to satisfy that alleged insider debt, even though the debt was not disclosed or resolved in Remnant's bankruptcy proceedings.

"At the time of the C-145 application, Gray attempted to conceal his involvement in Solis Partners by directing Joel Solis to sign on behalf of Solis Partners," the complaint alleges.

C-145 is an application to change the operator of a well.

According to the lawsuit, the New Mexico Oil Conservation Division approved the transfer of the 87 gas wells on Feb. 2, 2022, unaware that Solis Partners was

26

controlled by a Remnant insider, and unaware that the transfer would deprive Acacia of a key revenue source.

The complaint alleges that Gray began drawing a salary of $273,000 per year from Solis Partners early that same year, and later received $475,000 per year as CEO of New Era, while revenues from the transferred gas wells continued to flow through Solis and into New Era's corporate structure.

"Gray dominated and controlled Solis Partners since its inception … and Solis Partners is an alter ego of Gray," the complaint alleges.

New Mexico also alleges that Gray orchestrated a reorganization under which Solis Partners became a wholly owned subsidiary of New Era, and that Solis later mortgaged more than $10 million of its assets to benefit New Era, even as Acacia collapsed into bankruptcy.

The complaint explicitly links Gray's alleged conduct to the state's financial exposure, asserting that:

"New Era's revenues are primarily drawn from the very wells Gray diverted out of Remnant and Acacia to Solis Partners," and that but for those transfers, Acacia or Remnant would have retained sufficient revenue to meet their plugging obligations.

Finally, New Mexico alleges that Gray's actions were not incidental or negligent but intentional, stating that the "intended outcome" of the scheme was to leave the state as the "plugger of last resort" for hundreds of wells after insiders extracted the remaining economic value.

42.     On this news, New Era's stock price fell $1.87, or 41%, to close at $2.69 per share on December 29, 2025, on unusually heavy trading volume.

## **CLASS ACTION ALLEGATIONS**

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired New Era Energy securities between November 6, 2024 and December 29, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, New Era Energy's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of New Era Energy shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by New Era Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of New Era Energy; and

28

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

49.     The market for New Era Energy's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, New Era Energy's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired New Era Energy's securities relying upon the integrity of the market price of the Company's securities and market information relating to New Era Energy, and have been damaged thereby.

50.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of New Era Energy's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about New Era Energy's business, operations, and prospects as alleged herein.

51.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the

29

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about New Era Energy's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

52.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

53.    During the Class Period, Plaintiff and the Class purchased New Era Energy's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

54.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding New Era Energy, their control

30

over, and/or receipt and/or modification of New Era Energy's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning New Era Energy, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

55.     The market for New Era Energy's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, New Era Energy's securities traded at artificially inflated prices during the Class Period.  On December 9, 2024, the Company's share price closed at a Class Period high of $8.50 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of New Era Energy's securities and market information relating to New Era Energy, and have been damaged thereby.

56.     During the Class Period, the artificial inflation of New Era Energy's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about New Era Energy's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of New Era Energy and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the

31

Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

57.    At all relevant times, the market for New Era Energy's securities was an efficient market for the following reasons, among others:

(a)    New Era Energy shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, New Era Energy filed periodic public reports with the SEC and/or the NASDAQ;

(c)    New Era Energy regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    New Era Energy was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

58.    As a result of the foregoing, the market for New Era Energy's securities promptly digested current information regarding New Era Energy from all publicly available sources and reflected such information in New Era Energy's share price. Under these circumstances, all purchasers of New Era Energy's securities during the Class Period suffered similar injury through their purchase of New Era Energy's securities at artificially inflated prices and a presumption of reliance applies.

59.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of New Era Energy who knew that the statement was false when made.

33

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

61.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase New Era Energy's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

63.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for New Era Energy's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about New Era Energy's financial well-being and prospects, as specified herein.

34

65.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of New Era Energy's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about New Era Energy and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

66.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

67.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing New Era Energy's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of New Era Energy's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired New Era Energy's securities during the Class Period at artificially high prices and were damaged thereby.

69.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff

36

and the other members of the Class and the marketplace known the truth regarding the problems that New Era Energy was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their New Era Energy securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

70. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

72. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73. Individual Defendants acted as controlling persons of New Era Energy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

37

statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.     As set forth above, New Era Energy and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

38

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  April 1, 2026                              Respectfully submitted,


 */s/ Joe Kendall*                              
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
Email: jkendall@kendalllawgroup.com

*Texas Local Counsel for Kevyn Annonio*

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
clinehan@glancylaw.com

Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  rdawson@glancylaw.com

*Counsel for Plaintiff Kevyn Annonio*