**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| KEVYN ANNONIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEW ERA ENERGY & DIGITAL, INC., EVERETT WILLARD GRAY II, and MICHAEL J. RUGEN,<br><br>Defendants. | Case No. 7:26-cv-00120-DC-RCG<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**


NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 5

PARTIES ........ 6

Background on New Mexico's Regulation of Marginal and Inactive Oil and Gas Wells ........ 7

The Dangers to Human Health and the Environment Posed by Marginal and Inactive Wells ........ 7

The New Mexico Oil and Gas Act, and OCD's Rules for Safe Plugging and Reclamation ........ 10

Factual Chronology On the Self-Dealing Transactions Behind the Wells At the Heart of the Fledgling Public Company, New Era Energy ........ 14

The Rise and Fall of Remnant ........ 14

1) Remnant Acquires Over 500 Wells, but Quickly Falls Out of Compliance with OCD Regulations ........ 14

2) Remnant Enters into a Settlement Agreement with OCD ........ 16

3) Remnant Violates the Settlement, but Continues to Pay Gray Lavish Consulting Fees ........ 17

4) Remnant Declares Bankruptcy ........ 17

5) Defendant Gray's Deposition Raises Red Flags and Derails the Remnant Bankruptcy ........ 18

6) The Bankruptcy Court Converts the Bankruptcy into a Liquidation, Then Prevents its Three Principals From Splitting Up the Company So That Remnant's ARO Liabilities are Separated From its Productive Assets ........ 24

Undeterred, Remnant's Three Officers Create Multiple New Entities and Engineer a Series of Transfers to Siphon Off Remnant's Best Wells into an Entity That Becomes New Era Energy While Pushing Remnant's ARO Liabilities and Marginal Wells Towards Bankruptcy ........ 25

1) The Acacia Entities ........ 25

2) Solis Partners ........ 27

3) **In Early 2022, Remnant Transfers its Best Oil Wells to Acacia By Means of Fraudulent Transfer Certifications ... 28**

4) **Also in Early 2022, Remnant Transfers its Best 87 Gas Wells to Solis By Means of a Fraudulent Transfer Certification ... 30**

5) **With the 87-Well Related-Party Transaction Complete, Remnant Dumps its Unprofitable Marginal and Inactive Wells into Acacia ... 33**

6) **Meanwhile, Since at Least Mid-2023, the State of New Mexico has been Investigating Violations of the New Mexico Oil and Gas Act with Respect to Plugging and Reclamation of Remnant's Orphan Wells, Bringing Scrutiny To The Current Owners of These Wells ... 35**

7) **The State Asserts A Claim against the Entire Bond (Signed by Gray) That Remnant Had Posted to Address Environmental Damage and Copies Gray on the Claim—Demonstrating that the Remnant/Acacia Liabilities Were Tangible, Extensive, and Actively Being Pursued ... 37**

8) **Saddled With Remnant's Bad Wells, Acacia Slumps Towards Bankruptcy ... 38**

9) **Even While Solis Had Received the Best-Producing Gas Wells From the Acacia/Remnant Portfolio, Solis Partners Was Having its Own ARO Compliance Problems ... 42**

10) **The Same Month That Acacia Goes Bankrupt, Solis Partners, Merged into New Era, Begins to Trade ... 47**

**New Era Energy's Registration Statement, Among other Deficiencies, Conceals These Related Party Transactions, Rendering it Materially False and Misleading ... 47**

**New Era Repeats the Same Misstatements in the Closely Related S-1 Prospectus, Filed As Part of the Same SPAC Transaction and Distribution Plan ... 52**

**Defendant Gray Personally Hypes Up the Company to Investors in Podcasts and Interviews ... 53**

**New Era's Class Period Filings Continue to Conceal These Related Party Transactions, Rendering them False and Materially Misleading ... 54**

1) **New Era's 2024 Annual Report, filed on March 31, 2025 ... 54**

2) **New Era's Three Quarterly Reports Filed in the Class Period ... 61**

**New Era Attempts A Hard and Desperate Pivot During the Class Period ... 64**

**The Truth Comes Out ....... 68**

1) **An Initial Short Report Challenges Defendants Gray and New Era's Narrative and Exposes Some of its Related-Party Dealings ....... 68**

2) **New Era and Gray Respond With Blanket Denials, and Direct Investors Back to the Very SEC Filings That Concealed the 87-Well Related Party Transaction .... 69**

3) **Hunterbrook Media Publicizes New Mexico's Complaint and its Detailed Investigation into the 87-Well Related-Party Transaction, Causing New Era's Stock to Plunge By 41% ....... 70**

**Post-Script ....... 71**

1) **New Era and Gray Respond to the HM Report with More Lies and Deflection ... 71**

2) **Several Months Later, the Trustee for the Acacia Bankruptcy Estate Reaches a Settlement for the Claims Under the Trustee's Control ....... 73**

**SUMMARY OF RELEVANT ACCOUNTING STANDARDS AND DISCLOSURE RULES ....... 73**

1) **Generally Accepted Accounting Principles ("GAAP") ....... 74**

2) **Item 404 of Regulation S-K ....... 78**

3) **Item 101 of Regulation S-K ....... 79**

**MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ....... 81**

**The Prospectus ....... 81**

1) **List of Related Party Transactions ....... 81**

2) **The Related Party Approval Process ....... 82**

3) **The Company's Acquisition of its Wells ....... 84**

4) **The Environmental Remediation Risk Disclosure ....... 85**

5) **The Federal and State Lands Risk Disclosure ....... 88**

6) **The Environmental Matters Contingency ....... 89**

**The S-1 Prospectus** ..... **91**

**The 2024 Annual Report** ..... **91**

**1) Certain Relationships and Related Transactions, and Director Independence** ..... **91**

**2) Related Party Policy** ..... **94**

**3) The Related Party Approval Process** ..... **95**

**4) The Company's Acquisition of its Wells** ..... **95**

**5) The Environmental Remediation Risk Disclosure** ..... **96**

**6) The Environmental Matters Contingency** ..... **97**

**7) The Updated Federal and State Lands Risk Disclosure** ..... **97**

**The Class Period 10-Qs** ..... **100**

**Defendants' Denial of the FP Report** ..... **100**

**LOSS CAUSATION** ..... **101**

**PLAINTIFFS' CLASS ACTION ALLEGATIONS** ..... **103**

**APPLICATION OF PRESUMPTION OF RELIANCE** ..... **104**

**SECURITIES ACT CLAIMS** ..... **105**

**COUNT I** ..... **105**

**Violations of Section 11 of the Securities Act Against All Defendants** ..... **105**

**COUNT II** ..... **107**

**Violations of Section 15 of the Securities Act Against the Individual Defendants** ..... **107**

**SECURITIES EXCHANGE ACT CLAIMS** ..... **108**

**COUNT III** ..... **108**

**Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants** ..... **108**

**COUNT IV** ..... **110**

**Violations of Section 20(a) of the Securities Exchange Act Against the Individual Defendants ..... 110**

**PRAYER FOR RELIEF..... 111**

**JURY TRIAL DEMANDED..... 112**

Lead Plaintiff Mitchell Patterson ("Patterson") and Named Plaintiffs Terry Oh ("Oh") and John Westbrook ("Westbrook") (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents and announcements made by Defendants, public filings, wire and press releases published by and regarding New Era Energy & Digital, Inc. ("New Era Energy" or "New Era" or the "Company") f/k/a New Era Helium, Inc., and information obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who (i) purchased the common stock of New Era Energy traceable to the registration statement and prospectus (together, the "Registration Statement") in connection with the Company's Initial Public Offering ("IPO") which closed on December 6, 2024 (the "Securities Act Class"); and/or (ii) who purchased the common stock of New Era Energy between December 9, 2024 and December 29, 2025, inclusive (the "Exchange Act Class").[1] This Complaint pursues

[1] The Securities Act Class and the Exchange Act Class are collectively referred to as the "Class." The period from December 9, 2024 to December 29, 2025 is referred to as the "Class Period." Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of New Era Energy; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

claims under Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

2. When New Era Energy went public by merging with a special-purpose acquisition company (or "SPAC") in December of 2024, it presented itself to investors as an emerging helium producer whose extensive portfolio oil and gas wells and reserves would support a vertically integrated helium business.

3. Helium exists naturally in some natural-gas streams, and New Era's plan was to extract oil and natural gas from the hundreds of producing oil and gas well that it owned across Southeastern New Mexico, process and sell the natural gas and, after it constructed the requisite processing plant, separate helium for sale in the future.

4. In its Prospectus forming part of the Registration Statement in connection with the Company's December 6, 2024 IPO, in fact, New Era Energy touted that it had "over 400 operated and producing wells," that those wells were supported by reserve reports generated by a third-party reservoir engineer, and further that the Company "believes its core strengths are its inventory of drilling locations, its commitment to further pioneering responsibly sourced helium (helium sourced from responsibly sourced gas), and its experienced management team."

5. The Company explained that it owns and operates all of its producing oil and gas assets through one of the Company's two subsidiaries, known as Solis Partners (or "Solis"). The Company stated in no uncertain terms that Solis was "the primary asset from which we plan to expand our helium footprint."

6. What the Company did not tell investors, however, was that the heart of Solis's portfolio of New Mexico oil and gas wells consisted of a hand-picked selection of 87 of the best gas wells from the portfolio of a defunct oil and gas operator known as Remnant.

7. Defendant Gray and his two business partners started and operated Remnant, and had driven it into bankruptcy years earlier, leaving behind massive environmental obligations for the State of New Mexico to pay for while Defendant Gray and his two partners engineered a series of related party transactions to siphon off the best gas wells to Solis Partners.

8. The result of this series of underhanded transactions was that Remnant's marginal and liability-laden wells landed with a related party known as Acacia – which itself declared bankruptcy in December of 2024, the very same month that New Era Energy began to trade – while the 87 best gas wells were funneled into Solis Partners (the so-called "87-Well Related-Party Transaction") and powered New Era Energy to a NASDAQ listing.

9. Even though the Company was required to disclose the 87-Well Related-Party Transaction under GAAP and several SEC disclosure rules and to provide information sufficient to render their affirmative statements not misleading, New Era's Prospectus concealed the conflicted and related-party origin of its gas wells and operating business. More, the Company even omitted the 87-Well Related-Party Transaction from the table purporting to set forth the Company' related party transactions that took place in 2022 and 2023.

10. The 87-Well Related-Party Transaction was completed in 2022 when Remnant transferred its best gas wells to Solis, and the conflicted and related-party nature of this transaction jumps forth from the page: Defendant Gray himself signed the regulatory transfer form seeking approval for the transfer as Managing Member of transferor Remnant, even while he managed and controlled Solis Partners, the transferee and future subsidiary of New Era Energy.

11. In addition to concealing the 87-Well Related-Party Transactions and the risks that stemmed from it – which rendered New Era's financial statements materially incomplete and prevented investors from accurately evaluating the Prospectus and appraising the true value of the

newly public company – the Prospectus also contained a series of false and misleading statements concealing the reality that Solis had picked up right where Remnant left off and, by the time New Era Energy went public, had its own mounting regulatory noncompliance and environmental obligations due to the State of New Mexico.

12. In fact, while the Prospectus assured investors that New Era was "not aware of any remediation for which we may be responsible at this time," that was not true, on multiple levels: New Era, through its subsidiary Solis, was severely non-compliant in its plugging, remediation and reclamation obligations to the State; Defendant Gray was personally involved in the correspondence (both letters and emails) between Solis and the State of New Mexico over these remediation obligations stretching back to 2023; and in fact the New Mexico State Land Office ("SLO") would send Defendant Gray and Solis a formal Cease-and-Desist letter, following up on the Company's long-running delinquencies and identifying "serious compliance issues" and remediation responsibilities the very next week.

13. Accordingly, the Prospectus concealed both the conflicted, related party nature of the 87-Well Related-Party Transaction and how it shifted Remnant's best gas assets to Solis while pushing Remnant's remediation and environmental liabilities towards bankruptcy, as well as the Company's own long-overdue and mounting remediation and reclamation obligations.

14. Defendants repeated these materially false and misleading representations and culpable omissions in their public filings throughout the Class Period.

15. Investors did not learn the truth until December of 2025, when two short seller reports and a sprawling lawsuit filed by the State of New Mexico pulled back the curtain and revealed how New Era's operating business had been built upon the undisclosed 87-Well Related-Party Transaction, and how the series of transactions masterminded by Defendant Gray was an

elaborate ploy that separated Solis and New Era's productive operating gas wells from plugging, remediation, and environmental reclamation obligations owed to the State.[2]

16. When investors learned that the gas wells that stood at the heart of New Era Energy's public listing had been siphoned away from an oil and gas portfolio harboring major unsatisfied remediation and reclamation obligations to the State and that Defendant Gray had masterminded such a deceptive scheme, the price of New Era Energy's stock plummeted, losing over 40% in a single day. Defendants are liable to the investors who bought traceable to New Era Energy's defective Registration Statement and those who bought at a price inflated by Defendants' wrongful acts and omissions complained of herein.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o), and Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because substantial acts in furtherance of the conduct complained of occurred in this district, and because New Era Energy has its principal place of business in this district.

[2] The breadth of the fraudulent scheme the State of New Mexico's complaint lays out in detail is shocking, and involves false certifications on numerous regulatory forms over the course of several years. That complaint is attached as hereto as Exhibit 1.

20. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of national securities markets.

**PARTIES**

21. Lead Plaintiff Mitchell Patterson, as set forth in the PSLRA certification submitted in connection with his Lead Plaintiff motion, incorporated by reference herein, purchased New Era Energy common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein.

22. Named Plaintiff Terry Oh purchased New Era Energy common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein. Plaintiff Oh purchased shares traceable to the Registration Statement. His PSLRA certification is attached hereto as Exhibit 2.

23. Named Plaintiff John Westbrook purchased New Era Energy common stock during the Class Period at artificially inflated prices and suffered damages as a result of the federal securities law violations alleged herein. His PSLRA certification is attached hereto as Exhibit 3.

24. Defendant New Era Energy is incorporated under the laws of Nevada with its principal executive offices located at 4501 Santa Rosa Drive, Midland, Texas, 79707. New Era Energy's common stock trades on the NASDAQ under the symbol "NUAI."[3]

25. Defendant Gray served as the Company's CEO from before its public offering, throughout the entire Class Period, until June 30, 2026, when he transitioned from the role of the

[3] On August 13, 2025, the Company was renamed from New Era Helium, Inc. (NASDAQ: NEHC) to New Era Energy & Digital (NASDAQ: NUAI).

Company's CEO to the role of President, Permian Basin. Defendant Gray also served as a member of the Company's board of directors during the Class Period. He resigned from the Company's board of directors on June 30, 2026.

26. Defendant Rugen served as the Company's CFO from before the Company's public offering, until he resigned on April 22, 2025, effective May 31, 2025, at which time Defendant Gray became interim CFO while also still continuing to serve as CEO.

27. Defendants Gray and Rugen (together, the "Individual Defendants"), because of their positions in the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts and investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and filings alleged to be misleading herein and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts supplied herein had not been disclosed to, and were being concealed from, the public, and the representations being made were materially false and/or misleading. The Individual Defendants are liable for the materially false and/or misleading statements pleaded herein.

28. New Era Energy and the Individual Defendants are collectively referred to herein as "Defendants."

## BACKGROUND ON NEW MEXICO'S REGULATION OF MARGINAL AND INACTIVE OIL AND GAS WELLS

### The Dangers to Human Health and the Environment Posed by Marginal and Inactive Wells

29. A conventional oil or gas well is only productive for a finite period of time, with the average productive lifecycle of a well being between 20 and 30 years.

30. During the course of a well's productive life, oil and gas production steadily declines, and the well gradually becomes less profitable as time goes on.

31. Wells that are near the end of their productive lifecycle but still producing small amounts of oil or gas are often called "marginal" or "stripper" wells.[4]

32. Low production does not mean low risk, however.

33. Long after a well ceases to be economically viable, the wellbore, casing, cement, wellhead, tanks, flowlines, and related equipment remain. If not properly maintained, plugged and remediated, these structures can leak oil, gas, brine, hydrogen sulfide, methane, volatile organic compounds, and other contaminants into the air, soil, and groundwater.

34. Methane released by marginal wells contributes to smog, which has been linked with reduced lung function, asthma, and early death from respiratory and cardiovascular disease.[5] Methane emissions from inactive wells also contribute substantially to climate change, as methane traps 82.5 times as much heat in the atmosphere as the same amount of carbon dioxide over a twenty-year period.[6]

---

[4] New Mexico regulations define a "[s]tripper well property" as "an oil producing property" that, during the preceding year, "produced a daily average of less than 10 barrels of oil . . . per day," or "a gas producing property" that "produced a daily average of less than 60,000 cubic feet of gas . . . per day." 19.15.6.7(M) NMAC. If a well produces both oil and gas, then a stripper well is one with "a daily average of less than 10 barrels of oil . . . per day . . . , as determined by converting the volume of gas the well produced to barrels of oil by using a ratio of 6000 cubic feet to one barrel of oil." *Id.* In addition, the I.R.S. defines a stripper well property as one that produces 15 or less barrels-of-oil equivalent per day. 26 U.S.C. § 613A(c)(6)(E).

[5] United Nations Environment Program, *Global Methane Assessment: Benefits and Costs of Mitigating Methane Emissions* (2021), https://wedocs.unep.org/items/4d9774f8-1a9d-42d1-be2c-122408159b15.

[6] P. Forster et al., Intergovernmental Panel on Climate Change, *The Earth's Energy Budget, Climate Feedbacks and Climate Sensitivity*, Chapter 7 in *Climate Change 2021 – The Physical Science Basis: Working Group I Contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* at 923-1054, 1017 Cambridge University Press, (2023), https://www.ipcc.ch/report/ar6/wg1/chapter/chapter-7.

35. Marginal and inactive wells also emit benzene and toluene, which present public health threats including increased risks for asthma and leukemia.[7] Gas from abandoned wells can also leak into tap water, bringing toxins and risk of explosion.[8] The health impact of living near marginal wells has not been fully studied, however, living near producing wells has been correlated with worse respiratory, cardiovascular, and reproductive outcomes.[9]

36. Accordingly, while marginal wells produce a very small share of oil and gas in the United States, they make an outsized contribution to oil and gas methane emissions.

37. This harm to human health and the environment is eminently avoidable: In New Mexico, an average unplugged well emits roughly 120 kg of methane each year, while an average plugged well emits less than 0.1 kg per year.[10]

38. The timely remediation of marginal wells is therefore critical to the human and environmental health in New Mexico and everywhere else where oil and gas is extracted.

---

[7] Ningrui Liu et al., *Health effects of exposure to indoor volatile organic compounds from 1980 to 2017: A systematic review and meta-analysis*, 32 Indoor Air 5 (May 2022), https://onlinelibrary.wiley.com/doi/10.1111/ina.13038.

[8] Nicholas Kusnetz, Propublica, *Deteriorating Oil and Gas Wells Threaten Drinking Water Across the Country* (Apr. 4, 2011), https://www.propublica.org/article/deteriorating-oil-and-gas-wells-threaten-drinking-water-homes-across-the-co; Abrahm Lustgarten, Propublica, Injection Wells: The Poison Beneath Us (June 21, 2012), https://www.propublica.org/article/injection-wells-the-poison-beneath-us ("When injection wells intersect with fracked wells and abandoned wells, the combined effect is that many of the natural protections assumed to be provided by deep underground geology no longer exist.").

[9] J.A. Deighton et al., *Measurements show that marginal wells are a disproportionate source of methane relative to production*, 70 J. of Air & Waste Mgmy Ass'n 10, 1030 (Sept. 3, 2020), https://doi.org/10.1080/10962247.2020.1808115.

[10] *See* Tianyang Lei et al., *A global inventory of methane emissions from abandoned oil and gas wells and possible mitigation pathways*, 12 National Science Review 7, 9 (July 2025), https://doi.org/10.1093/nsr/nwaf184.

**The New Mexico Oil and Gas Act, and OCD's Rules for Safe Plugging and Reclamation**

39. New Mexico law reflects these risks and, like other states, requires inactive wells to be plugged and remediated within a certain period of time.

40. An oil and gas operator's duty to plug an oil and gas well and reclaim and remediate the site at the end of its productive life is an asset retirement obligation, or "ARO." AROs are often referred to as "plugging and abandonment" or "P&A" obligations.

41. AROs exist at common law and have been codified in New Mexico statute since 1935, when the New Mexico Oil and Gas Act created the Oil Conservation Division, or the "OCD," and empowered it to make rules requiring the plugging and reclamation of oil and gas wells. N.M. Laws 1935, Ch. 78 § 10(1).

42. Specifically, oil and gas operators have a duty to "either properly plug and abandon a well or place the well in approved temporary abandonment in accordance with 19.15.25 NMAC within 90 days after . . . a period of one year in which a well has been continuously inactive." 19.15.25.8(B) NMAC.

43. In addition, as relevant here, operators of between 101 and 500 wells are out of compliance with OCD regulations if they have more than five wells out of compliance with the plugging requirements of 19.15.25.8 NMAC. *See* 19.15.5.9(A) NMAC.

44. To enable OCD oversight, operators are required to report their wells' production to OCD. 19.15.7.24 NMAC. This reporting informs OCD's list of inactive wells, which is then updated daily. *See* 19.15.5.9(B) NMAC; https://wwwapps.emnrd.nm.gov/ocd/ocdpermitting/reporting/Compliance/InactiveWells.aspx.

45. OCD can order any well to be plugged and declare it abandoned by the operator if the operator is out of compliance with any statute or rule. NMSA 1978, § 70-2-14. OCD may also

seek compliance, penalties, and injunctive relief through civil actions. NMSA 1978, § 70-2-31(A)(2).

46. On average, it costs OCD $164,000 to plug an oil and gas well, while the cost of remediation and reclamation is "more variable and can cover a wide range from $50,000 to restore the surface around a plugged well, to several million dollars" where contamination is extensive.[11]

47. When an operator defaults on its plugging obligations, money from the State's Oil and Gas Reclamation Fund – which OCD administers and is drawn in part from the oil and gas conservation tax – may be used to cover the shortfall between the actual plugging costs and any financial assurance collected from the operator.

48. The oil and gas industry's contributions alone, though, are insufficient to tackle the scope of the State's well-plugging liability.

49. Accordingly, to address the human and environmental harm from leaking wells, avoid waste, and allow land to be put to other productive uses, the State of New Mexico must assume responsibility for plugging wells whose operators have defaulted. The State therefore serves as the plugger of last resort for these wells.

50. With the State ultimately on the hook, OCD's regulations attempt to weed out delinquent operators.

51. For instance, OCD's regulations are designed to identify and prevent the registration of new operators that are insiders of noncompliant operators. OCD "may deny

---

[11] Energy Minerals and Natural Resources Division, *Annual Report 2024* at 58, https://www.emnrd.nm.gov/officeofsecretary/wp-content/uploads/sites/2/emmrd_annual_report_2024.pdf; *see* OCD, *Orphan Well Plugging & Site Remediation Update* at 3 (Dec. 1, 2023), https://www.nmlegis.gov/handouts/RHMC%20120123%20Item%202%20EMNRD%20OCD%20-%20Orphan%20Well%20&%20Financial%20Assurance.pdf.

registration as an operator if . . . an officer, director, partner in the applicant or person with an interest in the applicant exceeding 25 percent, is or was within the past five years an officer, director, partner or person with an interest exceeding 25 percent in another entity that is not currently in compliance with Subsection A of 19.15.5.9 NMAC." 19.15.9.8(B)(2) NMAC; 19.15.9.8 NMAC ("Prior to commencing operations, an operator of a well or wells in New Mexico shall register with the division as an operator.").

52. OCD's regulations are also designed to identify and prevent the transfer of wells to operators that are noncompliant. OCD may deny a Change-of-Operator application if "(1) the new operator is not in compliance with Subsection A of 19.15.5.9 NMAC; or (2) the new operator is acquiring wells, facilities or sites subject to a compliance order requiring remediation or abatement of contamination, or compliance with 19.15.25.8 NMAC, and the new operator has not entered into an agreed compliance order setting a schedule for compliance with the existing order." 19.15.9.9(C) NMAC.

53. In addition, OCD requires that the owners or officers of transferee operators not be the same owners or operators of existing non-compliant operators. To effect a transfer, an officer or representative of the transferee company must certify and initial several statements and declarations on OCD's C-145 Change-of-Operator form, including the declaration that "[n]o person with an interest exceeding 25% in the undersigned company is, or was within the last 5 years, an officer, director, partner or person with a 25% or greater interest in another entity that is not currently in compliance with Subsection A of 19.15.5.9 NMAC."

54. Accordingly, under New Mexico law, the private conveyance of an interest in oil-and-gas properties is distinct from the regulatory transfer of operatorship. A "change of operator" occurs when the entity responsible for a well or group of wells changes, at which point the wells

are moved from the OGRID number of the operator recognized by OCD to the proposed new operator's OGRID number. 19.15.9.9(A) NMAC. The existing operator and proposed new operator must jointly submit a Form C-145, and the proposed operator is prohibited from commencing operations unless and until OCD approves the application. 19.15.9.9(B) NMAC.

55. Before operating, the new operator must also be registered with OCD, possess an OGRID number, and provide the required financial assurance; OCD may not approve the operator change until that financial assurance is in place. 19.15.9.8(A) NMAC; 19.15.8.12(B) NMAC. Accordingly, although parties may privately assign ownership or economic interests before OCD approval, the C-145 approval is the legally necessary act that changes the operator recognized by the State, moves wells between OGRIDs, and permits the new operator to commence operations.

56. OCD's oversight depends on operators making truthful representations on C-145s and other forms. Without truthful representations and candor from operators, the OCD lacks the resources to effectively oversee, *inter alia*, operator registrations and well transfers in the State.

57. While the cost of complying with AROs is reasonably calculable, foreseeable, and should be accounted for by oil and gas operators from the moment a well is drilled, a moral hazard arises because these costs inevitably arise only at the end of a well's life span.

58. Unfortunately, some oil and gas operators do not take their AROs seriously. Instead, after drilling and operating the wells – and reaping the benefits for themselves – these bad actors transfer their declining wells to smaller operators, who similarly operate the wells for a while before sending them to even smaller operators.

59. Hopeful that they will effectively able to pass the buck to the state, these companies deliberately neglect to account for, or maintain sufficient funds in reserve for, the eventual plugging and abandonment of their wells. Money that should be earmarked for well-plugging is

instead used for other purposes, such as being paid out in distributions to owners or dividends to shareholders.

60. At some point, the value of the remaining oil and gas revenues for a well invariably falls below its clean-up costs. A bankruptcy is the predictable result, through which these bad actors try to shirk their ARO obligations and leave the cost of plugging and remediating these so-called "orphan wells" to the state.

61. This is the modus operandi of Defendant Gray and his cronies.

## FACTUAL CHRONOLOGY ON THE SELF-DEALING TRANSACTIONS BEHIND THE WELLS AT THE HEART OF THE FLEDGLING PUBLIC COMPANY, NEW ERA ENERGY

### The Rise and Fall of Remnant

#### *1) Remnant Acquires Over 500 Wells, but Quickly Falls Out of Compliance with OCD Regulations*

62. Remnant was founded in 2015 as WS Oil and Gas Operating, before changing its name to Remnant in 2017. The company served as a vehicle for its three principals and business partners – (1) Defendant Gray, (2) Robert Stitzel, and (3) Marquis Reed Gilmore, Jr. – to acquire hundreds of aging New Mexico oil and gas wells with diminishing output from a handful of oil and gas operators.

63. Remnant's three principals controlled and owned the company through a variety of entities, as depicted in the diagram[12] below:

[12] Sarah Hughes-Gray is the remaining 16.6% owner of Remnant Oil Operating. Sarah Gray is also a codirector of First Gray Corp.; LuAnn Gilmore is a co-director of Bluebird Energy Corp.; and Roxie Stitzel is a codirector of Stitzel Corp.


Robert Stitzel
Marquis Reed Gilmore, Jr.
Everett Will Gray II
Member
Director
Manager
Director
Presi-dent
Director
Founder and CEO
Stitzel Corp.
Cibolo Energy Resources LLC
Bluebird Energy Corp.
First Gray Corp.
General Partner
Provided and Acquired DIP Loans
General Partner
General Partner
RS Resou-rces Ltd.
Gilmore Oil and Gas Ltd.
WS Oil and Gas Ltd.
33.3% Owner
33.3% Owner
16.6% Owner
Remnant Oil Operating LLC AKA Remnant Oil Company LLC (formerly WS Oil and Gas Operating LLC)
KEY
: Individuals
: Corporate Entities
: Limited Partnership Entities
: Limited Liability Companies
Text : Relationship with Companies Below

64. Remnant amassed a portfolio of over 500 wells. Shortly after Remnant acquired its portfolio of aging wells, around October 2017, Remnant's production reached its peak. The portfolio's output declined precipitously thereafter.

65. With its production falling, Remnant was unable to meet its bonding obligations to the State of New Mexico.

66. By late 2018, over 50 of Remnant's wells were out of compliance with New Mexico regulations set forth at 19.15.25.8 NMAC, meaning that the wells had been inactive long enough that Remnant was required to plug or properly remediate them, but had not done so.

67. As 19.15.5.9 NMAC provides that an operator with 101 to 500 wells is out of compliance if it has more than five wells out of compliance with 19.15.25.8, Remnant had over ten times the permitted number of inactive wells.

***2) Remnant Enters into a Settlement Agreement with OCD***

68. In December 2018, Remnant entered into a Settlement Agreement with OCD for violating the New Mexico Oil and Gas Act. The Settlement Agreement identified Everett Willard Gray II as the officer of record for Remnant.

69. In it, Remnant stipulated that it was out of compliance with OCD regulations and responsible for correcting that non-compliance.

70. Remnant stipulated that it "will return to production, plug and abandon, or temporarily [abandon] forty (40) wells in accordance with 19.15.25.10 NMAC, at a minimum rate of 3 per month over 7 months between the signing of this Agreement and July 31, 2019."

71. Remnant further stipulated that it will pay civil penalties per day for each day it is out of compliance with the terms of the Settlement Agreement.

72. The Settlement Agreement was signed by "E. Will Gray II" as CEO of Remnant.

### *3) Remnant Violates the Settlement, but Continues to Pay Gray Lavish Consulting Fees*

73. Remnant shirked its obligations under the Settlement Agreement just as it had shirked its obligations under the Oil and Gas Act.

74. Just a few months after Gray, on behalf of Remnant, signed the Settlement Agreement with the OCD, Remnant secured a $2,869,397.73 loan from FirstCapital Bank, which renewed and extended a previous note.

75. After receiving this loan, however, Remnant did not plug any of its inactive wells, post the required financial assurance, place the wells in temporary abandonment, or otherwise comply with the terms of the Settlement Agreement.

76. Instead of honoring its commitment to the State, Remnant funneled the money directly to Defendant Gray. Between August 2018 and July 2019, Remnant made payments totaling $468,733.93 to Gray, through Gray's company, WS Oil and Gas Limited, allegedly for consulting services and expenses.

### *4) Remnant Declares Bankruptcy*

77. On July 16, 2019 – just two weeks before the Settlement Agreement's compliance deadline of July 31 – Remnant filed for Chapter 11 bankruptcy. Remnant's bankruptcy petition was signed by Defendant Gray, as CEO of Remnant, and witnessed by Remnant's other two managers, Gilmore and Stitzel.

78. The same day, Gray filed a Declaration in the Remnant bankruptcy. That Declaration stated that Remnant operates 480 wells. In addition, it said that Remnant owns "142 wells that are offline and not capable of producing economically at today's prices."

79. Gray's Declaration insisted that "Remnant owns valuable assets but lacks necessary working capital to unlock their potential."

80. According to the initial schedule of assets in the bankruptcy that Remnant filed on August 27, 2019, Remnant claimed that its oil and gas assets had a market value of $22,000,000.

***5) Defendant Gray's Deposition Raises Red Flags and Derails the Remnant Bankruptcy***

81. In connection with the bankruptcy, Defendant Gray's deposition was taken on October 23, 2019. It revealed numerous indicia of troubling insider dealing and alarmingly informal corporate practices at Remnant.

82. In his deposition, Gray stated that he was the most qualified person at Remnant to testify concerning Remnant's financial transactions, organization hierarchy, oil and gas production, and other key topics.

83. Gray provided background on the founding and operation of Remnant, explaining that his two business partners in the venture are Reed Gilmore and Bob Stitzel. He further explained that, while his formal title is CEO of Remnant Oil and managing member of Remnant Oil Operating LLC, the three partners – Gray, Gilmore and Stitzel – "share equal partnership" in Remnant.[13]

84. Gray also clarified that while there are technically two separate entities, Remnant Oil Company and Remnant Operating, the two entities are "one and [the] same."[14]

85. On the formation of the Company, Gray explained that the three partners each contributed oil and gas wells into Remnant "on day one."[15]

---

[13] *In Re: Remnant Oil Company LLC*, 19-bk-70106 (Bankr. W.D. Tex.), Dkt. No. 232-1 ("Gray Deposition") at 144-145, 205.
[14] *Id*. at 31.
[15] *Id*. at 85-86.

86. Gray stated that he had purchased the company's initial oil and gas assets in 2015 under the entity WS Oil and Gas, Limited, and then transferred them into Remnant, in which the two partners owned an equal interest.[16]

87. Gray provided a confusing account of the three partners' financial contributions to Remnant involving a complex series of notes, but the upshot was that Gray believed that Remnant currently owed Gray (through an entity Gray owned and controlled, WS Oil and Gas) $400,000.[17]

88. That $400,000 debt to Gray was not addressed in the Remnant bankruptcy.

89. Asked about potential environmental problems at Remnant's wells, Defendant Gray admitted that there are several, but also insisted that these issues are not daunting.[18]

90. Asked whether there are outstanding issues with the New Mexico Oil and Gas Commission that would prevent the transfer of Remnant's wells, Gray acknowledged that Remnant was currently out of compliance with the New Mexico Oil Conservation Division. Typically, Gray acknowledged, when an operator is not in compliance, the operator cannot transfer wells to other operators. However, Gray continued that "in speaking with the Assistant Attorney General of New Mexico, he said if we brought a qualified buyer, they would waive that."[19] Gray stated that this was a verbal agreement, not in writing. He also clarified that a "qualified buyer" means "anyone that has cash."[20]

[16] *Id*. at 186-190.
[17] *Id*. at 36-37, 39, 193.
[18] *Id*. at 118-119.
[19] *Id*. at 119.
[20] *Id*.

91. Gray continued that a buyer of Remnant's wells would not need a license from the State of New Mexico to acquire ownership of the wells, but a buyer would need a license to actually operate the wells.[21]

92. Later in his deposition, Gray again confirmed that Remnant owns wells with unmet P&A liabilities, and that Remnant is delinquent in New Mexico's state bonding requirements.[22]

93. Gray testified that he and his two business partners – Gilmore and Stitzel – are in charge of the Remnant bankruptcy and also that, because all his money is in the company, he is very motivated to ensure a successful Chapter 11 bankruptcy for Remnant.[23]

94. When asked about an offer Remnant had received to buy certain oil and gas assets, Gray gave a rambling answer suggesting Remnant had rejected the deal, but then acknowledged that the offeror had pulled out of the deal after seeing Remnant's financials.[24]

95. Next, Gray was asked about an email he had written to a potential buyer of other Remnant assets in which Gray expressed the view that the offer was too low and that Remnant insiders – meaning Gray, Gilmore and Stitzel – would buy the assets themselves "before we give them away." Gray stated in the deposition that the Remnant insiders would consider buying the assets themselves out of bankruptcy.[25]

96. Gray also testified that, as of the filing of the bankruptcy petition, Remnant's plan was to sell off only certain assets while retaining and reorganizing around others.[26]

[21] *Id*. at 119-120.
[22] *Id*. at 251-253.
[23] *Id*. at 243, 162-163.
[24] *Id*. at 174-178.
[25] *Id*. at 181-184.
[26] *Id*. at 122.

97. Gray was asked about Remnant's financial statements for the year end 2018 that appeared to present total assets as $1,058,000 and total liabilities as $17,274,000. Asked about why these numbers appeared out of line with the value of these assets that Gray had been referencing throughout his testimony, Gray provided the following answer that did not clear up the confusion:

> A: So, essentially, when you look at what we've our assets less depreciation, I mean we've – we've – for value versus a market value there's – that's just two different worlds. So let's just say someone was buy a – a brand-new Porsche for 20 bucks, but you can sell it for $20,000, you'd book it that you bought it for 20. So, for instance, when we bought – you know, we bought a lot of these assets, we bought – we bought inexpensively [] So – I'm sorry.
>
> Q: And has Remnant provided these consolidated sheets to any third parties, I mean, outside of here?
>
> A: Just – just our – our financial institution Capital Bank.
>
> Q: Are these accurate to the best of you knowledge?
>
> A: Yes, sir.[27]

98. Gray admitted that there was no operating agreement between Remnant Oil Company and Remnant Oil Operating, and no board meetings were held for those companies.[28]

99. Even as Gray explained that Remnant Operating operates oil and gas leases owned by Remnant Oil Company, Remnant Operating never billed Remnant Oil Company for its services. Asked how much Remnant Oil owes to Remnant Operating, Gray testified that he did not know because "[w]e just have never done it that way on accounting purposes" and "[w]e just basically transfer the money over, what's necessary from Remnant Oil Company to Remnant Oil Operating."[29]

---

[27] *Id*. at 231.
[28] *Id*. at 195-196; 202.
[29] *Id*. at 198.

100. Just as troubling, even though the various Remnant entities maintained separate books, management treated them like a single entity, as the three principals – Gray, Gilmore and Stitzel – would decide when to move money back and forth between the Debtors' bank accounts.[30]

101. Gray also acknowledged that Remnant paid consulting fees to the three business partners without consulting agreements, including a typical $25,000 payment to an entity owned and controlled by Gray.[31]

102. More, when questioned about so-called "accrued consulting fees" that Gray received in large amounts shortly before the bankruptcy, Gray explained:

> Q. Okay. When it says "Accrued Consulting Fee," does that mean?
> A. There were a lot of times during the history company when I wouldn't get paid my monthly fee, so it would accrue.
> Q. Why did Remnant Oil Operating make the pay accrued consulting fee shortly before the bankruptcy?
> A. We felt that – that would be appropriate to get me caught up – help me in getting me caught up.
> Q. So is it fair to say when it says "consulting that relates to the typical $25,000 payment to WS Oil and when it says "Accrued Consulting Fee" that is a some past amount due.
> A. Correct.[32]

103. The month after the Gray Deposition, in November 2019, several of Remnant's creditors filed a motion to convert the Chapter 11 proceedings to a Chapter 7 liquidation because

[30] *Id*. at 239-240.
[31] *Id*. at 240.
[32] *Id*. at 240-41.

Remnant's Chapter 11 had become an insider-conflicted reorganization attempt marked by mismanagement, runaway losses, insider payment issues, and environmental-liability concerns.

104. While Chapter 11 would have allowed Remnant to try to reorganize and continue operating under insider influence, Chapter 7 would mean that Remnant cannot continue as a going concern, and an independent trustee would take control and liquidate Remnant's assets.

105. The creditors argued that Remnant could not be trusted to reorganize under existing management on the grounds that "Debtors [Remnant] have been grossly mismanaged," are "experiencing substantial and continuing losses," and "current management is conflicted."

106. The creditors asserted that "[c]urrent management seeks to pay insider equity contributions as legitimate debt and received significant transfers of money in the one-year period prior to bankruptcy."

107. Specifically, in a section entitled "Irreconcilable Conflicts Exist," the creditors argued that, in the year prior to the bankruptcy petition, WS and RS (the entities controlled by Gray and Stitzel, respectively) paid themselves over $720,000 from Remnant, even though there were no formal consulting agreements in place.

108. Moreover, the creditors pointed out that Gray's deposition testimony admitting that, right before the bankruptcy, he had received lump sum, past due consulting fees to help Gray "in getting caught up some" did not pass the smell test because, as Gray also acknowledged, Remnant had *always* been insolvent.[33]

[33] *See id*. at 232.

### *6) The Bankruptcy Court Converts the Bankruptcy into a Liquidation, Then Prevents its Three Principals From Splitting Up the Company So That Remnant's ARO Liabilities are Separated From its Productive Assets*

109. On April 13, 2020, the bankruptcy judge held a hearing on the conversion motion. The judge granted the conversion motion the next day.

110. Shortly after the conversion, Remnant's three principals – Defendant Gray, Gilmore and Stitzel – formed a placeholder company called NewCo Energy Resources LLC (or "NewCo") to bid on certain of Remnant's wells.

111. To obscure the reality that NewCo was really a placeholder company formed by Gray, Gilmore and Stitzel, they papered NewCo as an independent entity run by someone named Karl Winter.

112. Karl Winter is a business associate of Gilmore's attorney, Hap May. Winter was also initial manager for Acacia Resources, as discussed below.

113. NewCo made an offer to buy a subset of Remnant's wells, which was presented to the bankruptcy court for approval on June 8, 2020.

114. The provider of the surety bonds that Remnant had pledged to OCD in connection with Remnant's environmental liabilities, Lexon Insurance Company (or "Lexon"), objected to Newco's offer.

115. Lexon's objection was that the proposed sale to Newco "seeks to only sell a portion of the Debtors' assets, and appears to exclude, or otherwise abandon, assets covered by at least 11 of the Lexon Bonds. Based on the above, the Debtors' estates may be left without the capabilities to perform their environmental obligations."

116. Thus, Lexon observed that splitting up Remnant's inventory of wells to skim off and segregate the higher-producing wells would make it much more likely that the remaining

wells would be abandoned to the State, which would then have the right to forfeit the financial assurance provided by Lexon.

117. Lexon urged that "[i]n any sale, the buyer should be forced to purchase all of the assets of the Debtors and, in doing so, be made to replace all of the outstanding Lexon Bonds by the time of the closing of the sale. A sale of less than 100% of the assets would leave the bankruptcy estate without adequate assets to complete the plugging and abandonment and decommissioning required by 28 U.S.C. § 959(b)."

118. The bankruptcy court agreed. Lexon's objection was addressed at a June 23, 2020, hearing, at which the proposed sale order was modified to include language clarifying that the sale would include not just the subset of wells identified in the proposed sale order, but "substantially all of the assets of the Debtors," thereby keeping Remnant's productive wells together with its marginal and inactive wells laden with liabilities to the State.

**Undeterred, Remnant's Three Officers Create Multiple New Entities and Engineer a Series of Transfers to Siphon Off Remnant's Best Wells into an Entity That Becomes New Era Energy While Pushing Remnant's ARO Liabilities and Marginal Wells Towards Bankruptcy**

119. While its creditors were objecting to Remnant's attempts to sell off only part of its inventory and abandon its environmental liabilities in bankruptcy, Gray, Stitzel and Gilmore plotted their next move: They formed multiple new companies that were designed, once again, to split Remnant's assets in a way that would separate the producing wells from the high-liability wells, ensuring that these liabilities would be passed on to the State once those undercapitalized companies defaulted or filed for bankruptcy.

***1) The Acacia Entities***

120. In June 2020, Hap May – Gilmore's attorney and business associate of Karl Winter – set up Acacia Resources to replace NewCo and acquire Remnant's assets.

121. In late June 2020, the bankruptcy court approved the sale of Remnant's assets to Acacia, and Remnant's estate received deposits totaling $402,000 from Hap May in July.

122. That sale price represented a stunning contrast to the $22,000,000 value of its oil and gas assets that Remnant had provided less than a year earlier.

123. Only after the bankruptcy court approved the sale of Remnant's assets to Acacia did Gilmore replace Winter as manager of Acacia Resources.

124. In addition, Acacia Operating was formed in New Mexico in August 2020. Acacia Resources is the sole member and 100% shareholder of Acacia Operating. Acacia Resources is owned 80% by Gilmore and 20% by Stitzel. Acacia Operating and Acacia Resources are collectively referred to as "Acacia."

125. The final sale order provided that the sale of Remnant's wells to Acacia was made subject to certain specified debts, but none of the enumerated debts or liens included any debt to Defendant Gray or his entities. The order expressly provided that beyond the specified debts, the sale was "free and clear of liens, claims, interests and encumbrances."

126. Acacia acquired the wells subject to Remnant's existing environmental liabilities, with the final approved sale order providing:

> Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability of a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory laws.

127. The sale was also subject to any "contingent liabilities to . . . governmental entities related to owning, operating and plugging the wells." Acacia therefore acquired Remnant's wells

subject to all obligations and requirements imposed by New Mexico's oil and gas regulations, and all obligations and requirements imposed by the 2018 Settlement Agreement with OCD, including the daily civil penalties.

128. Although money was sent from Acacia Resources to Remnant's bankruptcy estate in July 2020 (and the sale was recorded on July 27, 2020), the wells could not be operated by Acacia or formally transferred until: (i) Acacia registered as a new operator; (ii) Remnant and Acacia filed the required C-145 Change-of-Operator applications with OCD; and (iii) OCD approved those applications. *See* 19.15.9.9(B) NMAC ("The new operator shall not commence operations until the division approves the application for change of operator.").

129. Accordingly, in September 2020, Stitzel reached out to OCD to register Acacia Operating as a new operator in the State of New Mexico.

130. During Stitzel's correspondence to establish Acacia Operating in 2020, Stitzel did not inform OCD that Gilmore was a majority owner of Acacia Resources, the sole member of Acacia Operating, nor did he inform OCD that he, Stitzel, was an officer of Remnant. Rather, he distanced himself from Remnant in his correspondence with OCD by describing Remnant as "negligent in filing production," and asserting that Acacia was "out of compliance due to forces outside its control" because of "[p]revious operators [sic] nonfiling." Thus, he petitioned OCD for a "fresh start" for Acacia.

131. Acacia's Operating's registration was approved by OCD on February 5, 2021.

***2) Solis Partners***

132. At the same time Stitzel and Gilmore were creating Acacia, Solis Partners was formed in June 2020 to receive a specialized subset of Remnant's assets, a set of gas wells that represented one of the few consistent sources of revenue from Remnant's portfolio.

133. From its inception in June 2020 to the present, Defendant Gray was the de facto organizer and owner of Solis Partners, and Solis Partners was an alter ego of Defendant Gray.

134. Defendant Gray provided his own contact email (with a domain name belonging to Solis Partners—will.gray@solispartnersllc.com) when he registered Solis Partners with the New Mexico Secretary of State.

135. Defendant Gray also directed that any correspondence regarding Solis Partners' registration, including its certificate, be sent to his email. Initially, Solis Partners' three partners were listed as Joel G. Solis, Casey Solis, and Robert Solis.

136. In July 2020, Solis Partners registered with OCD as a new operator, with Gray named as its point of contact.

137. With Solis Partners set up in the OCD system, the parties laid the foundation for the later transfer. On December 29, 2020, Karl Winter authorized Acacia to sell to Solis certain wells and leases for an agreed sales price of $400,000. In July 2021, Acacia and Solis executed an Assignment and Bill of Sale purporting to privately convey the specified assets, which expressly contemplated that the parties would execute the additional federal and state forms necessary to obtain governmental "recognition of the transfer."

### *3) In Early 2022, Remnant Transfers its Best Oil Wells to Acacia By Means of Fraudulent Transfer Certifications*

138. In January and February 2022, Remnant transferred its best oil wells to Acacia by means of fraudulent transfer certifications on Form C-145s.

139. Stitzel signed these C-145s on behalf of Acacia, as transferee, and Gilmore signed on behalf of Remnant, as transferor. These C-145 Forms are attached hereto as Exhibit 4.

140. In each of these C-145 applications, Stitzel initialed the declaration affirming, *inter alia*, that "no person with an interest exceeding 25% in the undersigned company is, or was within

the last 5 years, an officer, director, partner or person with a 25% or greater interest in another entity that is not currently in compliance with Subsection A of 19.15.5.9 NMAC," despite the facts that, at the time of these statements, a) Gilmore had an 80% interest in Acacia Resources, which was the sole member of Acacia Operating, so that Gilmore had an 80% interest in Acacia Operating; b) Remnant was out of compliance with Subsection A of 19.15.5.9 NMAC; and c) Gilmore was a director, officer or partner of Remnant.

141. Gilmore signed these Forms as President of the previous operator and transferor, Remnant Oil Operating, and so was aware of the false representations on the C-145s.

142. Based on these false signed statements, OCD approved the transfer from Remnant to Acacia of 72 wells in January and February 2022. These oil wells represented Remnant's best oil assets.

143. When it approved these transfers, OCD did not realize that the principals of Remnant were, in effect, transferring wells to themselves.

144. Based on this transfer of mostly producing oil wells, OCD had no reason to question whether Acacia would be able to satisfy associated well plugging and remediation obligations.

145. As Gray, Stitzel and Gilmore were carving up Remnant's assets, they understood that substantial portions of the portfolio were impaired and burdened by unresolved regulatory obligations. Not only was that apparent from the events that had transpired in the Remnant bankruptcy, but one can see it in the correspondence between Stitzel and OCD as the parties prepared to submit the necessary forms and obtain OCD approval for the operator changes.

146. During that process, on December 15, 2021, Stitzel sent OCD an "Acacia Injection Well List" and asked what testing would be required to return those former Remnant injection wells to service. Ex 5.

147. A few weeks later, OCD advised Stitzel that all of the former Remnant waterflood projects and saltwater-disposal wells on Stitzel's list had lost their injection authority, lacked valid UIC permits, and had to remain shut in. OCD provided a detailed well-by-well assessment, and further advised that resuming operations would require new permit applications, formal hearings for the waterflood projects, additional pressure testing, and, for some, resolution of existing violation letters.

148. With the regulatory transfer process about to begin, then, that correspondence confirmed the starkly different condition of assets outside the Solis gas-well package from those within it. In other words, Acacia's principal received detailed notice that significant former Remnant injection and disposal assets were legally nonoperational, required new permits and testing, and were burdened by unresolved violations and integrity concerns, yet the Remnant principals nevertheless proceeded to execute the regulatory transfers through which Solis obtained operatorship of the selected gas wells while Acacia assumed operatorship over substantial portions of the remaining portfolio.

***4) Also in Early 2022, Remnant Transfers its Best 87 Gas Wells to Solis By Means of a Fraudulent Transfer Certification***

149. At the same time that Remnant and Acacia submitted the false C-145 applications to OCD to transfer Remnant's best oil wells, Gray made an application to OCD to transfer Remnant's best 87 gas wells to Solis Partners. These wells had been sold to Acacia in the Remnant bankruptcy, but no transfer application had been submitted to OCD, so OCD records still listed Remnant as the operator.

150. Unlike the Remnant-to-Acacia transfer applications (which were signed by Gilmore on behalf of Remnant as transferor), the C-145 Change-of-Operator application to Solis Partners was signed on behalf of transferor Remnant by Defendant Gray as Remnant's "Managing Member," on January 25, 2022, with Joel Solis signing as "Managing Partner" for transferee Solis Partners:

1/25/2022 C-145

**District I**
1625 N. French Dr., Hobbs, NM 88240
Phone:(575) 393-6161 Fax:(575) 393-0720
**District II**
811 S. First St., Artesia, NM 88210
Phone:(575) 748-1283 Fax:(575) 748-9720
**District III**
1000 Rio Brazos Rd., Aztec, NM 87410
Phone:(505) 334-6178 Fax:(505) 334-6170
**District IV**
1220 S. St Francis Dr., Santa Fe, NM 87505
Phone:(505) 476-3470 Fax:(505) 476-3462

**State of New Mexico**
**Energy, Minerals and Natural Resources**
**Oil Conservation Division**
**1220 S. St Francis Dr.**
**Santa Fe, NM 87505**

Form C-145
Revised May 19, 2017

Permit 307103

**Change of Operator**

| **Previous Operator Information** | | **New Operator Information** | |
|---|---|---|---|
| | | Effective Date: | Effective on the date of approval by the OCD |
| OGRID: | 370922 | OGRID: | 330238 |
| Name: | REMNANT OIL OPERATING, LLC | Name: | Solis Partners, L.L.C. |
| Address: | P.O. Box 5375 | Address: | P.O. Box 5790 |
| | | | |
| City, State, Zip: | Midland, TX 79704 | City, State, Zip: | Midland, TX 79704 |

I hereby certify that the rules of the Oil Conservation Division ("OCD") have been complied with and that the information on this form and the certified list of wells is true to the best of my knowledge and belief.

Additionally, by signing below, Solis Partners, L.L.C. certifies that it has read and understands the following synopsis of applicable rules.

…

1/25/2022 C-145

I hereby certify I understand the above. The statements I have made are true and correct and a condition precedent to the Oil Conservation Division accepting this Change of Operator.

| **Previous Operator** | | **New Operator** | |
|---|---|---|---|
| Signature: | EW Gray | Signature: | [signature] |
| Printed Name: | Everett W. Gray II | Printed Name: | JOEL SOLIS |
| Title: | Managing Member | Title: | MANAGING PARTNER |
| Date: | 01/26/2022 Phone: (832) 270-6479 | Date: | 01/25/22 Phone: 432-208-3963 |

Permit 307103

…

**NMOCD Approval**

Electronic Signature(s): Rob Jackson, District 2
Date: February 02, 2022

The complete C-145 Form is attached hereto as Exhibit 6.

151. At the time of the C-145 application, Defendant Gray attempted to conceal his involvement in Solis Partners by directing Joel Solis to sign on behalf of Solis Partners. *See* Ex. 1 at ¶133.

152. The application obscures the reality that Defendant Gray is on both sides of this transfer, making it a related party transaction. The application is also false because Solis is the alter ego of Gray, who is a director, officer or partner of Remnant, which is out of compliance with Subsection A of 19.15.5.9 NMAC.

153. Unaware that Solis Partners was associated with Remnant or the Defendant Gray, OCD approved the transfer of 87 wells from Remnant to Solis Partners on February 2, 2022, officially completing the 87-Well Related Party Transaction. Ex. 1 at ¶¶134-135 ("Unaware that Solis Partners was associated with Remnant or the Individual Defendants, OCD approved the

transfer of 87 wells from Remnant to Solis on February 2, 2022. Transfer of the 87 wells to Solis Partners was not complete until OCD approved the transfer application on February 2, 2022.").

154. In fact, the OCD and the State of New Mexico would later explain how they were unaware of Solis' connection to Remnant and only learned of it in the course of investigating the Acacia bankruptcy. Ex. 1 at ¶201.

155. At some point in early 2022, Gray started drawing a $273,000 salary from Solis Partners, including health insurance benefits.

156. In later C-145 transfer applications between Solis Partners and other entities, Gray signed on behalf of Solis Partners.

157. Because, at the time these 87 gas wells were transferred to Solis Partners, Remnant had not yet filed any applications with OCD to transfer Remnant's remaining low-production and inactive wells to Acacia, the ultimate impact of the loss of these producing gas wells on Acacia's revenue – and therefore on Acacia's ability to satisfy its ARO obligations to the State – was not apparent to OCD.

***5) With the 87-Well Related-Party Transaction Complete, Remnant Dumps its Unprofitable Marginal and Inactive Wells into Acacia***

158. On September 14, 2023, more than a year and a half after Remnant had transferred its best oil wells to Acacia and its best gas wells to Solis, Stitzel and Gilmore submitted an application to transfer another set of 146 wells from Remnant to Acacia, including many inactive wells. This C-145 transfer form was false for the same reasons as the earlier ones. Ex. 7.

159. OCD rejected the transfer that same day, because Acacia already had four inactive wells out of a portfolio of 69 wells, in violation of 19.15.5.9(A)(4)(a) NMAC; needed additional financial assurance to cover its requested portfolio of wells; and needed prior approval from the Bureau of Land Management (BLM) for the transfer of wells with federal leases. *See* Ex. 8.

160. At some point in Spring 2024, Acacia informed OCD for the first time that it had acquired all of Remnant's assets in bankruptcy.

161. Seeking to do anything in its power to ensure that the operator of these wells remain outside of bankruptcy, on July 8, 2024, OCD agreed to manually approve the batch transfer and waive the $150 filing fee, because each inactive well required a separate C-145, and Acacia could not afford to pay a $150 filing fee for each of the hundreds of wells it still needed to transfer.

162. In August 2024, OCD approved the transfer of Remnant's remaining wells to Acacia. These were the dregs of the portfolio and consisted of the overwhelming majority of Remnant's inactive and marginal wells—including 12 wells that OCD had already approved for plugging using State funds; it also included 43 of the 52 wells that were included in the Settlement Agreement between Remnant and OCD.

163. By the time Acacia received these unprofitable wells and their plugging liabilities in August 2024, and the reality of Acacia's imbalanced portfolio of low-production and high-liability wells became apparent, the transfer of the producing natural gas wells to Solis Partners had been approved and complete for more than two-and-a-half years.

164. Had OCD been aware of the connection between Solis and Remnant or had an accurate picture of Acacia at the time of the application seeking to transfer the best gas wells to Solis Partners in early 2022, it would never have approved this series of transfers.

165. Had the 87 producing gas wells remained with the rest of Remnant's portfolio and gone to Acacia rather than being siphoned off to Solis Partners, Acacia could have put the revenue generated by those wells towards satisfying its well-plugging obligations.

166. Accordingly, Defendant Gray thus ensured that his company, Solis Partners, would obtain the best of Remnant's gas assets, while Acacia would assume the marginal oil wells, along with all of the plugging and remediation liabilities that Acacia could not afford to pay.

***6) Meanwhile, Since at Least Mid-2023, the State of New Mexico has been Investigating Violations of the New Mexico Oil and Gas Act with Respect to Plugging and Reclamation of Remnant's Orphan Wells, Bringing Scrutiny To The Current Owners of These Wells***

167. With the AROs due on Remnant's wells still unsatisfied well into 2023, the State of New Mexico stepped up its enforcement actions in an attempt to protect the State from shouldering the burden of these orphan wells.

168. In 2023, the State wrote to Defendant Gray, Gilmore, Stitzel and others, demanding that they comply with their obligations and begin plugging wells in the field.

169. In particular, the New Mexico State Land Office exchanged a lengthy series of letters concerning Remnant and Acacia's unpaid environmental obligations to the state and unplugged wells with Acacia's representatives starting in May of 2023.

170. In January of 2024, Acacia's representatives made the State of New Mexico a formal proposal to address these Acacia/Remnant AROs. Ex. 9.

171. Acacia prefaced its proposal by blaming Acacia's prior management for the severe lack of compliance, claiming that "Acacia feels confident it can address the SLO's issues due to the fact that is now under new management. This is in response to the prior management's lack of response and severe inaction on issues the state has brought forward. The new management team seeks to maintain professionalism, integrity, and authenticity, and respects state resources with the highest regard. This team also hopes to restore and maintain a good working relationship with all regulatory and state agencies on Acacia's behalf."

172. This is the same tactic Stitzel used when he was registering Acacia as an operator with the State initially, blaming the so called "[p]revious operators" and petitioning OCD for a "fresh start" for Acacia.

173. Acacia offered, *inter alia*, to immediately create a $200,000 sinking fund with the intent of funding plug and abandonment operations; to grant a 50% royalty to the State Land Office on leases where trespass production is owed to repay trespass penalties; and to commit to plugging eight wells per year, over the course of approximately ten years, to address the list of delinquent wells set out in various letters sent by the State Land Office.

174. In this private correspondence with the State Land Office, with Gilmore – manager of both Remnant and Acacia – copied on the letter, Acacia urged: "This is estimated to cost Acacia $560,000 per year, which is a significant cost for a small operator like Acacia."

175. The State's answer, in February 2024, was that "[w]hile Remnant and Acacia should have started plugging the inactives they operate a long time ago (on their own leases as well as those held by third parties), we expect Remnant/Acacia to immediately begin making plans to plug inactives on their own leases, especially but not limited to expired leases."

176. The State continued that "Remnant/Acacia's 'proposal' to plug less than one well per month is a non-starter," and advised Acacia's counsel to "[t]ell your client to get serious and develop a bona fide work plan that doesn't take decades to see through[.]"

177. Remarkably, at the time Acacia made this offer to the State in early 2024 and raised the specter of trouble on the horizon by stating that the $560,000 is a significant cost for a small operator like Acacia, Acacia had not even received the vast majority of the marginal and inactive wells from the Remnant portfolio.

### *7) The State Asserts A Claim against the Entire Bond (Signed by Gray) That Remnant Had Posted to Address Environmental Damage and Copies Gray on the Claim—Demonstrating that the Remnant/Acacia Liabilities Were Tangible, Extensive, and Actively Being Pursued*

178. On February 7, 2024, the New Mexico State Land Office asserted a claim against the entire $20,000 damage bond securing Remnant's obligations on New Mexico state oil-and-gas leases. The bond had originally been executed by Gray, as president of Remnant's predecessor WS Oil and Gas Operating, and Gray later signed the rider changing the bonded principal's name to Remnant Oil Operating. The SLO copied the bond claim to Defendant Gray, Remnant, Stitzel, and Acacia. Ex 10.

179. The SLO explained that it had previously demanded that Remnant plug its inactive wells and fully reclaim and remediate its lease premises, but that Remnant had failed to do so, writing: "On November 15, 2023, the State Land Office made written demand on Remnant to plug its inactive oil and gas wells, and to conduct full reclamation and remediation of the lease premises. The company, however, has failed to take meaningful action to plug their inactive wells or reclaim or remediate the lease premises."

180. The SLO's claim identified expired leases, numerous long-inactive wells, unresolved spills, trespass production, contaminated or disturbed well sites, and extensive plugging, equipment-removal, remediation, and reclamation requirements. The SLO concluded that plugging alone would "easily cost many times the value of the Bond" (which was only $20,000), separate and apart from the additional cost of remediation and reclamation.

181. Therefore, by no later than February 2024 – months before the Prospectus – Defendant Gray had been placed on direct notice that the former Remnant portfolio carried substantial, presently existing environmental liabilities that were grossly undersecured. Because Defendant Gray had personally participated in transferring 87 of Remnant's most productive gas wells through Acacia to Solis, he knew or was reckless in not knowing that the transaction had

separated valuable revenue-producing assets from the large body of inactive and environmentally impaired wells whose liabilities Remnant and Acacia could not pay, and that the State of New Mexico was actively pursuing these debts.

***8) Saddled With Remnant's Bad Wells, Acacia Slumps Towards Bankruptcy***

182. By the time Acacia received the last batch of Remnant's wells – the batch that included the vast majority of Remnant's marginal and inactive wells, laden with environmental liabilities to the State – in August of 2024, Acacia's days were numbered. It was undercapitalized and bankruptcy-bound, by design.

183. Not only was Acacia dealing with increasingly aggressive efforts from the State of New Mexico to compel it to make good on the long-overdue Remnant/Acacia AROs, but other parties had also started to come after it demanding that Acacia satisfy its obligations as well.

184. On December 11, 2024, ConocoPhillips sued Acacia in New Mexico state court, alleging that Acacia had failed to comply with its duty to plug inactive oil and gas wells and to remediate or reclaim the affected lands. *ConocoPhillips Co. v. Acacia Resources, LLC*, D-506-CV-2024-01193 (5th Judicial District Court, Lea County, Lovington District). Ex. 11.

185. The ConocoPhillips lawsuit concerned six oil and gas wells located on New Mexico State land for which ConocoPhillips was the leaseholder and Acacia the operator.

186. As ConocoPhillips explained in its complaint, Remnant had been the operator of record for the wells at issue and then, following Remnant's bankruptcy, conveyed its assets to Acasia, including "[a]ll oil and gas, and other mineral interests owned by Assignors in Chaves, County, New Mexico."

187. ConocoPhillips pointed out that "Acacia acquired all of Remnant's oil and gas assets subject to '[t]he terms and conditions of the oil and gas leases that are part of Remnant's Oil and Gas Interests," and further that the bankruptcy court's order approving the assignment to

Acacia specifically stated that it did not "affect any plugging and abandonment obligations and financial assurance requirements under the Federal or State Lease(s), as determined by the Department of the Interior of the United States, State Lease(s), as determined by the State of New Mexico Land Department, that must be met by Debtors or their successor and assigns (including the Buyer(s)) going forward."

188. The OCD had approved Acacia as the successor operator of record for one of the wells on January 12, 2022, and the remaining five wells on August 5, 2024.

189. As the operator of record, ConocoPhillips alleged, New Mexico regulations require Acacia to "properly plug and abandon [each] well."

190. ConocoPhillips' lawsuit recounted that the State of New Mexico had been sending repeated letters to (1) ConocoPhillips, (2) Remnant, and (3) Acacia, demanding that these wells be reclaimed and remediated.

191. In particular, "[b]y letter dated September 21, 2023, the State Land Office made demand on COP [ConocoPhillips Company] as lessee of record, Remnant, as former operator of record, and Acacia, as current operator of record, to plug and abandon the North Square Lake Unit #117 well, and to reclaim and remediate the affected lands."

192. In addition, "[b]y letters dated December 11, 2023, and February 7, 2024, SLO made demand on Remnant, as operator of record, to plug and abandon the other five Wells and to reclaim and remediate the affected lands."

193. As Remnant was receiving these demands along with Acacia, Defendant Gray was placed on notice, again, that the Acacia/Remnant orphan portfolio was incurring major unmet environmental liabilities, and these liabilities were being actively pursued by the State of New Mexico.

194. When Remnant and Acacia failed to comply with the SLO's repeated demands, ConocoPhillips sent Acacia, as successor to Remnant, a letter in February of 2024 notifying it of its obligation to plug the wells and remediate and reclaim the affected lands, and demanding that Acacia fulfill its obligations.

195. When Acacia did not respond to that February 2024 letter by December 2024, ConocoPhillips filed its lawsuit, seeking, *inter alia*, a declaratory judgment declaring that Acacia is responsible for plugging the wells and the remediation and reclamation of the affected lands, and a finding that Acacia's failure to plug the wells or remediate or reclaim the affected lands is a violation of New Mexico law and also negligence per se.

196. After failing to respond to ConocoPhillips' letter for ten months, Acacia responded to its lawsuit by filing for bankruptcy two weeks later.

197. The New Mexico Attorney General would later describe that filing as the "final and inevitable act" in the scheme to dump Acacia's negative-value assets and environmental liabilities into bankruptcy so that neither Remnant, nor Acacia, nor Solis Partners, nor the individuals responsible for the scheme, including Defendant Gray, would have to pay those liabilities. Ex 1 at ¶164.

198. Acacia's bankruptcy was filed on December 27, 2024, with Stitzel signing as manager on the bankruptcy petitions both of Acacia Resources and Acacia Operating.

199. In the bankruptcy documents, Stitzel acknowledged that Acacia's oil and gas wells have "zero market value."

200. According to the Statement of Financial Affairs filed in the bankruptcy, neither Acacia Resources nor Acacia Operating had any accountant or bookkeeper who maintained books and records for those companies since 2022. Similarly, neither company could identify any firm

or individual "in possession of the debtor's books of account and records." Neither company had issued a financial statement in the past two years, and no inventories of property had been taken.

201. Despite the lack of paperwork for either Acacia Resources or Acacia Operating, in the 90 days before the bankruptcy filing, Acacia Operating had paid a diverse set of creditors including Amazon, Walmart, KFC and a taqueria, suggesting that Acacia Operating's account was being used as some kind of slush fund or personal account. *See In re: Acacia Operating Co., LLC*, 24-bk-70194 (Bankr. W.D. Tex.), Dkt. No. 8.

202. In addition, the documents filed in the Acacia bankruptcy make plain that Gilmore and Stitzel were managing Acacia—just as they had been, alongside Defendant Gray, at the helm of its predecessor, Remnant. Not only did Stitzel sign as Manager of both Acacia entities and make sworn statements on their behalf, but the filings reveal that the only secured claim belongs to Gilmore.

203. Even more directly, the Statement of Financial Affairs asked Acacia to list "the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of the case." The filing listed two: Gilmore, representing 80% interest, and Stitzel, managing member, with the other 20%.

204. The Statement of Financial Affairs then asked: "Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?" The filing stated: "No."

205. Despite what Acacia represented to the State of New Mexico earlier, Ex. 9, the new management of Acacia looks a lot like the old management of Acacia, which looks a lot like its predecessor, Remnant, as well.

206. After Acacia declared bankruptcy, the State of New Mexico's long-running enforcement directives aimed at getting Acacia to comply with the Acacia/Remnant AROs pivoted, predictably, to investigating whether Acacia had been set up for fraudulent purposes—that is, to dump Remnant's and Acacia's environmental liabilities on the State by orphaning these wells in bankruptcy.

207. Indeed, on January 9, 2025, ConocoPhillips' in-house counsel for New Mexico oil and gas matters wrote to New Mexico's SLO and OCD, "to let each of you know that Acacia, successor to Remnant, filed for bankruptcy on December 27th—very soon after OCD approved operatorship into Acacia of all of Remnant's wells. See attached. It's very frustrating and gross to see operators try to avoid their obligations in New Mexico."

208. After the SLO wrote back the same day to thank ConocoPhillips for the update and, *inter alia*, noting: "It's very frustrating but not entirely surprising to me that many of the same individuals who ran Remnant negligently and irresponsibly would do the same with the successor entity," ConocoPhillips responded: "This guy (E.Will Gray) has created New Era Helium Corp which went public late last year. Guess his money is going to that."

***9) Even While Solis Had Received the Best-Producing Gas Wells From the Acacia/Remnant Portfolio, Solis Partners Was Having its Own ARO Compliance Problems***

209. As alleged above, Solis received 87 of the most productive gas wells from the former Remnant portfolio, while Acacia received a much less productive portfolio burdened by marginal and inactive wells and their corresponding plugging and remediation obligations.

210. Even after receiving the strongest portion of the former Remnant portfolio, however, Solis itself quickly accumulated significant plugging, abandonment, remediation, reclamation, and lease-compliance problems.

211. The warning signs stretch back to at least mid-2023. On May 24, 2023, the SLO sent Solis revenue-and-expense verification demands concerning three Solis-operated gas wells. The SLO stated that its production review showed "very marginal production" and expressed concern that the applicable leases could expire because the wells were not producing in sufficient quantities. The SLO warned that, unless Solis supplied supporting revenue-and-expense information, the leases would be reviewed for expiration. *See* Ex 12 at 14, 17, 20.

212. Solis also experienced recurring problems making the lease payments necessary to preserve its rights to operate the wells. Internal correspondence showed that the payments could not be made without the approval of Defendants Gray and Rugen. Gray personally approved lease payments, while Rugen asked Gray for the payment schedule so that New Era could ensure that an "appropriate bank balance" was available. *See* Ex. 12 at 33.

213. The same correspondence revealed problems related to rental payments. Rugen then formalized a process under which Solis's land director would request immediate approval from Gray each month and Gray would approve the payment by replying to the email. *See* Ex. 10 at 32.

214. Separately, Defendant Gray received notice that OCD's permitting system identified Solis as out of compliance with Rule 5.9, the rule governing an oil-and-gas operator's compliance status, requiring, among other things, adequate financial assurance and no more than the permitted number of wells out of compliance with plugging requirements.

215. On August 26, 2024, when Solis sought authorization to plug an oil well, OCD's online system displayed the warning: "The Operator is not in compliance with Rule 5.9." OCD sent the related rejection notice directly to Gray, who forwarded it to Solis personnel. Ex. 13.

216. Defendant Gray was also copied when Solis requested agency assistance, asserting that Solis "should be in compliance with Rule 5.9." Ex. 14. Although Solis appeared to dispute the warning, the communication placed Gray on actual notice, months before the Prospectus, that the regulator's own system identified Solis as noncompliant under the inactive-well compliance rule, and that the issue was affecting Solis's permitting activities.

217. On November 13, 2024 – just a week after the Prospectus was filed – the SLO sent Solis a formal "Cease and Desist Notice and Compliance Demand Regarding Solis Partners' Operations on New Mexico State Oil and Gas Leases." The notice was sent by certified mail and email directly to Gray and Solis's Land Director. The SLO stated that Solis had allowed "serious compliance issues" to persist on New Mexico state trust lands. Ex 15.

218. The SLO advised Defendant Gray that Solis continued to produce oil and gas from expired leases in trespass; had allowed wells under its operatorship to become chronically inactive; operated wells producing in such negligible quantities that the SLO considered them functionally inactive; and had failed properly to remediate previously plugged well sites.

219. The SLO therefore demanded that Solis cease commercial operations on expired leases; plug wells being operated in trespass; plug wells on canceled leases; plug inactive wells on active leases; plug functionally inactive wells unless they were promptly restored to bona fide production; remediate and reclaim the affected well sites; complete outstanding remediation at already-plugged sites; and pay the State for oil and gas produced in trespass.

220. The SLO also demanded an accounting of all helium volumes removed from Solis's wells and all sales of that helium, whether direct or indirect.

221. The SLO directed Solis to respond within 15 days and confirm that it had ceased production from expired and canceled leases; begun immediate planning to plug the identified wells; contacted the Environmental Compliance Office concerning surface remediation; committed to pay for production in trespass; and otherwise bring operations into compliance. The notice was copied to the SLO's Environmental Compliance Office and Oil, Gas and Minerals Division, as well as to senior OCD personnel.

222. The SLO's formal cease and desist letter followed lengthy email exchanges between the SLO and Defendant Gray personally, on the subject of Solis' continuing ARO noncompliance, stretching back to 2023. For instance, on page 2 of the Cease-and-Desist Letter, the SLO enumerates eight wells that Solis has been operating in trespass, and then on page 3 writes: "Except for Bitter Lake PX State #001, which Solis plugged only last month, and the Loretta BBO State wells shown in the table above which are located on acreage that has been re-leased (to Solis), the company also must immediately initiate plans to plug these unlawfully operated wells."

223. The Bitter Lake PX State #001 well referenced there as being pugged in October 2024, for instance, was the subject of an email exchange from the SLO to Defendant Gray back in December of 2023, demanding that the well be plugged and stating: "The lease expired in 2021 and the wells are long overdue to be plugged." Defendant Gray responded on December 18, 2023, stating: "We are currently securing bids from various plugging companies and expect to begin plugging sometime early Q1 24'. We greatly appreciate your willingness to work with Solis Partners on this matter and will let you know once plugging has commenced."

224. While that well was apparently plugged – though not until October 2024 – many others were not, as laid out in the SLO's formal cease-and-desist letter in November 2024.

225. On December 5, 2024, Solis responded through outside counsel. Solis disputed portions of the SLO's factual and legal conclusions and maintained that certain lease records were inaccurate or incomplete, however, Solis did not deny that the underlying dispute involved substantial numbers of wells, expired or canceled leases, plugging demands, remediation obligations, and potential payments for unauthorized production. Ex. 12.

226. The letter demonstrates Defendants' knowledge that Solis already faced extensive ARO-related demands involving scores of wells, canceled and expired leases, inactive and marginal production, incomplete remediation, and disputed royalties.

227. Those direct Solis obligations made the concealed Acacia/Remnant related exposure even more material. Solis was not an unencumbered operating company that could handle the loss of the 87 transferred wells or responsibility for Acacia's environmental liabilities. Rather, just a week after the Prospectus was filed, after a back-and-forth between Solis and the SLO lasting many months, the State had demanded that Solis cease operations on certain leases, plug numerous wells, remediate multiple sites, and make payments for unauthorized production. The potential avoidance of the 87-well transfer – or the imposition of Acacia's liabilities on Solis or New Era or Gray – therefore threatened a company that, with the ink on the Prospectus not yet dry, was already facing substantial plugging and remediation demands of its own.

228. Before New Era went public, then, Defendant Gray was aware that the predecessor Acacia/Remnant portfolio carried substantial, inadequately secured plugging and remediation liabilities; knew that Solis had received the valuable producing gas wells from that portfolio; knew that Acacia depended on production revenue to fund its liabilities; and knew that Solis already

faced serious ARO and lease-compliance problems of its own. Nevertheless, New Era concealed the related party aspect of the 87-well transaction, obscuring the resulting exposure, while presenting its environmental and related-party risks as ordinary, limited, and under control.

***10) The Same Month That Acacia Goes Bankrupt, Solis Partners, Merged into New Era, Begins to Trade***

229. By December 2024, the Remnant/Acacia/Solis transfer scheme had reached its predictable endpoint: Acacia, the entity left holding hundreds of marginal and inactive Remnant wells and their associated plugging and remediation liabilities to the State, had entered Chapter 7 bankruptcy and at the same time, Solis Partners – the Gray-controlled entity that received the valuable Remnant/Acacia gas wells – had already been merged into New Era Helium (or "New Era"), which began trading publicly on Nasdaq that same month.

230. As New Era explained in its November 6, 2024 Proxy Statement/Prospectus filed pursuant to Rule 424(b)(c) (the "Prospectus"), which forms part of the Registration Statement on Form S-4 (the "Registration Statement"), New Era was formed on February 2, 2023 and headquartered in Midland, Texas (home of Remnant, Acacia, *and* Solis Partners).

231. Just days after its formation, on February 6, 2023, New Era acquired Solis Partners.

232. On December 6, 2024, New Era went public by completing a merger with a special purpose acquisition vehicle (or "SPAC") known as Roth CH Acquisition V Co. (or "ROCL").

233. The result of the SPAC merger was New Era Helium, Inc., a public company built around Solis Partners and its New Mexico oil and gas assets, which began trading on the Nasdaq, effective December 9, 2024.

**New Era Energy's Registration Statement, Among other Deficiencies, Conceals These Related Party Transactions, Rendering it Materially False and Misleading**

234. The Prospectus stated that the information concerning New Era's business, operations, management, and other matters had been provided by New Era. Thus, New Era and

its management were responsible for providing investors with a complete and accurate account of New Era's business and the transactions through which that business had been assembled.

235. The thrust of the pitch put forth in the Prospectus was this: New Era, through Solis, owned producing wells in Chaves County, New Mexico – importantly, including the ones that Solis received from Remnant/Acacia – and it would use those gas wells and reserves to support a future helium-processing business.

236. Helium exists naturally in some natural-gas streams, and New Era's plan was to extract natural gas containing helium, process and sell the natural gas and, in addition, separate helium for sale in the future.

237. At the time of the Prospectus, though, all of New Era's actual revenues came from traditional oil and gas, not helium, as the planned helium monetization depended on the construction of a suitable processing plant.

238. The Prospectus described New Era as an "exploration and production company" whose primary operations included "the exploration, development, and production of helium, natural gas, oil, and natural gas liquids."

239. From the outset, Solis and its gas wells were the crown jewel of New Era. This is because, according to the Prospectus, Solis, one of New Era's two subsidiaries, "owned[ed] and operat[ed] the Company's producing oil and gas assets and non-producing acreage."

240. The Prospectus further explained that the other subsidiary, NEH Midsteam, "will be the owner and operator" of a natural gas processing facility known as the Pecos Slope Plant, but the facility was not yet operational, so the Company's existing value and revenue base was all Solis.

241. The Prospectus touted: "NEH believes its core strengths are its inventory of drilling locations, its commitment to further pioneering responsibly sourced helium (helium sourced from responsibly sourced gas), and its experienced management team," and also stated that Solis Partners is "the primary asset from which we plan to expand our helium footprint."

242. The Prospectus boasted that "New Era Helium has proven, not prospective, reserves," that New Era had "over 400 operated and producing wells," and that those wells were supported by reserve reports generated by a third-party reservoir engineer. The Prospectus further stated that, based on the December 31, 2023 reserve report, New Era had approximately $49 million of undiscounted net cash-flow potential from proved hydrocarbon reserves and approximately $56 million from probable hydrocarbon reserves.

243. That reserve report, addressed directly to Defendant Gray and attached as Annex D to the Prospectus, linked the new public company's value directly to the underlying oil-and-gas properties; confirmed that the asset base being touted to public investors was materially the Solis reserve base; and stated that reserve estimates were based on factual data furnished by Solis.

244. Next, even while the Prospectus made Solis's New Mexico wells the center of the public-company story and stated that: "The Company has acquired all of its interests in acreage and wells from acquisitions," it did not disclose that a core portion of Solis's gas-well portfolio came from Remnant and Acacia through a related-party transfer—the one the State of New Mexico would challenge as deceptive, fraudulent and liability-shifting.

245. The Prospectus contained a related-party disclosure section, yet concealed the Remnant/Acacia/Solis transfer history. Instead, New Era disclosed other related-party balances and transactions involving, among others, Defendant Gray and Joel Solis. The Prospectus disclosed, for example, advances, consulting fees and loans involving Defendant Gray and Joel

Solis, but did not disclose that Solis's gas-wells assets came by related party transaction and accordingly that New Era's current revenues and asset base depended, in material part, on wells transferred through an insider-connected structure that exposed Solis and New Era to undisclosed regulatory, fraudulent-transfer, alter-ego, unjust-enrichment, and environmental-liability risk.

246. Not only did Defendants have a duty to disclose this under GAAP and SEC rules but, as discussed in greater detail below, Defendants' failure to do so rendered the statements in the Prospectus materially false, incomplete, misleading and actionable.

247. For instance, the notes to New Era's financial statements for the years ended December 31, 2022 and 2023, included in the Prospectus, contain a table purporting to list the related party transactions that took place in those years. "The table below represents transactions with related parties that occurred during the years ended December 31, 2023 and 2022." Note 8, Related Party Transactions, F-74.

248. But the related party transaction captured in black and white and attached here as Exhibit 6 – a transaction that had Defendant Gray on both sides, that concerned the beating heart of the new public company, and that the State would later expose as deceptive and fraudulent – does not appear, rendering the table in Note 8 of the Prospectus incomplete and actionably false.

249. In other words, the Prospectus omitted from the table of related party transactions the related party transaction most important to understanding the origins of New Era's operating business: the transfer of 87 former Remnant wells through Acacia to Solis. Those wells constituted a material portion of the producing-well portfolio that Solis subsequently contributed to New Era and that New Era presented to investors as its principal operating asset base.

250. The omission of the related-party disclosure was material because it concealed that the 87-well transfer was not an arm's-length disposition, but instead a transaction among entities

controlled by the same insiders, including Defendant Gray on both sides of the transfer. That information would have significantly affected financial statement users' assessment of whether the company's reported transactions reflected the economic substance of moving valuable wells and associated liabilities among related entities rather than an ordinary third-party sale. The Prospectus disclosed none of these key facts.

251. The Prospectus also represented that: "Management approves all material related-party transactions."

252. It further stated that management considered the details of "***each new, existing or proposed related party transaction***," including the terms and business purpose of the transaction, its benefits to the Company and the related party, whether its terms were fair to the Company, and whether it presented an improper conflict of interest for an officer.

253. But because the 87-Well Related-Party Transaction was omitted, the related party transaction approval process – designed to give investors comfort that disinterested directors were at the helm of the company – was just more deception.

254. Finally, the Prospectus contained a series of risk disclosures that misleadingly converted known, existing regulatory and environmental problems into hypothetical future risks. New Era represented that it was unaware of any remediation for which it might be responsible, expected to continue production from its government leases, described additional restrictions and costs as matters that regulatory agencies might impose in the future, portrayed eighteen pending State-lease assignments as nearing completion, and warned merely that historical noncompliance might later be discovered on leases operated by New Era.

255. In reality, however, the facts set forth in this Complaint – all of which were known to Defendants Gray and New Era – materially contradicted the Prospectus's reassuring portrayal

of a portfolio facing only possible ARO-related restrictions and penalties and undiscovered historical problems, because the Prospectus concealed both (1) the 87-Well Related-Party Transaction connecting Solis's productive assets to the same Remnant–Acacia portfolio burdened by severely underfunded AROs; and (2) Solis' own, long overdue environmental obligations.

256. Indeed, Solis's properties had already been the subject of SLO inspections identifying incomplete restorative work at previously plugged well sites, with Solis already acknowledging that outstanding work remained to address the deficiencies identified in inspection reports dating back to 2023. Solis would receive the SLO's formal cease-and-desist letter – the latest chapter in the long-running enforcement saga in which the SLO clearly viewed Solis' AROs as unresolved existing and serious obligations – the very next week.

**New Era Repeats the Same Misstatements in the Closely Related S-1 Prospectus, Filed As Part of the Same SPAC Transaction and Distribution Plan**

257. New Era's Prospectus expressly contemplated that, upon completion of the Business Combination, New Era would grant specified holders registration rights for additional securities associated with the closing. In particular, the documents filed with the Prospectus required New Era, within 30 business days after consummation of the Business Combination, to file a registration statement on Form S-1 registering these securities.

258. New Era implemented that contemplated second-stage registration process in short order, and filed the S-1 Registration Statement and Prospectus (together, the "S-1 Prospectus") on December 30, 2024 and the SEC declared it effective on January 15, 2025.

259. That S-1 Prospectus covered a range of closing-related shares and other securities, and it repeated the same misrepresentations that had been included in the Prospectus filed just weeks earlier. In particular, the S-1 Prospectus repeated the same related-party approval representations, including the assertion that management approved all material related-party

transactions and considered each new, existing, or proposed transaction for its terms, purpose, benefits, fairness, business rationale, and officer conflicts; the same materially misleading environmental disclosures; and the same audited 2022-2023 Note 8, Related Party Transactions, containing the identical table purporting to depict the Company's related-party transaction during 2022 and 2023. Thus, the S-1 Prospectus contained the same materially misleading account of New Era's related-party dealings that was used to complete the Business Combination and used it, only weeks later, to register the resale or issuance of additional securities as well.

**Defendant Gray Personally Hypes Up the Company to Investors in Podcasts and Interviews**

260. After New Era completed the Business Combination and became publicly traded on Nasdaq, Defendant Gray undertook a sustained media campaign to promote the newly public Company to retail and small-cap investors. Defendant Gray appeared repeatedly in video interviews, podcasts, investor-oriented programs, and promotional media to present himself as the mastermind of New Era's strategy and to portray New Era first as a commercial-stage helium producer and later as an emerging AI-infrastructure company. The appearances were disseminated through platforms expressly directed toward the investment community.

261. Defendant Gray used the prestige of New Era's new Nasdaq listing to promote the Company's prospects, touting it as one of the first helium-focused companies listed on a major U.S. exchange and as strategically positioned to become a leading helium platform.

262. For instance, on March 10, 2025, Defendant Gray appeared on the Bell2Bell podcast, conducting an interview from the microcap investor conference at which Gray was presenting on New Era's behalf. *See* https://podcast.bell2bell.com/e/bell2bell-podcast-featuring-will-gray-ceo-director-of-new-era-helium-inc-video-edition/.

263. During that interview, Defendant Gray touted New Era's approximately 137,000 acres and its proved and probable gas reserves containing helium. He distinguished New Era from

other publicly traded small- and micro-cap helium companies that remained in the exploration stage, stating "We're actually producing helium and natural gas now… We're looking to vertically integrate with our own processing plants and our own infrastructure. That's really what we're doing as we speak. That's how we differentiate in the market. We offer a lower-risk scenario with proved helium reserves."

264. Gray's statement that New Era was "actually producing helium," coupled with his comparison to exploration-stage peers, was smoke and mirrors because, even assuming helium was being physically separated from New Era's raw natural gas, New Era was not operating a helium-processing plant, was not receiving compensation from helium extracted from its gas, and had "not generated any revenue from the production of helium," as actual commercial helium sales depended upon the future operation of the unfinished Pecos Slope Plant, completion of which would cost tens of millions of dollars the Company did not have.

265. Putting all that aside, though, at no point during this or Defendant Gray's many other appearances did he disclose that New Era's operating subsidiary had been built in material part upon the 87-Well Related-Party Transaction; that the transaction had not been disclosed in the Prospectus, the 2024 Form 10-K, or Form 10-Qs; that Gray had participated on behalf of Remnant while also controlling Solis; and that the transfer deprived Acacia of productive assets needed to satisfy its AROs; AROs that the State of New Mexico had already started to pursue and of which Defendant Gray had been notified personally many times.

**New Era's Class Period Filings Continue to Conceal These Related Party Transactions, Rendering them False and Materially Misleading**

***1) New Era's 2024 Annual Report, filed on March 31, 2025***

266. On March 31, 2025, New Era filed its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 Annual Report").

267. The filing was signed by Defendant Gray as New Era's Chief Executive Officer and Chairman, and by Defendant Michael Rugen as its Chief Financial Officer. The 2024 Annual Report consolidated the accounts of New Era and its wholly owned subsidiaries and again stated that Solis Partners owned and operated New Era's producing oil-and-gas assets and non-producing acreage.

268. The Annual Report falsely concealed the foundational related-party transaction at the heart of the public company.

269. In Item 13, entitled "Certain Relationships and Related Transactions, and Director Independence," New Era purported to disclose all related party transactions since January 1, 2022. In particular, it represented that the filing provided "a description of each transaction since January 1, 2022" in which New Era was a participant, the amount involved exceeded $120,000, and a director, executive officer, greater-than-5% shareholder, or another covered person had a direct or indirect material interest. New Era's related-party policy similarly defined a related-party transaction to include transactions in which New Era or any of its subsidiaries participated.

270. The 87-Well Related-Party Transaction fell within the category of transactions that Item 13 purported to disclose. Solis Partners was the transferee and participant. Defendant Gray was a Remnant founder and insider, had managed Solis since 2020, and had a direct or indirect material interest in Solis's acquisition of its foundational operating assets. And Gray signed the C-145 Change-of-Operator application for transferor Remnant as its "Managing Member" on January 25, 2022, Joel Solis signed for transferee Solis, and OCD subsequently approved the transfer on February 2, 2022. Ex. 6.

271. This transaction easily exceeded the $120,000 threshold. Acacia's authorization to complete the transfer contemplated a sales price of $400,000, even while the associated bill of

sale left the actual consideration paid unclear. Ex 1 at ¶¶126-130. Accordingly, the State of New Mexico later alleged that the actual consideration received by Acacia remained unknown but that, if Solis did not pay Acacia $400,000 in cash or equivalent value, the transaction may instead have been intended to satisfy the $400,000 debt that Gray believed Remnant owed to his entity, WS Oil and Gas. In any event, whether $400,000 was paid or not, the foundational transaction at the heart of the New Era Energy was a related party transfer, and the Annual Report concealed this from investors.

272. The omission is especially glaring as the Annual Report selectively disclosed numerous other, less consequential related-party transactions. Note 9 identified loans and expense reimbursements involving Gray and Joel Solis. It also described New Era's assignment of certain properties to Earnest Producing Corporation, an entity controlled by Joel Solis, and stated that the transferred properties had a fair value of $166,449. The filing separately disclosed that Earnest assumed $26,780 of associated asset-retirement obligations.

273. Thus, the 2024 Annual Report demonstrated that New Era understood how to identify, describe, value, and account for transactions involving oil-and-gas properties, affiliated counterparties, and transferred asset-retirement obligations. Nevertheless, it omitted the far more consequential transaction through which Solis obtained 87 of the producing gas wells from Remnant/Acacia—the very transaction upon which New Era's operating business was built.

274. The omission also rendered New Era's related-party approval representations false and misleading. The audited financial statements stated that "the details of each new, existing or proposed related party transaction" were approved by directors who were not affiliated with the transaction and that those directors evaluated the transaction's terms, business purpose, benefits,

fairness, and potential conflicts. Item 13 similarly stated that related-party transactions required review and prior approval by the audit committee and disinterested independent directors.

275. Because the Annual Report falsely omitted the 87-Well Related-Party Transaction, though, New Era's related-party approval process was not as described because that pivotal transfer should have been presented to, evaluated by, and approved by disinterested directors only after finding that the transaction was fair to Solis, New Era, and Acacia.

276. The 87-well transfer was material not just because of its insider character, but because of the nature of the assets transferred. The State of New Mexico would later allege that Solis received the strongest producing gas wells from the former Remnant portfolio, while Acacia was left with a substantially less productive portfolio burdened by marginal and inactive wells and their associated plugging and remediation obligations. The State's production analysis showed substantially higher average production from the Solis wells than from Acacia's wells and alleged that the revenues from the transferred wells otherwise could and should have been used to satisfy Acacia's plugging obligations.

277. The 2024 Annual Report also emphasized the central importance of Solis's wells to New Era. It stated that Solis owned and operated New Era's producing oil-and-gas assets and that New Era operated as a single reportable segment under a single company-wide management team. The filing identified Gray as the Company's chief operating decision-maker responsible for reviewing the Company's assets and operating results and allocating its resources.

278. Nonetheless, New Era did not disclose that its principal operating subsidiary had obtained the 87 wells through a transaction involving Gray, Remnant, and Acacia; that Gray was on both sides of the deal; or that the transaction created a material risk that Solis or New Era could

lose the wells, be required to return their value, or that they could be pursued for plugging and remediation costs that Acacia could not pay.

279. That exposure had become substantially more concrete by the time the 2024 Annual Report was filed. By then, ConocoPhillips had sued Acacia to compel it to plug certain inactive wells and remediate and reclaim the affected lands and, on December 27, 2024, Acacia filed for Chapter 7 bankruptcy. With Acacia now bankrupt, the State had no choice but to pivot from trying to get Acacia to pay for the Acacia/Remnant liabilities to investigating whether Acacia had been set up for fraudulent purposes to allow Remnant's more productive gas wells to be siphoned off to another entity; namely, to Solis and New Era.

280. The undisclosed risk was material in light of New Era's financial condition. As of December 31, 2024, New Era reported only approximately $1.054 million in cash, a working-capital deficit of approximately $2.301 million, a stockholders' deficit of approximately $2.049 million, and a net loss of approximately $13.782 million for the year. Its oil, natural-gas, and product revenues for 2024 totaled only approximately $532,780. Even a fraction of Acacia's plugging and remediation liabilities, or the loss or return of the 87 wells, therefore threatened to materially affect New Era's liquidity, assets and perhaps its survival.

281. Of course, the failure to disclose the transaction cannot plausibly be attributed to Gray's lack of knowledge. The 2024 Annual Report itself stated that Gray had managed Solis beginning in 2020 and had founded and served as Chief Executive Officer of Remnant. Defendant Gray had direct and personal knowledge of the transaction that New Era omitted from the 2024 Form 10-K. It bears his signature.

282. The 2024 Annual Report contained the same misleading disclosures as the Prospectus, with the Company again representing that "we are not aware of any remediation for which we may be responsible at this time."

283. The Company's repetition of that lie was even more blatant here, considering that Solis and Gray had received the State's formal Cease-and-Desist letter several months earlier.

284. In fact, not only was Defendant Gray aware that Solis and New Era could be held accountable for the environmental liabilities stemming from the orphan Remnant/Acacia portfolio but on November 13, 2024, more than four months earlier, the SLO had sent a formal cease-and-desist and compliance demand directly to Gray and Solis identifying serious existing remediation and reclamation deficiencies. Among other things, the SLO stated that Solis had failed to properly remediate previously plugged well sites and directed Solis to remediate and reclaim well sites associated with expired leases, canceled leases, inactive wells, and functionally inactive wells.

285. Solis's December 5, 2024 response confirmed that the remediation obligations were not merely a future hypothetical. Solis acknowledged that work remained to satisfy them and, thus, when New Era represented on March 31, 2025 that it was unaware of any remediation for which it might be responsible, Defendant Gray had personally received a formal governmental remediation demand and Solis had already responded to it through counsel.

286. The Annual Report echoed the Prospectus' representation that the Company expects to be able to continue operating its leases on federal and state lands, while acknowledging the possibility that additional delays, costs, and restrictions may be added to these leases in the future by state agencies. The Annual Report then added: "For example, we began legally operating eighteen State leases assigned to us by another entity in September of 2020. However, the

NMSLO did not transfer these leases into our name initially. This finally occurred on February 1, 2023."

287. Thus, the Annual Report's disclosure conveyed to investors that this approximately two-and-a-half-year delay was some benign bureaucratic or administrative problem on the part of SLO, and represented that the matter had been resolved by February 1, 2023.

288. Both of those implications were untrue, as the filing concealed the scale and substance of the regulatory obstacles facing the transaction.

289. Contemporaneous records indicate that the unnamed transferor was Grizzly Operating, LLC ("Grizzly") and that the eighteen State-lease assignments were part of a substantially broader Grizzly-to-Solis portfolio acquisition. In September 2020, Grizzly sought to transfer operatorship of over 300 wells from Grizzly to Solis, including numerous wells located on New Mexico State lands. The assignment did not encounter merely administrative delay. First, OCD rejected the permit because two inactive wells required bond payments, and, second, the State-lease assignment process involved cleanup and reclamation requirements—requirements that Solis failed to meet long after February 1, 2023.

290. Contrary to what the Annual Report conveyed to investors, the Grizzly-Solis transfer saga that began in September 2020 was not resolved in February 2023. Rather, four months later, in June 2023, Solis's counsel wrote a private email to the SLO advising that Solis had submitted the requested paperwork for the SLO's approval of the Grizzly assignments "in February," but that "Solis is still waiting on the assignments."

291. The SLO's general counsel responded the same day that Grizzly and Solis had still not provided the required cleanup work plan for one of the leases dating back to the September

2020 assignment, and demanded to know who would perform the cleanup and when. Defendant Gray was copied on the correspondence.

292. Remarkably, Solis' environmental obligations on that lease remained unmet into late 2024, when the SLO's November 13, 2024 Cease and Desist Letter (also addressed to Defendant Gray, by USPS certified mail and email) revealed that Solis had still failed to complete the required reclamation work on that same lease.

293. Accordingly, the Annual Report misrepresented the nature and status of the Grizzly-to-Solis assignment. A reasonable investor would have understood New Era's disclosure to mean that Solis had validly acquired the eighteen State leases in September 2020, that the impediment was an administrative delay on the part of the SLO, and that the matter had been fully resolved in February 2023. In reality, the eighteen lease assignments were part of a portfolio-wide acquisition involving more than 300 wells that ran into substantive regulatory obstacles because Solis failed to meet its environmental obligations and still failed to meet them as of late 2024, about which Defendant Gray had been notified several times. By converting Solis' ongoing environmental compliance problems into a benign story of government bureaucracy followed by final resolution, New Era materially understated the regulatory risks affecting Solis's assets, its ability to continue operating them, and its associated plugging, remediation, and reclamation exposure to the State.

294. Each of the Company's Form 10-Qs filed during Class Period, discussed below, also represented that there had been "no material changes" to the Annual Report's risk factors.

***2) New Era's Three Quarterly Reports Filed in the Class Period***

295. Following the filing of its 2024 Annual Report, New Era filed three quarterly reports during the Class Period: (1) a Form 10-Q for the quarter ended March 31, 2025, filed on May 15, 2025 (the "1Q 2025 10-Q"); (2) a Form 10-Q for the quarter ended June 30, 2025, filed

on August 14, 2025 (the "2Q 2025 10-Q") ; and (3) a Form 10-Q for the quarter ended September 30, 2025, filed on November 13, 2025 (the "3Q 2025 10-Q") (collectively, the "2025 Form 10-Qs").

296. These Form 10-Qs continued to conceal the 87-well Related Party Transactions and mispresent New Era's related-party approval process to investors.

297. Each of the Class Period Form 10-Qs repeated the same categorical representation concerning New Era's review and approval of related-party transactions: "All material related-party transactions are approved by members of the Board of Directors not affiliated with the transactions." Importantly, each filing further represented that those unaffiliated directors considered the details of ***"each new, existing or proposed related party transaction,"*** including its terms, business purpose, benefits to New Era and the related party, fairness to New Era, legitimate business justification, and whether the transaction presented an improper conflict of interest for any officer.

298. In the MD&A or critical-accounting-estimates portion of each filing, New Era offered a second, overlapping description of the same approval process. There, New Era represented that management approved all material related-party transactions and evaluated each ***new, existing, or proposed transaction*** for its terms, purpose, benefits, fairness, business rationale, and potential officer conflicts. Thus, each Form 10-Q assured investors both that management reviewed all material related-party transactions and that unaffiliated directors independently approved them.

299. The repeated use of the words "all material" and "each new, existing or proposed" represented to investors that New Era had identified its material existing related-party arrangements, subjected them to conflict review, and obtained approval from persons who were

independent of the interested parties. A reasonable investor would understand the statements to mean that no undisclosed, foundational insider transaction remained embedded in New Era's operating business without having been reviewed for fairness, purpose, consideration, benefits, and conflicts. This was false, as, in truth, the 87-Well Related Party transaction upon which Solis's operating business had been built remained concealed.

300. Defendant Gray signed the 1Q 2025 10-Q as Chief Executive Officer, while Rugen signed as Chief Financial Officer. After Rugen's resignation, Defendant Gray served as both Chief Executive Officer and interim Chief Financial Officer and executed both officer certifications accompanying the 2Q and 3Q 10-Qs. In each certification, Defendant Gray represented that he had reviewed the filing; that it did not omit a material fact necessary to make its statements not misleading; that the financial information fairly presented New Era's financial condition; and that disclosure controls had been designed to ensure that material information relating to New Era was made known to the certifying officers.

301. Defendant Gray's certifications were particularly misleading because the omitted transaction was not information that depended upon effective subordinate reporting. Defendant Gray personally signed the C-145 for transferor Remnant while managing and controlling transferee Solis. Ex. 6. He therefore possessed direct knowledge of the transaction, the identities and relationships of the parties, the wells transferred, and Solis's resulting receipt of the assets. The failure to disclose the transaction cannot plausibly be attributed merely to any control weaknesses within New Era.

302. Accordingly, the three Class Period Form 10-Qs repeatedly assured investors that all material related-party transactions – including each existing transaction – were evaluated by management and approved by unaffiliated directors after review of their fairness, purpose,

benefits, and conflicts, while concealing the 87-Well Related-Party Transaction upon which New Era's operating business had been built.

303. These Form 10-Qs compounded that misrepresentation by selectively disclosing minor reimbursement balances and a later Joel Solis loan; reporting AROs without identifying the potential exposure arising from Acacia's insolvency and the challenged related party transfer, even as Defendant Gray was personally aware of the seriousness with which the State takes ARO obligations and its efforts to recover from Acacia before it went bankrupt; framing environmental liability as a generic future possibility; and certifying that no material facts had been omitted.

**New Era Attempts A Hard and Desperate Pivot During the Class Period**

304. At the beginning of the Class Period, New Era presented itself as an emerging helium producer, based on its New Mexico oil and gas wells that it owned through Solis. New Era stated that its business model was "moving from a hydrocarbon focus to a helium focused model," that its mission was to become a leading supplier of helium and natural gas, and that completion of its Pecos Slope Plant would allow it to begin selling helium to the market.

305. On November 12, 2024 – just six days after the SEC declared the Registration Statement effective – New Era announced an entirely new venture. New Era and Sharon AI, Inc. had executed a non-binding letter of intent to form a 50/50 joint venture to design, develop, and operate an initial 90-megawatt natural-gas-powered data center in the Permian Basin.

306. On January 21, 2025, New Era and Sharon AI formally created Texas Critical Data Centers LLC ("TCDC") to pursue the planned 250-megawatt project. Despite a December 2024 announcement that the location had been finalized, New Era stated in January that TCDC still had multiple potential sites under consideration and expected to announce a final site in early 2025.

307. During the early portion of the Class Period, New Era portrayed the AI data-center project as an extension of its helium and natural-gas business, as the Company would monetize

the natural gas that New Era produced alongside helium while New Era completed the Pecos Slope Plant and commenced helium sales. In its 1Q 2025 10-K, for instance, New Era continued to state that its business was moving toward a helium-focused model and that the Pecos Slope Plant was expected to commence operations in the fourth quarter of 2025.

308. New Era's helium strategy quickly faced severe financial and operational obstacles. New Era admitted that it needed approximately $45 million in additional capital to develop the Pecos Slope Field, and New Era further acknowledged that it was unlikely to obtain the necessary financing, complete the plant, and begin helium deliveries before the applicable July 1, 2025 deadline in its agreement with Matheson Tri-Gas, Inc. New Era nevertheless represented that it believed it could commence operations before the November 30, 2025 deadline in its separate agreement with AirLife Gases USA, Inc.

309. By June 2025, New Era's strategic focus was visibly shifting away from helium. Directors Phil Kornbluth and Stan Borowiec, both helium-industry experts, departed New Era on May 28, 2025, as the Company broadened its strategy to include natural gas and digital infrastructure. Defendant Gray stated that New Era was expanding its strategic focus to encompass data-center infrastructure, and the Company began searching for directors aligned with the new strategy.

310. The failure of New Era's helium strategy became more concrete on July 2, 2025. Matheson had agreed to purchase 50% of the helium that the Pecos Slope Plant was expected to produce, but it possessed a right to terminate if the plant had not begun operations by July 1, 2025. When New Era failed to meet that deadline, Matheson exercised its termination right immediately.

311. On August 12, 2025, New Era made its pivot to AI explicit. The Company announced that it was changing its name from New Era Helium, Inc. to New Era Energy & Digital,

Inc. and that its common stock would begin trading under the symbol NUAI the following day. New Era stated that the rebrand reflected a "strategic transformation" into a vertically integrated energy and digital-infrastructure company and promoted TCDC as a data-center campus capable of scaling to as much as one gigawatt.

312. New Era further stated that it was considering how best to maximize the value of its natural-gas and helium properties "while pivoting to AI infrastructure development efforts." Gray called the name change "the next chapter" and "a clear signal" of New Era's direction. Thus, approximately eight months after becoming public as New Era Helium, the Company formally recast itself as an AI data-center and power-infrastructure developer.

313. On September 29, 2025, Defendant Gray appeared in a podcast style interview with the investing platform StockTwits, as part of its series of interviews with executives. *See* https://www.youtube.com/watch?v=3BzujwBRBJc.

314. When asked about the Company's pivot to AI data centers, Defendant Gray stated:

> That's a great question, because we get that question from investors non-stop, and it's quite a relevant question as well. So originally when we went public, we've always kind of had, in the background, this business segment for the AI infrastructure. Because when you look at the production of helium, 95% of helium is in association with natural gas, which we have a lot of natural gas, and so historically you know natural gas prices in the Permian Basin, so we're based here in West Texas. So just because, you know, your investors are watching nymex and they see you know uh nat gas at three dollars and nine cents, that's not necessarily what it trades for in the Permian Basin. And I'd say the last year, year and a half, it's been trading negative. So it's like, what is the arbitrage, how do we, do we make more money, selling it as gas in the pipeline or making it into power? So we have spent a tremendous amount of time really understanding power gen…
>
> And so obviously with that business segment transitioning to the AI infrastructure, we've had tremendous, and I do mean tremendous, response to that, to that segment, and also one other reason was when we were going public during you know 2024 there was a helium shortage called helium shortage 4.0. Well, once we de-spac'd, that shortage stopped and like any commodity, it was over-supplied. So, people weren't necessarily concerned with helium anymore because it just wasn't as needed…

> And so we decided to say listen let's focus on the infrastructure component and since that's where the vast majority of the interest lies as well as the, the potential revenues that we're looking to secure here through what we've done this far.

315. Defendant Gray's puzzling statement raises questions as to when and why New Era became an AI-infrastructure company. It indicates that the AI strategy was being developed "in the background" during the going-public process, yet the Prospectus did not identify AI infrastructure as a business initiative or explain that management was considering a fundamental redirection of New Era's natural-gas assets toward power generation and data centers.

316. Defendant Gray's statement is also materially at odds with the Company's SEC disclosures: Not only did the Prospectus not identify AI infrastructure as an existing business initiative and instead presented the ongoing helium shortage and planned Pecos Slope Plant as New Era's principal market opportunity, but all three of the Class Period 10-Qs – including the 3Q 2025 10-Q not filed until November 13, 2025 – continued to represent that New Era's business model was moving toward a helium-focused model. This is even after the TCDC joint venture was formed and the Company changed its name to New Era Energy & Digital.

317. Despite New Era's August 2025 rebranding and its extensive public promotion of an AI-data-center transformation, the 3Q 2025 10-Q filed on November 13, 2025, continued to represent in its "Business Overview and Strategy" that New Era's business model was moving "from a hydrocarbon focus to a helium-focused model." The filing further described New Era's primary operations as the exploration, development, and production of helium and hydrocarbons and identified its sole reportable segment as natural-gas, helium, natural gas liquid, and oil exploration and production. While the filing separately disclosed New Era's investment in the proposed TCDC data-center campus, it never reconciled that development with its continued

representation that the Company remained in the process of becoming a helium-focused enterprise.

318. The same-day inconsistency is jarring: While the 3Q 2025 10-Q continued to state that New Era's business was moving toward a "helium-focused model," the third-quarter earnings release on the same day stated that the quarter reflected a "deliberate shift from legacy energy operations to development-stage investments" supporting the Company's AI strategy. In the earning release, Defendant Gray stated that New Era was moving from a legacy helium and natural-gas operator into an AI-infrastructure developer and that the Company's "legacy energy revenues are expected to wind down as we contemplate the divestiture process[.]"

319. Accordingly, during the Class Period, New Era repeatedly reinvented its investment thesis: it entered the market as a helium-focused company promising that the Pecos Slope Plant would take its existing oil and gas assets and generate substantial revenues and support long-term profitability, but when the helium plant failed to commence operations, produced no helium revenue, lost one contracted purchaser and faced termination by the other, it replaced that faltering narrative with increasingly ambitious AI-data-center projections—all while simultaneously representing in SEC filings that it was moving toward a "helium-focused model."

**The Truth Comes Out**

***1) An Initial Short Report Challenges Defendants Gray and New Era's Narrative and Exposes Some of its Related-Party Dealings***

320. On December 12, 2025, at approximately 10:00 AM EST, Fuzzy Panda Research published a report entitled "NUAI: Serial Penny Stock CEO Combined Bad Gas Assets, Paid Stock Promo, Renamed Co & Added 'AI'" (the "FP Report"). In addition to pointing out that many of the Company's claims regarding its pivot to A.I. made no sense, the FP Report alleged that "of NUAI's 406 gas wells, 346 were acquired from companies that went bankrupt operating

the very same wells, ***including 87 wells from the company E. Will Gray II was CEO of and bankrupted himself, Remnant Oil.***"

321. The FP Report states that this was in line with prior companies run by Defendant Gray, who "has a long history (~20 years) of incinerating value at oil & gas pink sheet companies," some seemingly on purpose to effectuate his own financial benefit.

322. For instance, the report details how "Gray was Co-Founder & CEO of Remnant Oil, a private co, which went bankrupt in 2019 after ***hundreds of 'regulatory violations'***" but that Remnant's wells were "***acquired in bankruptcy by a related party, Acacia Resources, and were then sold to Solis Partners, a subsidiary of New Era Energy***." The FP Report states it "uncovered that Gray's playbook includes financial tricks to enrich insiders, like converting related party loans to equity or paying fees to friends and family."

323. While the FP Report did not yet disclose the New Mexico Attorney General's detailed allegations concerning the 87-Well Related-Party Transaction, the fraudulent C-145 transfer process, Acacia's undercapitalization or the attempt to push Acacia's plugging liabilities onto the State while moving the producing gas wells to Solis and then New Era, it did, however, begin to reveal that New Era's assets had emerged from a conflicted Remnant–Acacia–Solis related party chain.

324. On this news, New Era's stock price fell $0.25 per share, or 6.9%, to close at $3.35 on on December 12, 2025, on unusually heavy trading volume.

### *2) New Era and Gray Respond With Blanket Denials, and Direct Investors Back to the Very SEC Filings That Concealed the 87-Well Related Party Transaction*

325. Later on December 12, 2025, at approximately 12:45 PM EST, New Era responded to the FP Report by issuing a public statement entitled: "New Era Energy & Digital Responds to False and Misleading Allegations by Short Seller." Rather than address the FP Report's specific

factual findings, New Era characterized FP as a short-seller activist seeking to profit from a decline in the Company's share price, and categorically asserted that Fuzzy Panda's claims were "factually inaccurate" and constituted an effort to mislead investors.

326. New Era then urged investors to rely upon the Company's SEC filings and formal disclosures. Defendant Gray stated that New Era had kept investors updated through multiple channels, accused FP of attempting to mislead and manipulate the market, and assured investors that management and the Board remained committed to moving the Company's projects forward.

327. New Era's instruction that investors rely on its SEC filings was therefore itself materially misleading. Those filings did not answer the Report's core related-party allegations because they concealed the foundational 87-Well Related-Party Transaction.

328. Rather than disclose the transaction and allow investors to evaluate its terms, consideration, approval process, conflicts, and potential liabilities, Defendants broadly denied the Report's factual allegations while withholding the true facts concerning the 87-Well Related-Party Transaction, the origin of Solis's producing assets, the Remnant and Acacia liability situation, and the regulatory problems affecting the wells and entities from which New Era's operating business had been assembled, all in an attempt to use the authority of New Era's public filings to reassure the market that the FP Report could be disregarded.

***3) Hunterbrook Media Publicizes New Mexico's Complaint and its Detailed Investigation into the 87-Well Related-Party Transaction, Causing New Era's Stock to Plunge By 41%***

329. On December 29, 2025, at about 12:25 PM EST, Hunterbrook Media published an investor-facing report entitled "New Mexico Sues New Era and CEO After Alleged 'Fraud on the State'" (the "HM Report").

330. The HM Report publicized the details of New Mexico's lawsuit that had been filed the week before, widely disseminating the central facts concerning the 87-Well Related-Party

Transaction, including that Defendant Gray formed and controlled Solis while remaining at the helm of Remnant and that OCD approved the 87-Well Related-Party Transfer on February 2, 2022 without knowing the truth of Defendant Gray's insider relationships.

331. The HM Report explained how "the complaint places Everett Willard Gray II at the center of the alleged activity, portraying him as the mastermind and primary beneficiary of the scheme," and how "New Mexico further alleges that the most valuable gas wells — 87 in total — were transferred from Acacia to Solis Partners, an entity the complaint says was 'dominated and controlled' by Gray."

332. The HM Report summarized the detailed allegations in the New Mexico complaint, cited swaths of it, and linked all of this information directly to New Era's stock ticker.

333. On this news, New Era's stock price fell by over 41%, to close at $2.69 per share on December 29, 2025, on unusually heavy trading volume, erasing a substantial portion of the Company's market value in a single trading session.

**Post-Script**

***1) New Era and Gray Respond to the HM Report with More Lies and Deflection***

334. On December 29, 2025, the same day the HM Report publicized the New Mexico Complaint and its detailed factual allegations against New Era and Gray, New Era released a response entitled "New Era Energy & Digital Issues Statement Setting the Record Straight Regarding New Mexico Civil Complaint."

335. New Era's same-day statement called the State's lawsuit a "baseless and uninformed attack;" insisted that neither New Era nor Gray had ever been affiliated with Acacia Operating Company, LLC or Acacia Resources; and asserted that "the 87 wells referenced in the Lawsuit are immaterial to our current business [as] [t]hese wells no longer align with the

Company's business model, and we were already in the process of divesting them, in line with our focus on our digital infrastructure business."

336. New Era's response did not address the actual allegations in the State's complaint. First, the State's theory did not depend upon Gray or New Era having formally owned Acacia. In fact, the related party transfer at the heart of the State's lawsuit was between Remnant and Solis, the theory being that Defendant Gray signed the C-145 as operator-of-record for Remnant to transfer the 87 wells to Solis; that Gray in fact managed and controlled Solis; that OCD approved the transfer to Solis on February 2, 2022 under these false pretenses; and that New Era later derived revenue from the transferred wells.

337. In any event, the attempt to distance New Era and Gray from Acacia is a red herring because Acacia was simply the successor to Remnant—and that was indisputably run by Defendant Gray. In fact, this Complaint contains many instances of Remnant (and therefore Gray) receiving the same key communications as Acacia: For example, both entities received the State's repeated demands to plug the wells that precipitated ConocoPhillips' lawsuit against Acacia, and both entities were copied on the State's claim against the Remnant bond after Remnant had failed to meet its AROs. Accordingly, Gray and New Era had direct personal notice that the Remnant/Acacia orphan well portfolio held major unmet liabilities that the State was actively pursuing. A denial of formal "affiliation" with Acacia does not address Defendant Gray's participation in the integrated Remnant–Acacia–Solis scheme.

338. Also, New Era's assertion that the 87 wells were immaterial to its "current business" was a temporal sleight of hand because the State alleged that, during the entire relevant period, New Era's revenues came from its New Mexico producing wells, including the gas wells received by Solis through the Remnant–Acacia chain.

339. Likewise, the thrust of Plaintiffs' Complaint here is that the Defendants misled investors when they placed the Solis-acquired gas wells at the heart of the public company, without disclosing the true facts, and continued to conceal them throughout the Class Period. That New Era had begun to promote an entirely different business model by December 2025 is irrelevant and, if anything, simply highlights the Defendants' desperation.

***2) Several Months Later, the Trustee for the Acacia Bankruptcy Estate Reaches a Settlement for the Claims Under the Trustee's Control***

340. Due to Acacia's bankruptcy, several of the claims brought in the New Mexico action were property of the Acacia bankruptcy estate and under the control of its trustee.

341. In May 2026, the trustee for the Acacia bankruptcy estate negotiated a settlement with New Era and related defendants over the trustee-controlled claims for $1 million.

342. The settlement did not adjudicate any claims. Moreover, all claims that are under the State's control – including two fraud-based claims against Defendant Gray related to the false C-145 transfer Forms and one corporate veil piercing/alter ego claim praying that "[i]n the interests of justice, liability for Remnant's (and in turn Acacia's) environmental liabilities should also be imposed on the Individual Defendants, Gray, Gilmore, and Stitzel" – are proceeding.

**SUMMARY OF RELEVANT ACCOUNTING STANDARDS AND DISCLOSURE RULES**

343. There is a particularly robust set of accounting rules and reporting items requiring the disclosure of related-party transactions. This is not surprising, as disclosure of related-party transactions is essential to allow investors to evaluate the integrity of management and the financial realities underlying offerors of securities.

344. The reason the SEC and FASB (the "Financial Accounting Standards Board") are so stringent in requiring disclosure of related party transactions is that "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite

conditions of competitive, freemarket dealings may not exist." FASB, *Statement of Fin. Accounting Standards No. 57,* ¶3. And as many courts have explained, "'[D]isclosure is the overriding principle' governing related-party transactions, because while they are 'not inherently bad, they have proven to be an easy and effective way ... to misstate the economic substance and reality of financial transactions ... [and] are difficult to measure economically because they may not be comparable[.]'" *See Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 711 (N.D. Tex. 2008) (citation omitted).

***1) Generally Accepted Accounting Principles ("GAAP")***

345. GAAP are the principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice. The SEC Rules, interpretive releases and the FASB's Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. In addition, the SEC issues Staff Accounting Bulletins, which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1.

346. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires interim financial statements to also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

347. ASC 850, *Related Party Disclosures*, is the authoritative accounting standard under GAAP concerning related party disclosures in a company's financial statements. ASC 850-10-05-1 and ASC 850-10-60-7.

348. According to ASC 850, related parties include the following:

a. Affiliates[34] of the entity

b. Entities for which investments in their equity securities would be required

c. Trusts for the benefit of employees

d. Principal owners of the entity and members of their immediate families

e. Management of the entity and members of their immediate families

f. Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests

g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. [Footnote added.] ASC 850-10-20.

349. Examples of common transactions between related parties include the following:

a. Sales, purchases, and transfers of real and personal property

b. Services received or furnished, such as accounting, management, engineering, and legal services

c. Use of property and equipment by lease or otherwise

d. Borrowings, lendings, and guarantees

e. Maintenance of compensating bank balances for the benefit of a related party

f. Intra-entity billings based on allocations of common costs

g. Filings of consolidated tax returns. ASC 850-10-20.

350. GAAP requires financial statements to include the following disclosures of material related party transactions:

[34] An "affiliate" is defined as "[a] party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity. …." Control is defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise." ASC 850-10-20.

a. The nature of the relationship(s) involved

b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements

c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period

d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

351. The basic objective of these requirements is to ensure disclosure of useful information that would make a difference in decision making for users of the financial statements:

> Information about transactions with related parties is useful in comparing an entity's results of operations and financial position with those of prior periods and with those of other entities. It helps users of financial statements to detect and explain possible differences. ASC 850-10-05-2.
>
> Information about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance. Therefore, this Topic establishes requirements to disclose certain significant related party transactions and control relationships. Relevant information is omitted if the disclosures required by this Topic are not made. ASC 850-10-10-1.

352. Because Gray signed the C-145 transfer form on behalf of Remnant, the transferor, while managing Solis, the transferee that would become the operating business for New Era, the 87-Well Related-Party Transaction is clearly a related party transaction under ASC 850.

353. In addition, FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting, including the relevant concept of materiality. As stated in FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8"), the "objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about

providing resources to the entity" CON 8 ¶ OB2. A primary quality that renders financial information useful is faithful representation. For an entity to faithfully represent what it purports to represent, information must be complete, neutral, and free from error. CON 8 ¶ QC12. CON 8 further explains that materiality is entity specific: "The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." CON 8 ¶ QC11.

354. Further guidance on materiality is provided by SEC Staff Accounting Bulletin ("SAB") Topics 1.M, generally referred to as SAB No. 99, which offers the most comprehensive guidance on the determination of materiality of misstatements of financial statements. It brings together guidance from financial accounting standards, auditing standards, and Supreme Court decisions. SAB 99 addresses misstatements or omission of amounts, classifications, manner of presentation and disclosures in financial statements. It provides that the materiality assessment must be based on consideration of all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. It also sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material. *See, e.g.,* Financial Statements and Regulation S-X; Technical Amendments to Rules and Forms, 50 FR 49529-02 at 49,530 n.3 ("in some cases the significance of an item may be independent of the amount involved. For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately even though the dollar amounts involved are relatively small . . .").

355. According to SAB 999, "The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality." Thus, the evaluation of whether a misstatement or omission in financial statements is material is viewed from the standpoint of a reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors.

***2) Item 404 of Regulation S-K***

356. The SEC also has a line-item disclosure rule on related party transactions. Item 404 of Regulation S-K, codified at 17 C.F.R. § 229.404, governs disclosure of transactions with related persons, as well as related-party approval procedures.

357. The rule is intended to ensure that investors are told when a registrant's officers, directors, controlling shareholders, or other covered insiders have interests that may differ from those of the company and its public investors.

358. For each related party transaction in which the amount involved exceeds $120,000, and any related person had or will have a direct or indirect material interest, Item 404(a) requires the disclosure of:

> (1) The name of the related person and the basis on which the person is a related person.
>
> (2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.
>
> (3) The approximate dollar value of the amount involved in the transaction.
>
> (4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.
>
> (5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which

disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.

(6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

359. In addition to transactions that took place since the beginning of the registrant's last fiscal year, when the information called for by Item 404 is presented in a registration statement filed pursuant to the Securities Act or the Exchange Act, then – except for when the information is being incorporated by reference – Instruction 1 to Item 404 requires that the information be provided for the two fiscal years preceding the registrant's last fiscal year.

360. Moreover, Instruction 2 to Item 404(d) provides: "For smaller reporting companies information shall be given for the period specified in paragraph (a) of this Item and, in addition, for the fiscal year preceding the small reporting company's last fiscal year." New Era qualifies as a smaller reporting company, *see* Item 404 (citing § 229.10(f)(1)) and identified itself as one.

361. Finally, the Instructions to Item 404(a) define "related person" to include persons who served as a director or executive officer of the registrant, and also define "transaction" broadly to include, non-exhaustively, "any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships."

362. Accordingly, Item 404 of Regulation S-K required disclosure of New Era's related party transactions going all the way back to 2021.

***3) Item 101 of Regulation S-K***

363. Item 101 of Regulation S-K, codified at 17 C.F.R. § 229.101, is an SEC disclosure rule requiring a registrant to provide investors with a materially complete description of the

general development and present operation of its business, including the business of its subsidiaries and predecessors, for the period of time that is material to an understanding of the general development of the business.

364. The purpose of Item 101 is to provide investors with a coherent, decision-useful account of what the registrant's business is, how it was assembled and developed, and the material operational, regulatory, and environmental circumstances affecting it; not merely a selective description of its current products or most favorable attributes.

365. Item 101 required New Era to "[d]escribe the general development of the business of the registrant, its subsidiaries, and any predecessor(s)," including "[t]he acquisition or disposition of any material amount of assets otherwise than in the ordinary course of business."

366. As a smaller reporting company under SEC regulations, New Era could satisfy its Item 101 disclosure obligations by meeting the requirements set forth in Item 101(h), Smaller reporting companies.

367. That paragraph, however, specifically requires that a registrant's business development description include "[a]ny material reclassification, merger, consolidation, or purchase or sale of a significant amount of assets not in the ordinary course of business," and that this "information should be provided for the period of time that is material to an understanding of the general development of the business."

368. Finally, Item 101(h) provides: "If the smaller reporting company has not been in business for three years, provide the same information for predecessor(s) of the smaller reporting company if there are any."

369. Thus, Item 101 required New Era to disclose its related party transactions for the period of time that is material to an understanding of the general development of the business.

## MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### The Prospectus

#### *1) List of Related Party Transactions*

370. The Prospectus included New Era's audited financial statements for the years ended December 31, 2023 and 2022. Note 8 to those financial statements was entitled "RELATED PARTY TRANSACTIONS" and stated "The table below represents transactions with related parties that occurred during the years ended December 31, 2023 and 2022":

**NOTE 8. RELATED PARTY TRANSACTIONS**

The table below represents transactions with related parties that occurred during the years ended December 31, 2023 and 2022:

| Name of Party | Nature of Transaction | Year Ended December 31, 2023 | Year Ended December 31, 2022 |
|---|---|---|---|
| Will Gray | Advances from (to) related party, net | 170,000 | 168,342 |
| Joel Solis | Advances from (to) related party, net | 175,000 | — |
| Will Gray | Consulting fees | 348,000 | 339,047 |
| Mike Rugen[(1)] | Consulting fees | 40,000 | — |
| Joel Solis | Reassignment of liability | 70,000 | 70,000 |
| Melius Energy LLC | Repayment (advance) — related party | 19,000 | (50,000) |
| Melius Energy LLC[(2)] | Exchange of AR for ORRI | 969,809 | — |
| High Desert Resources, LLC | Consulting fees and associated costs | — | 12,230 |
| High Desert Resources, LLC | Repayment (advance) — related party | 68,000 | — |
| Liberty Pump & Supply, Co. | Oilfield services and insurance | 234,251 | 116,893 |
| Tall City Well Service | Oilfield services | 105,967 | 136,954 |

(1) Mr. Rugen was named the Company's CFO effective November 1, 2023. The costs in the table represent consulting fees incurred from November1, 2023 through December 31, 2023.

(2) Exchange of accounts receivable owed to the Company for ORRI in Melius properties (See NOTE 5)

F-74

371. The statement and the accompanying table were materially false and misleading because they omitted the 87-Well Related-Party Transaction through which Solis obtained a material portion of its oil-and-gas assets from Remnant's portfolio.

372. The related-party nature of the transaction is readily apparent: Defendant Gray was CEO and director of New Era; had served as the managing member of Solis (his alter ego) beginning in 2020; and was the founder and former CEO of Remnant. Gray occupied material and conflicting positions in the former operator and the transferee, and he participated personally in the 2022 transfer. *See* Ex. 6.

373. The omitted 87-Well Related-Party Transaction was material, as it concerned the origin of a substantial portion of New Era's producing assets, involved consideration greater than many of the transactions New Era chose to disclose, and presented conflicts and contingent risks qualitatively different from the routine insider advances and consulting arrangements listed in Note 8.

374. Investors evaluating New Era's assets, revenues, management integrity, environmental exposure and internal controls would have considered these facts important when considering New Era's Prospectus and the financial statements contained therein.

375. Not only was disclosure of the 87-Well Related-Party Transaction mandated by the accounting standards and SEC disclosure rules set forth above, but its omission presented investors with a materially incomplete and distorted account of New Era's related-party dealings and concealed the conflicted arrangement at the heart of its operating business.

***2) The Related Party Approval Process***

376. Under the heading "Related parties," the Prospectus represented:

> ***Management approves all material related-party transactions***. Management considers the details of ***each new, existing or proposed related party transaction***, including the

> terms of the transaction, the business purpose of the transaction, and the benefits to the Company and the relevant related party. In determining whether to approve a related party transaction, the following factors are considered: (1) if the terms are fair to the Company, (2) if there are business reasons to enter into the transaction, or (3) if the transaction would present an improper conflict of interest for any officer.

377. The statement was materially false and misleading because, while it assured investors that there was an existing management control in place whereby management approves all material related-party transactions and considered the details of ***"each new, existing or proposed"*** transaction, the approval process was not applied to the omitted 87-Well Related-Party Transaction at the heart of Solis and, therefore, of New Era's business.

378. Moreover, the use of "all" and "each" conveyed that New Era had identified its material related-party arrangements, subjected them to substantive review, and evaluated their terms, purpose, fairness, benefits, and officer conflicts before approving them. This was false.

379. The Prospectus did not disclose that management had identified the 87-Well Related-Party Transaction as a related-party transaction. It did not identify any person who reviewed or approved it; disclose when any review occurred; state whether Defendant Gray participated in or recused himself from that process; identify any nonconflicted decisionmaker; describe any valuation or fairness analysis; explain the transaction's business rationale; or disclose any determination that the transaction did not present an improper conflict.

380. Accordingly, the Prospectus's assertion that management approved all material related-party transactions and considered each existing transaction for fairness, business purpose, benefits, and officer conflicts was materially false and misleading, as it created the appearance of an effective conflict review process while New Era concealed the foundational transaction with Defendant Gray on both sides of the deal.

***3) The Company's Acquisition of its Wells***

381. Under the heading "Oil and Gas Properties, Wells, Operations, and Acreage," the Prospectus represented:

> The Company has acquired all of its interests in acreage and wells from acquisitions. In all of its acquisitions, New Era Helium Corp has been assigned all of the rights, title and interests of its predecessors in the leases and wells conveyed. This has included all title research, well files and logs, division of interest records, joint operating agreements and miscellaneous contracts.

382. Even if the word "acquisitions" is technically accurate if viewed in isolation, the statement is materially false and misleading in the context of a Prospectus that purports to itemize the related party transactions that occurred since the beginning of 2022 and omits the 87-Well Related-Party Transaction. A reasonable investor would read "acquisitions" to refer to typical market transactions, not material, related party transactions that occurred in 2022 but were omitted from the list.

383. It was also materially false and misleading for the Company to tout the provenance of its acquired wells while omitting why the provenance of the wells created a material financial and regulatory risk: Stating that the Company has been assigned all of the rights, title and interests of its predecessors conceals that the 87-well package originated in a predecessor portfolio that was burdened by substantial inactive-well, plugging, remediation, and reclamation obligations.

384. It was also grossly undersecured. By February 2024 – months before the Prospectus – the SLO had asserted a claim against Remnant's entire damage bond, identified (and provided extensive documentary and photographic proof of) numerous inactive wells, expired leases, unresolved spills, disturbed sites, and reclamation obligations, and concluded that plugging alone would cost "many times" the value of the bond, apart from remediation and reclamation. Defendant Gray was copied directly on that claim, and he understood that New Era had acquired

its wells from a portfolio (a portfolio that he himself had assembled and managed) containing major unmet ARO obligations to the State and that those obligations were being actively pursued, yet concealed all of these material facts from investors.

***4) The Environmental Remediation Risk Disclosure***

385. Among several risks related to regulatory compliance, the Prospectus stated, under the heading "***If*** we own, operate, or acquire lands with and releases of materials into the environment, we ***may be*** required to remediate such lands, which can be extremely costly," the Prospectus represented:

> We will be operating properties, such as oil and gas wells, compression units, and pipelines, that have the potential to release regulated materials into the environment. New Mexico passed rules clarifying the prohibitions on releases and remediation in 2021. ***Although we are not aware of any remediation for which we may be responsible at this time*** and we implement spill prevention plans, ***it is possible with future operation or with the acquisition of new lands, compressors, wells, and pipelines may have had releases subject to such requirements and subject to costly remediation***. Regulations also require the pugging and abandonment of wells, removal of production facilities, and other restorative actions ***by current former operators, including corporate successors of former operations.*** We are actively involved in plugging a few of our wells. The cost of future abandonment and plugging will depend on well activity and authorizations and cannot be predicted at this time.

386. The statement is materially false and misleading because, while New Era claims that "we are not aware of any remediation for which we may be responsible at this time," months before the Prospectus was issued, Defendant Gray had received direct notice that Solis already faced unresolved cleanup, reclamation, plugging, and restorative obligations to the State.

387. In fact, on June 1, 2023, the SLO advised Solis's counsel – copying Gray – that Grizzly and Solis had not provided the required work plan for the cleanup of State Lease V0-0503. The SLO demanded to know which entity would provide the cleanup plan and when. The

correspondence concerned pending Grizzly lease assignments into Solis and a property associated with the portfolio that Solis had begun operating in 2020.

388. On December 14, 2023, the SLO again wrote directly to Gray and Solis concerning delinquent well sites. The agency stated that its inspector had determined that the prior reclamation work was insufficient, and further stated that the prior work had been completed without an approved plan and directed Solis not to undertake additional field work until it submitted and obtained approval of a written reclamation plan.

389. The same day, the SLO asked Gray whether Solis had plugged Bitter Lake PX State #001 and #002. The agency stated that the underlying lease had expired in 2021, that both wells were "long overdue" to be plugged, and that Solis should make the work a priority and provide an estimated completion date. Defendant Gray personally responded that Solis was securing bids and expected to begin in early 2024.

390. Thus, the Prospectus's assertion that New Era was unaware of any remediation for which it "may be responsible" was false or, at minimum, materially misleading. The statement did not say that no liability had been finally adjudicated; it claimed that management was unaware even of remediation for which the Company might bear responsibility. By the Prospectus date, however, Defendant Gray knew that the SLO had attributed unresolved corrective obligations to Solis and had required Solis to submit plans and perform additional remediation work.

391. Moreover, the SLO's November 13, 2024 cease-and-desist letter – sent just a week after the Prospectus – did not identify newly arising conditions. It formalized and expanded upon the same preexisting deficiencies documented in 2023. The letter stated that Solis had failed to properly remediate plugged-well sites and specifically identified the same properties as having incomplete reclamation obligations.

392. The statement was independently misleading because it described remediation exposure as something that might stem from future operations or the future acquisition of properties. In reality, the risk had already materialized. Solis already operated properties subject to unresolved corrective obligations, and the SLO had already demanded additional plans, plugging, and remediation work from Solis.

393. Finally, the Prospectus expressly acknowledged that plugging and restorative obligations could apply to "corporate successors of former operations," but continued to conceal the specific predecessor arrangement that created precisely such a risk for Solis and New Era.

394. By February 2024, Defendant Gray had been placed on direct notice that the former Remnant portfolio carried substantial, existing, and grossly undersecured environmental obligations. The State concluded that plugging alone would cost "many times" the amount of the bond, apart from remediation and reclamation costs, in its bond claim and attached aerial surveillance data documenting those conditions.

395. These facts establish that Defendant Gray had already received direct notice (1) of existing Solis cleanup, reclamation, and remediation requirements, and (2) of extensive, grossly underfunded environmental obligations in the Remnant/Acacia predecessor portfolio, yet New Era concealed the related-party transaction through which Solis had received the productive assets associated with that portfolio.

396. Accordingly, the Prospectus' statement that "we are not aware of any remediation for which we may be responsible at this time" was false and misleading. Defendants were aware of remediation work concerning its own portfolio, in addition to the Remnant/Acacia portfolio, that fit that description. New Era's statement was false.

*5) The Federal and State Lands Risk Disclosure*

397. Under the heading "We operate on federal and state lands, which have rules and regulations related to our business and require us to pay royalties, which may adversely affect our operations," the Prospectus represented:

> The operation of our wells on federal and state lands are subject to additional regulations under the BLM and New Mexico State Land office. Although we are currently operating these leases on these lands and expect to be able to continue such production, additional delays, costs, and restrictions may be added to these leases. Currently, eighteen of our New Mexico State Land leases we are operating are being transferred to our name, which we understand this is near completion.

398. The statement was materially false and misleading because it conveyed several reassuring present-tense messages to investors: New Era, through Solis, was lawfully operating its government leases; management reasonably expected production from these leases to continue; any additional governmental delays, expenses, or restrictions remained future possibilities; and the only identified issue affecting eighteen New Mexico State leases was a nearly completed administrative transfer into Solis. By the time the Prospectus was issued, however, New Era was not merely awaiting routine administrative processing while otherwise operating a stable and compliant lease portfolio. Solis was operating wells on expired or canceled leases, had unresolved plugging and reclamation obligations, had encountered regulatory obstacles affecting its permitting activities, and remained embroiled in a longstanding State-lease assignment process involving unresolved cleanup conditions, with Defendant Gray having received direct notice of these matters multiple times.

399. Moreover, the State leases being referred to are leases that had been in a contested state of regulatory limbo since the transfer from Grizzly was initiated in September of 2020, about which the SLO wrote directly to Gray repeatedly in 2023.

400. The "near completion" statement was false or misleading, even if framed as management's understanding, because the Prospectus omitted the specific facts known to Gray that materially undermined that stated belief, including the longstanding limbo of the Grizzly assignments, the SLO's demand for an outstanding cleanup plan, and Solis's continued operation of wells despite lacking approved record title to the leases. The statement described a state of affairs materially different from the one that actually existed.

401. In addition, the Prospectus misleadingly described additional "delays, costs, and restrictions" as matters that "may be added" to the leases in the future. In truth, the relevant restrictions had already begun to materialize. Several leases had expired before the Prospectus; other leases had been canceled for failure to pay rentals; Solis was attempting to cure or reinstate affected lease rights; and continued production from certain properties exposed Solis to demands for cessation, plugging, reclamation, and payment for production taken without a valid lease.

402. Accordingly, the Prospectus materially misled investors by portraying New Era as presently operating its government leases with a reasonable expectation of continued production; characterizing additional restrictions, costs, and delays as mere future possibilities; and describing the eighteen State-lease transfers as near completion. In reality, none of that was true, based on facts known by Gray and New Era and contrary to the reassuring account presented to investors.

***6) The Environmental Matters Contingency***

403. Finally, in the Commitments and Contingencies section, under the heading "Environmental Matters," the Prospectus represented:

> The Company, as a lessee of oil and gas properties, is subject to various federal, provincial, state and local laws and regulations relating to discharge of materials into, and protection of, the environment. These laws and regulations may, among other things, impose liability on the lessee under an oil and gas lease for the cost of pollution clean-up resulting from operations and subject the lessee to liability for pollution damages. In some instances, ***the Company may be directed to suspend or cease operations in the***

***affected area. There can be no assurance, however, that current regulatory requirements will not change, or past noncompliance with environmental laws will not be discovered on the Company's properties***.

404. The statement was materially false and misleading because it described environmental noncompliance, cleanup liability, and operational restrictions as matters that might arise or be discovered in the future, while omitting that state authorities had already identified specific cleanup, reclamation, plugging, and compliance deficiencies affecting properties operated by Solis and had communicated those matters directly to Defendant Gray.

405. In particular, the statement that there could be no assurance that "past noncompliance with environmental laws will not be discovered" conveyed that the Company was unaware of any presently discovered noncompliance. A reasonable investor would understand that language to mean that historical violations might be uncovered through future inspections or regulatory review; not that regulators had already inspected Solis properties, identified deficient work, demanded corrective plans, and required plugging and reclamation work.

406. The statement was further misleading because it focused on the possibility that "current regulatory requirements will" change. New Era's problems did not depend upon any future change in environmental requirements. The deficiencies identified by the SLO arose under existing requirements governing cleanup plans, plugging, remediation, reclamation, and the protection of State lands. Warning that the regulatory framework might change misleadingly concealed that the Company was already confronting demands under the regulations then in force.

407. Accordingly, the Prospectus's "Environmental Matters" contingency was materially false and misleading. It portrayed changes in regulation, the discovery of historical noncompliance, environmental cleanup liability, and suspension of operations as possible future

events, when state authorities had already identified specific environmental and reclamation deficiencies, communicated them directly to Gray and demanded corrective action.

**The S-1 Prospectus**

408. The S-1 Prospectus repeated each materially false and misleading statements from the Prospectus in full.

409. The six identical statements were materially false and misleading for the same reasons as those provided in the immediately preceding section.

**The 2024 Annual Report**

***1) Certain Relationships and Related Transactions, and Director Independence***

410. In Item 13 of the 2024 Annual Report, entitled "Certain Relationships and Related Transactions, and Director Independence," New Era represented:

> In addition to the compensation arrangements with directors and executive officers described under 'Executive and Director Compensation' and 'Management,' the following is a description of ***each transaction*** since January 1, 2022 and each currently proposed transaction in which:
>
> ● we have been or are to be a participant;
>
> ● the amount involved exceeded or will exceed $120,000; and
>
> ● any of our directors, executive officers or beneficial holders of more than 5% of our capital stock, or any immediate family member of, or person sharing the household with, any of these individuals (other than tenants or employees), had or will have a direct or indirect material interest.
>
> …

411. After stating the above, Item 13 went on to describe certain Related Party Transactions but omitted the 87-Well Related-Party Transaction.

412. The above statement in Item 13 was materially false and misleading because, while New Era represented that the filing described "***each transaction since January 1, 2022***"

satisfying the stated participation, value, and related-person criteria, it omitted the critical 87-Well Related-Party Transaction.

413. In addition, Item 13 of Form 10-K specifically requires registrants to furnish the information called for by Item 404 of Regulation S-K, which defines a "transaction" broadly to include not only a discrete purchase or sale, but any financial transaction, arrangement or relationship, including any series of similar transactions, arrangements, or relationships.

414. New Era's own Related Party Policy likewise defined a related-party transaction as one in which the amount involved exceeded $120,000, New Era ***or any of its subsidiaries*** was a participant, and a director, executive officer, greater-than-five-percent beneficial owner, or covered family or household member had a direct or indirect material interest.

415. Item 13 was materially false and misleading because New Era did not proceed to disclose the 87-Well Related-Party Transaction, even though that arrangement satisfied the filing's stated criteria and was far more consequential than many of the insider transactions New Era chose to disclose.

416. The 87-Well Related-Party Transaction satisfied the first Item 13 criterion because Solis was the transferee and direct participant in the arrangement. Solis thereafter became New Era's wholly owned operating subsidiary, continued to hold and operate the transferred wells, and supplied the producing assets and revenues consolidated into New Era's business during the Class Period. New Era's own policy expressly included transactions involving any subsidiary.

417. The transaction satisfied the second criterion because the "amount involved" exceeded $120,000. Acacia's formal corporate resolution authorized a sales price for the wells of $400,000; this is more than three times the disclosure threshold.

418. The transaction satisfied the third criterion because Gray was a covered related person with a direct or indirect material interest. The 2024 Form 10-K identified Gray as New Era's CEO and Chairman, stated that he had served as managing member of Solis beginning in 2020, and acknowledged that he was the founder and former CEO of Remnant.

419. More, Defendant Gray personally signed the C-145 on behalf of Remnant while the wells were being transferred into Solis, the entity he managed. The arrangement therefore involved New Era's CEO acting in connection with both the former operator and the transferee that became New Era's principal operating subsidiary.

420. This related party transaction was not complete until 2022, *see* Ex. 1 at ¶135 ("Transfer of the 87 wells to Solis Partners was not complete until OCD approved the transfer application on February 2, 2022."), and in addition the arrangement also remained an existing and economically operative related-party relationship after 2022. Solis continued to hold and operate the wells; New Era acquired Solis and consolidated its assets and financial results; Defendant Gray continued to control and manage the operating business; and New Era continued to receive the economic benefits associated with the properties. Item 13 could not and did not fairly present a complete account of New Era's qualifying related-person transactions while concealing this foundational arrangement.

421. The scale of the omitted transaction further demonstrates its materiality. The omitted arrangement involved 87 wells (the best gas wells from the Remnant portfolio), while the 2024 Form 10-K reported that New Era had 406 gas wells in total.

422. Even apart from the mandatory requirements of Item 404, the statement was false. Once New Era affirmatively represented that Item 13 described "each transaction since January

1, 2022" satisfying the listed criteria, it could not omit the transaction that most directly implicated the criteria it had chosen to describe.

423. Accordingly, the above statement in Item 13 was materially false and misleading because it expressly represented that New Era had disclosed each qualifying related-person transaction since January 1, 2022, while failing to disclose the 87-Well Related-Party Transaction, Defendant Gray's conflicting roles, and the material risks arising from the arrangement.

***2) Related Party Policy***

424. Item 13 also stated, under the heading "Related Party Policy":

> Our Code of Ethics requires us to avoid, wherever possible, all related party transactions that could result in actual or potential conflicts of interests, except under guidelines approved by the Board (or the audit committee). Related-party transactions are defined as transactions in which (1) the aggregate amount involved will or may be expected to exceed $120,000 in any calendar year, (2) we or any of our subsidiaries is a participant, and (3) any (a) executive officer, director or nominee for election as a director, (b) greater than 5% beneficial owner of our common stock, or (c) immediate family member, of the persons referred to in clauses (a) and (b), has or will have a direct or indirect material interest…
>
> Our audit committee, pursuant to its written charter, is responsible for reviewing and approving related-party transactions to the extent we enter into such transactions. All ongoing and future transactions between us and any of our officers and directors or their respective affiliates will be on terms believed by us to be no less favorable to us than are available from unaffiliated third parties. Such transactions will require prior approval by our audit committee and a majority of our disinterested independent directors, or the members of our Board who do not have an interest in the transaction, in either case who had access, at our expense, to our attorneys or independent legal counsel.

425. The statement was materially false and misleading. While the statement made affirmative representations concerning the integrity of New Era's corporate-governance and conflict-review procedure and conveyed that New Era had established controls designed to identify transactions presenting actual or potential insider conflicts and subject those transactions to independent scrutiny, this related party policy was not as described because it failed to disclose (or identify any application of the policy to) the 87-Well Related-Party Transaction.

426. Considering Gray's relationships with Remnant and Solis, his participation for the transferor while managing the transferee, and his economic interest in New Era, the transaction presented precisely the type of actual or potential conflict the policy purported to address; yet the Annual Report did not identify any audit-committee or Board review of the transaction; did not identify the directors who purportedly considered it; did not describe any recusal by Gray; did not disclose any independent valuation, fairness analysis or legal opinion; did not state that the transaction had been approved; or disclose that the transaction had been excluded from the policy.

427. Accordingly, Item 13's Related Party Policy was materially false and misleading because, with the 87-Well Related-Party Transaction concealed, it assured investors that New Era avoided actual or potential insider conflicts and required audit-committee and disinterested-director approval of related party transactions. That was not true.

***3) The Related Party Approval Process***

428. In addition to Item 13's discussion entitled "Related Party Policy," the Annual Report repeated the Prospectus's false and misleading statement that this Complaint identified as the "Related Party Approval Process."

429. The statement was materially false and misleading when repeated in the Annual Report for the same reasons it was materially false and misleading when made in the Prospectus.

***4) The Company's Acquisition of its Wells***

430. The Annual Report repeated the Prospectus's false and misleading statement that this Complaint identified as "The Company's Acquisition of its Wells."

431. The statement was materially false and misleading when repeated in the 2024 Annual Report for the same reasons it was materially false and misleading when made in the Prospectus.

432. Also, touting the provenance of New Era's wells by mentioning its predecessors was even more misleading now, as Acacia had gone bankrupt on December 27, 2024.

***5) The Environmental Remediation Risk Disclosure***

433. The Annual Report repeated the Prospectus's false and misleading statement that this Complaint identified as "The Environmental Remediation Risk Disclosure."

434. The statement was materially false and misleading when repeated in the 2024 Annual Report for the same reasons it was materially false and misleading when made in the Prospectus.

435. In addition, the statement that "***we are not aware of any remediation for which we may be responsible at this time***" was even more misleading when repeated in the 2024 Annual Report, filed on March 31, 2025, because this was several months after Solis and Defendant Gray had received the SLO's cease and desist letter on November 12, 2024 outlining Solis' many unmet environmental and remediation responsibilities.

436. Accordingly, while the risk disclosure acknowledged the possibility that delays, costs and restrictions in connection with the Company's operation on public lands could arise in the future, it concealed that, by the time of this Annual Report, the SLO had sent a formal cease-and-desist and compliance demand directly to Defendant Gray and Solis identifying "serious compliance issues," asserting that Solis had operated wells after their underlying leases expired, and ordering Solis immediately to cease commercial operations on wells the agency said remained in trespass. The SLO further demanded that Solis plug wells on expired and canceled leases, plug inactive wells, remediate and reclaim the affected sites, pay for production taken in trespass, and address 43 wells located on five leases that the agency stated had been canceled for nonpayment. Because the risks of environmental remediation had long materialized, this risk disclosure was false and materially misleading.

***6) The Environmental Matters Contingency***

437. The Annual Report repeated the Prospectus's false and misleading statement that this Complaint identified as "The Environmental Remediation Risk Disclosure."

438. The statement was materially false and misleading when repeated in the 2024 Annual Report for the same reasons it was materially false and misleading when made in the Prospectus.

439. In addition, the (future and/or hypothetical tense) statement ***"In some instances, the Company may be directed to suspend or cease operations in the affected area"*** was even more misleading when repeated in the 2024 Annual Report, filed on March 31, 2025, because this was several months after Solis and Defendant Gray had received the SLO's cease and desist letter on November 12, 2024 explicitly ordering Solis to, inter alia, cease operations on expired leases and complete the remediation work as required by law.

440. Thus, at the time New Era disclosed that environmental noncompliance may "be discovered," it had already been "discovered" in the most concrete sense relevant to investors: the responsible state land agency, the SLO, had identified specific leases, wells, periods of alleged trespass, inactive wells, missing rentals, plugging obligations, remediation deficiencies, and claimed unpaid production proceeds. The SLO had communicated those findings directly to Gray and Solis and had demanded immediate corrective action. The Company's Environmental Matters contingency was actionably false.

***7) The Updated Federal and State Lands Risk Disclosure***

441. Under the heading "We operate on federal and state lands, which have rules and regulations related to our business and require us to pay royalties, which may adversely affect our operations," the 2024 Annual Report provided an updated disclosure as compared to the disclosure contained in the Prospectus, stating:

> The operation of our wells on federal and state lands are subject to additional regulations under the Bureau of Land Management, an agency within the United States Department of the Interior responsible for administering U.S. federal lands (the "BLM"), the New Mexico Oil Conservation Division, (the "NMOCD"), as well as the New Mexico State Land office("NMSLO"). Although we are currently operating these leases on these lands and expect to be able to continue such production, additional delays, costs, and restrictions may be added to these leases in the future by these agencies. ***For example, we began legally operating eighteen State leases assigned to us by another entity in September of 2020. However, the NMSLO did not transfer these leases into our name initially. This finally occurred on February 1, 2023.***

442. The statement is materially false and misleading. It conveyed that: (i) Solis possessed secure and continuing authority to operate its government leases; (ii) management reasonably expected production from those leases to continue; and (iii) with respect to the leases assigned to Solis in September 2020, the only material problem affecting the eighteen State leases had been a historical administrative or bureaucratic delay by the SLO that was finally and completely resolved in February 2023.

443. Each of those implications was materially false or misleading.

444. First, before New Era filed the Annual Report on March 31, 2025, the SLO had already sent Defendants Gray and Solis a formal cease-and-desist and compliance demand identifying "serious compliance issues" affecting Solis's State-land operations. The agency alleged that Solis had continued producing from expired leases in trespass, allowed wells to become chronically or functionally inactive and failed to properly remediate plugged-well sites. The SLO demanded that Solis cease specified operations, plug numerous wells, remediate and reclaim affected sites, pay for production taken in trespass, and otherwise bring its operations into compliance. The statement's suggestion that Solis possessed secure and continuing authority to operate its government leases was false.

445. Second, the representation that New Era ***"expect[ed] to be able to continue"*** production on government land was misleading because Defendants omitted the particularized facts known to them that directly undermined the stated expectation, including expired and canceled leases, a formal cease and desist demand, outstanding rental disputes, pending transfers of operatorship, wells facing immediate plugging demands, and incomplete remediation. Investors were given Defendant's rosy expectation without the known facts necessary to evaluate its basis.

446. Third, the statement misrepresented the history and status of the eighteen State-lease assignments. The filing identified neither the assignor nor the leases and portrayed the matter as a straightforward administrative delay: Solis began legally operating the leases in September 2020, the SLO initially failed to transfer them into Solis's name, and the transfer "finally occurred" on February 1, 2023.

447. As explained above, the statement concerns a subset of wells transferred to Solis from Grizzly, including numerous wells situated on New Mexico State lands, and the assignment process did not encounter merely administrative delay. In fact, the process was still not complete as of the time the SLO sent Solis the formal cease and desist letter in November of 2024.

448. Accordingly, the Annual Report materially misrepresented both New Era's present regulatory condition and the history of the eighteen State-lease assignments. It portrayed continued production as reasonably expected, described additional restrictions and costs as merely future possibilities, blamed the SLO for what the Company implied was an administrative delay, and represented that the assignment problem had been finally resolved in February 2023 when, in reality, Solis faced existing cessation, plugging, payment, and remediation demands; several

leases had expired or been canceled; and title and transfer issues remained unresolved. The Annual Report's statement was false and materially misleading.

**The Class Period 10-Qs**

449. All three of New Era's 10-Qs filed during the Class Period repeated the false and misleading statements which appeared in both the Prospectus and the 2024 Annual Report that this Complaint identifies as the "Related Party Policy" and the "Environmental Matters Contingency."

450. Each of these statements wase materially false and misleading when repeated in the Class Period 10-Qs for the same reasons it was materially false and misleading when made in the Prospectus and 2024 Annual Report.

**Defendants' Denial of the FP Report**

451. In response to the FP Report that identified, *inter alia*, the conflicted Remnant–Acacia–Solis related party chain, Defendants released a press release the same day entitled "New Era Energy & Digital Responds to False and Misleading Allegations by Short Seller," stating:

> The Company believes the claims made by Fuzzy Panda are factually inaccurate and an attempt to mislead investors about New Era's actual operations, financial position and status of the Company's various projects. The Company urges investors to rely on its SEC filings and formal disclosures.
>
> E. Will Gray II, CEO of New Era Energy & Digital, commented: "We are a shareholder focused company and have kept investors updated with our project status via multiple channels. We take false claims against our company seriously and especially when it is to mislead and manipulate the market.["]

452. The statement was materially false and misleading because, while a reasonable investor would understand the response to mean that the FP Report had not uncovered a material undisclosed transaction involving New Era's assets, management, or related parties, the core facts

in the FP Report were accurate and would be corroborated in extensive detail by the New Mexico lawsuit filed later that month.

453. Moreover, New Era's instruction that investors rely upon its SEC filings and formal disclosures was independently false and misleading, as those were the very documents that had concealed the 87-Well Related-Party Transaction in the first place.

454. Accordingly, the statement directing investors back to the filings containing the very omissions highlighted by the FP Report reaffirmed the misleading impression that New Era's disclosed related-party transactions were complete and that no undisclosed insider arrangement affected the origin, value, or potential liabilities of its operating assets. This was false.

## LOSS CAUSATION

455. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about New Era Energy's business and assets. These statements inflated the price of New Era Energy's securities as, if Defendants had instead told the truth, the share price would have dropped. As a result, during the Class Period, Plaintiffs and the Class Members purchased New Era Energy's securities at artificially inflated prices. The price of the Company's securities significantly declined when the misrepresentations made to the market were corrected, and/or the information alleged herein to have been concealed from the market was revealed and/or the risks thereof materialized, causing investor losses.

456. On December 12, 2025, during trading hours, the FP Report disclosed part of the truth concerning the Remnant–Acacia–Solis related party chain, stating that: "of NUAI's 406 gas wells, 346 were acquired from companies that went bankrupt operating the very same wells, ***including 87 wells from the company E. Will Gray II was CEO of and bankrupted himself, Remnant Oil,*** " and further Remnant's wells were "***acquired in bankruptcy by a related party, Acacia Resources, and were then sold to Solis Partners, a subsidiary of New Era Energy***."

457. On this news, New Era's stock price fell $0.25 per share, or 6.9%, to close at $3.35 on December 12, 2025, on unusually heavy trading volume.

458. Market reaction confirmed that the stock price decline was caused by the facts contained in the FP Report. For instance, the investing website Investing.com ran a story on December 12, 2025, entitled: "New Era Energy & Digital stock falls after Fuzzy Panda short report."

459. On December 29, 2025, during trading hours, the HM Report published an investor-facing account that publicized the details of the New Mexico lawsuit, explaining how "the complaint places Everett Willard Gray II at the center of the alleged activity, portraying him as the mastermind and primary beneficiary of the scheme," and how "New Mexico further alleges that the most valuable gas wells — 87 in total — were transferred from Acacia to Solis Partners, an entity the complaint says was 'dominated and controlled' by Gray."

460. Market reaction confirmed that the stock price decline was caused by the facts contained in the HM Report. For instance, Investing.com ran a story on December 29, 2025, just after trading, entitled: "New Era Energy stock plunges after CEO named in fraud lawsuit."

461. While the New Mexico lawsuit had been filed a few days earlier, the news of its allegations did not get picked up by the financial press and absorbed by the investing public until the HM Report publicized it to investors. For instance, searching for company-relevant news by the stock ticker, NUAI, the first news of the New Mexico lawsuit is the HM Report on December 29, 2025. Indeed, the Company released its statement, "New Era Energy & Digital Issues Statement Setting the Record Straight Regarding New Mexico Civil Complaint," on the evening of December 29, 2025.

462. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

463. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities who (i) purchased the common stock of New Era Energy traceable to the Registration Statement and Prospectus (together, "Registration Statement") in connection with the Company's IPO which closed on December 6, 2024 (the "Securities Act Class"); and/or (ii) who purchased the common stock of New Era Energy between December 9, 2024 and December 29, 2025, inclusive (the "Exchange Act Class").

464. The Class members are so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by New Era Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

465. Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

466. Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

467. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the federal securities laws;

b. whether the Registration Statement misrepresented material facts;

c. whether the Registration Statement omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. whether the Class members have sustained damages and, if so, what is the proper measure of damages.

468. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICATION OF PRESUMPTION OF RELIANCE**

469. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. New Era Energy's common shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

b. As a public issuer, New Era Energy filed periodic public reports;

c. New Era Energy regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press

releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. New Era Energy's common shares were liquid and traded with heavy volume during the Class Period; and

e. New Era Energy was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

470. Based on the foregoing, the market for New Era Energy common shares promptly digested current information regarding New Era Energy and reflected that information in the prices of the securities. Accordingly, Plaintiffs and the Exchange Act Class Members are entitled to a presumption of reliance upon the integrity of the market.

471. Alternatively, Plaintiffs and the Exchange Act Class Members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## SECURITIES ACT CLAIMS

## COUNT I

**Violations of Section 11 of the Securities Act Against All Defendants**

472. Plaintiffs repeat and reallege the allegations set forth in ¶¶1-407, 463-468 as if fully set forth herein. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

473. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Class, against all Defendants. Plaintiffs bring this Section 11 claim, alleging strict liability and negligence.

474. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

475. New Era Energy is strictly liable for issuing, and all other Defendants are liable for negligently issuing, the Registration Statement.

476. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

477. Plaintiffs in the Securities Act Class acquired New Era Energy common shares pursuant to the Registration Statement.

478. At the time of their purchases of New Era Energy common shares, Plaintiffs and members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

479. The true value of New Era Energy's shares at the time this lawsuit was filed was substantially below the IPO price.

480. The Defendants are strictly liable to Plaintiffs and the Securities Act Class for the misstatements and omissions in the Registration Statement.

481. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**COUNT II**

**Violations of Section 15 of the Securities Act Against the Individual Defendants**

482. Plaintiffs repeat and reallege the allegations set forth in ¶¶1-407, 463-468 as if fully set forth herein. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

483. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o on behalf of the Securities Act Class against the Individual Defendants, both of whom was a control person of New Era Energy during the relevant period.

484. The Individual Defendants were in positions to control, and did control, the false and misleading statements and omissions contained in the Registration Statement.

485. Neither of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

486. Plaintiffs and the Securities Act Class have sustained damages. The value of New Era Energy common shares has declined substantially due to the Securities Act violations alleged herein.

487. This Claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## SECURITIES EXCHANGE ACT CLAIMS

## COUNT III

### Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

488. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

489. This Count is asserted on behalf of the Exchange Act Class against All Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

490. During the Class Period, All Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

491. The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a. employed devices, schemes and artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c. engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of New Era Energy securities during the Class Period.

492. The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of New Era Energy were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of New Era Energy, their control over, and/or receipt and/or modification of these materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning New Era Energy and its business, participated in the securities law violations alleged here.

493. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Exchange Act Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them and/or the Company and/or other Company personnel to members of the investing public, including Plaintiffs and the Exchange Act Class.

494. As a result of the foregoing, the market price of New Era common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Exchange Act Class relied on the statements described above and/or the integrity of the market price of New Era Energy common shares during the Class Period in purchasing New Era Energy common shares at prices that were artificially inflated as a result of the Defendants' materially false and misleading statements and omissions.

495. Had Plaintiffs and the other members of the Exchange Act Class been aware that the market price of New Era Energy common stock had been artificially inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased New Era Energy common shares at the artificially inflated prices that they did, or at all.

496. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Exchange Act Class for substantial damages which they suffered in connection with their purchase of New Era Energy common stock during the Class Period.

**COUNT IV**

**Violations of Section 20(a) of the Securities Exchange Act Against the Individual Defendants**

497. Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

498. This Count is brought on behalf of the Exchange Act Class against the Individual Defendants, pursuant to Section 20(a) of the Exchange Act.

499. During the Class Period, the Individual Defendants participated in the operation and management of New Era Energy, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the

adverse non-public information about New Era Energy, including concerning the provenance of its gas and oil wells and the potential environmental liability those wells entailed.

500. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to New Era Energy's financial and operational condition, and to correct promptly any public statements issued by the Company that had become materially false or misleading.

501. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that the Company disseminated into the marketplace during the Class Period concerning New Era Energy's financials and its business. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause New Era Energy to engage in the wrongful acts complained of herein, including by signing the Company's SEC filings as alleged herein. The Individual Defendants therefore, were "controlling persons" of New Era Energy within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein. which artificially inflated the market price of New Era Energy's common shares.

502. By reason of the above conduct, the Individual Defendants are liable to Plaintiffs and members of the Exchange Act Class pursuant to Section 20(a) of the Securities Exchange Act for the violations committed by New Era.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: August 21, 2026

**CONDON TOBIN SLADEK SPARKS NERENBERG PLLC**

/s/ Stuart L. Cochran
Stuart L. Cochran
Texas Bar No. 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Tel: (214) 691-6311
scochran@condontobin.com

*Liaison Counsel for*
*Lead Plaintiff and the Class*

**THE ROSEN LAW FIRM P.A.**

Laurence M. Rosen (pro hac vice)
Phillip Kim (pro hac vice)
Michael Cohen (pro hac vice)
275 Madison Avenue, 40th Floor
New York, New York 10016
Tel: (212) 686-1060
lrosen@rosenlegal.com
philkim@rosenlegal.com
mcohen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*