**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| KEVYN ANNONIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEW ERA ENERGY & DIGITAL, INC., EVERETT WILLARD GRAY II, and MICHAEL J. RUGEN,<br><br>Defendants. | Case No. 7:26-cv-00120-DC-RCG<br><br>**CLASS ACTION** |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3

III. LEGAL STANDARDS ..... 5

IV. ARGUMENT AND AUTHORITIES ..... 7

A. The Securities Act claims (Counts I and II) must be dismissed because no Plaintiff pleads facts tracing his shares to the S-4 Registration Statement. ..... 7

B. Plaintiffs have not pleaded that any challenged statement was actionably false or misleading. ..... 9

1. Category A: The related-party transaction disclosures describe transactions that occurred in 2022 or later—and the 87-well transaction occurred in 2021 (Statements 1 and 7). ..... 9

2. Category B: The related-party policy descriptions govern transactions New Era enters into, and Plaintiffs plead no facts showing that either policy went unfollowed (Statements 2 and 8). ..... 12

3. Category C: The acquisition statement accurately describes what New Era acquired (Statement 3). ..... 14

4. Category D: The environmental risk factor addresses remediation of releases, and it disclosed the plugging and restoration obligations Plaintiffs say it concealed (Statement 4). ..... 17

5. Category E: The federal-and-state-lands risk factor accurately described Solis's operations and the eighteen-lease transfer (Statements 5 and 9). ..... 20

6. Category F: The Environmental Matters note makes no representation about the Company's compliance record (Statement 6). ..... 24

7. Category G: New Era's belief that the short seller's claims were inaccurate is not actionable (Statement 10). ..... 26

C. Plaintiffs fail to satisfy the PSLRA's high standards for pleading scienter. ..... 27

1. The Complaint pleads nothing about Rugen's state of mind. ..... 28

2. The Complaint pleads only that Gray knew the underlying facts, which does not establish scienter. ..... 29

3. Because neither Individual Defendant acted with scienter, the claim against New Era fails. ........ 36

D. The Section 20(a) claim (Count IV) fails because Plaintiffs plead no primary violation. ........ 37

V. CONCLUSION ........ 37

## TABLE OF AUTHORITIES

### Cases

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) .......... 28, 29

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019).......... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......... 5, 24

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) .......... 25

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017).......... 30

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) .......... 15

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*,
908 F.3d 872 (3d Cir. 2018).......... 14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011).......... 30

*Cupat v. Palantir Techs., Inc.*,
2025 WL 1141534 (D. Colo. Apr. 4, 2025).......... 9

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
579 F. Supp. 3d 933 (S.D. Tex. 2022) .......... 24, 25

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).......... 6

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) .......... 7

*Firefighters Pension & Relief Fund v. Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014).......... 19

*In re Ariad Pharms., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016).......... 7, 8

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017).......... 13

*In re CrowdStrike Holdings, Inc. Sec. Litig.*,
816 F. Supp. 3d 683 (W.D. Tex. 2025) .................... 28

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
245 F. Supp. 3d 870 (S.D. Tex. 2017) .................... 25

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018) .................... 6

*In re Remnant Oil Co.*,
No. 19-70106 (Bankr. W.D. Tex. June 8, 2020) .................... 4

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) .................... 16, 26, 31, 32

*Jackson Inv. Grp., LLC v. Thomas*,
325 F. Supp. 3d 1334 (N.D. Ga. 2017) .................... 31

*Johnson v. CBD Energy Ltd.*,
2016 WL 3654657 (S.D. Tex. July 6, 2016) .................... 8

*Krim v. pcOrder.com, Inc.*,
402 F.3d 489 (5th Cir. 2005) .................... 8

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) .................... 15

*Melder v. Morris*,
27 F.3d 1097 (5th Cir. 1994) .................... 6, 29

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) .................... 7, 11, 29, 30

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) .................... 28

*Newtyn Partners, LP v. All. Data Sys. Corp.*,
165 F.4th 947 (6th Cir. 2026) .................... 36

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016) .................... 15, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .................... passim

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) .................... 34

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
777 F. App'x 726 (5th Cir. 2019) ........ 13

*R2 Invs. LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) ........ passim

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ........ 13

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012) ........ 26

*SEC v. Southwest Coal & Energy Co.*,
624 F.2d 1312 (5th Cir. 1980) ........ 29, 30, 31

*Shivangi v. Dean Witter Reynolds, Inc.*,
825 F.2d 885 (5th Cir. 1987) ........ 3, 29, 31

*Shnayder v. Allbirds, Inc.*,
2025 WL 1745596 (N.D. Cal. June 23, 2025) ........ 8

*Slack Techs., LLC v. Pirani*,
598 U.S. 759 (2023) ........ 1, 7

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ........ passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........ 6, 35, 36

*TransEnterix Inv'r Grp. v. TransEnterix, Inc.*,
272 F. Supp. 3d 740 (E.D.N.C. 2017) ........ 7

*Winer Family Tr. v. Queen*,
503 F.3d 319 (3d Cir. 2007) ........ 15, 24, 30

**Statutes**

15 U.S.C. § 77k(a) ........ 5, 9

15 U.S.C. § 78u-4(b)(1) ........ 6, 24

15 U.S.C. § 78u-4(b)(2)(A) ........ 3, 6, 27, 30

**Rules and Regulations**

19.2.100.67 NMAC ........ 19

19.15.29.8 NMAC ........ 18, 19

19.15.29.12 NMAC ........ 18

19.15.29.13 NMAC ........ 18

Fed. R. Civ. P. 8 ........ 24

Fed. R. Civ. P. 9(b) ........ 6, 24

Fed. R. Civ. P. 12(b)(6) ........ 1

Defendants New Era Energy & Digital, Inc. ("New Era" or the "Company"), Everett Willard Gray II ("Gray"), and Michael J. Rugen ("Rugen") (Gray and Rugen together, the "Individual Defendants") move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Class Action Complaint (Dkt. 27) (the "Complaint") in its entirety and with prejudice.

## I. INTRODUCTION

This is a securities fraud action in which Plaintiffs seek to hold New Era and its former Chief Executive Officer and former Chief Financial Officer liable for two stock-price declines in December 2025. The first followed a short seller's report on December 12; the second, a December 29 article publicizing a lawsuit the New Mexico Attorney General filed the week before. That lawsuit challenges how 87 gas wells passed from Remnant Oil, a bankrupt operator Gray co-founded, to Acacia, and then to Solis Partners, L.L.C., the New Era subsidiary that now holds them. Solis acquired those wells by a July 2021 bill of sale—more than eighteen months before New Era even existed.

The Complaint recycles the State's unadjudicated allegations and tries to repackage them as a securities fraud claim. But the State's claims arise under New Mexico law and concern transfers of wells among private companies before New Era existed. None alleges that New Era misled investors. Plaintiffs were thus left to work backward from the State's allegations: combing through New Era's SEC filings for statements touching the same subjects and then declaring each misleading for omitting the 87-well transfer or related regulatory problems.

Their claims fail for three principal reasons:

*First*, the Securities Act claims (Counts I and II) fail because no Plaintiff pleads facts tracing his shares to the S-4 Registration Statement. As the Supreme Court recently recognized, to avoid dismissal on these claims, a plaintiff must "plead and prove that he purchased shares traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S.

759, 770 (2023). Plaintiffs Patterson and Westbrook do not even try to satisfy that requirement. Oh, the only Plaintiff who does, alleges in one conclusory sentence that he "purchased shares traceable to the Registration Statement," without saying how. Courts consistently hold that such a bare assertion of traceability does not carry the burden *Slack* recognized.

*Second*, Plaintiffs challenge ten statements, and every challenge makes at least one of two errors:

i. **Plaintiffs grossly mischaracterize the statements they challenge.** For instance, they fault New Era's related-party transaction lists for omitting an 87-well transfer that occurred in ***2021***, despite the lists expressly limiting themselves to transactions that occurred on or after January 1, ***2022***. And they say New Era hid its plugging obligations, when its disclosures told investors that New Era was "***actively involved*** in plugging a few of our wells" and recorded more than $1.6 million in asset retirement obligations for plugging and site restoration.

ii. **Plaintiffs treat accurate statements as false because the statements could have said more.** Plaintiffs concede, for example, that New Era's description of its "acquisitions" was "technically accurate," yet fault it for not disclosing that the wells came to Solis "through a related-party transfer." That is, they fault it not for being misleading or untrue, but for not providing additional disclosure. That is not enough to render it actionable under the securities laws: an omission that "adds nothing to the truthfulness or accuracy" of a statement does not make it misleading. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citation omitted).

*Third*, the Section 10(b) claim (Count III) fails the heightened standard the Private Securities Litigation Reform Act ("PSLRA") sets for pleading scienter. Under that standard,

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The Complaint offers none of the support securities plaintiffs usually plead for that inference: no confidential witness, no internal document about any challenged disclosure, and no stock sale or other motive. As to Rugen, who became CFO more than two years after the 2021 bill of sale, the Complaint pleads little more than his title and his signatures on two periodic reports. And as to Gray, it pleads only that he knew the facts Plaintiffs say were omitted. But "[k]nowledge of omitted facts does not itself establish scienter." *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987). Plaintiffs plead nothing showing that Gray knew, or must have known, that the omissions would mislead investors.

Allowing Plaintiffs to proceed to discovery on this Complaint would enable any shareholder of any public company to convert unadjudicated enforcement allegations into a fishing expedition for federal securities claims. The PSLRA was enacted to stop exactly that. The Complaint should be dismissed in its entirety and with prejudice.

## II. BACKGROUND

New Era is a Midland, Texas energy company that went public in December 2024. Its subsidiary, Solis Partners, L.L.C. ("Solis"), holds its producing wells and assembled them before New Era existed. ¶¶5, 24, 230–33, 239.[1]

### A. The parties.

New Era Energy & Digital, Inc., formerly New Era Helium, Inc., is a Nevada corporation with its headquarters in Midland. ¶24 & n.3. Everett Willard Gray II served as its Chief Executive

[1] Citations in the form "¶__" are to the Complaint (Dkt. 27), and citations in the form "Compl. Ex.-__" are to its exhibits. Citations in the form "Ex.-__" are to the exhibits to this motion.

Officer and a director from before its public offering until June 2026. ¶25. Michael J. Rugen became Chief Financial Officer effective November 1, 2023, and resigned effective May 31, 2025. ¶26; Ex.-1 at 180.

**B. Solis acquires its properties before New Era is formed.**

Remnant Oil, an operator Gray co-founded that filed for bankruptcy in 2019, once owned some of Solis's wells. ¶¶77, 83.[2] In June 2020, the bankruptcy court approved the sale of substantially all of Remnant's assets to Acacia, an entity owned by Remnant's two other principals. ¶¶121, 124. Solis was formed the same month, with Joel, Casey, and Robert Solis as its three initial partners. ¶¶132, 135. Gray, who was not among them, served as its managing member beginning that year. Ex.-1 at 180. Six months later, Acacia's manager authorized the sale of 87 of the former Remnant wells and their leases to Solis for $400,000, and in July 2021 Acacia and Solis signed an Assignment and Bill of Sale conveying them. ¶137.

Because no one had filed a change-of-operator application after the bankruptcy sale, the New Mexico Oil Conservation Division ("OCD") records still listed Remnant as the wells' operator. ¶149. In January 2022, Gray signed the change-of-operator form on behalf of Remnant, whose Chapter 7 trustee had sold its assets to Acacia in 2020, and Joel Solis signed for Solis. ¶¶121, 150; Trustee's Mot. to Sell, *In re Remnant Oil Co.*, No. 19-70106 (Bankr. W.D. Tex. June 8, 2020), Dkt. 409. The OCD approved the form the next month. ¶153.

**C. New Era goes public and discloses Gray's history and its plugging obligations.**

New Era was formed in February 2023, more than eighteen months after the July 2021 bill of sale, and acquired Solis days later. ¶¶230–31.

[2] "Remnant" refers to Remnant Oil Company, LLC and Remnant Oil Operating, LLC, whose Chapter 7 cases were jointly administered. *In re Remnant Oil Co.*, No. 19-70106 (Bankr. W.D. Tex.).

In December 2024, New Era combined with a special purpose acquisition company and listed on Nasdaq. ¶¶232–33. The Prospectus for that transaction told investors that Gray had been managing member of Solis since 2020, that he founded and ran Remnant, and that Remnant had filed for bankruptcy in 2019. Ex.-1 at 180. It disclosed that regulations require "the p[l]ugging and abandonment of wells, removal of production facilities, and other restorative actions," and that New Era was "actively involved in plugging a few of our wells." ¶385. Its financial statements recorded more than $1.6 million in asset retirement obligations for plugging and site restoration. Ex.-1 at F-76–F-77. New Era's 2024 Form 10-K repeated the disclosures about Gray's background. ¶418.

### D. A short seller publishes a report, and the State sues.

On December 12, 2025, Fuzzy Panda Research, which disclosed that it held a short position in New Era stock, published a report criticizing the Company's business and management. ¶320; Ex.-2. Within hours, New Era responded that it believed the report's claims were "factually inaccurate." ¶¶325, 451. Later that month, the New Mexico Attorney General sued Gray, New Era, and others, challenging the 2020–2022 transfers. ¶¶15, 330. Days later, Hunterbrook Media publicized the suit in an investor-facing report. ¶¶329–31. No court has adjudicated the State's claims. *See* ¶342.

## III. LEGAL STANDARDS

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For the Securities Act claims, Plaintiffs must plausibly allege that the Registration Statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). And because Count I adopts wholesale the allegations underlying the fraud claims, the Securities Act claims are

"grounded in fraud rather than negligence," so "Rule 9(b) applies." *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994).[3]

The Exchange Act claims must also satisfy the PSLRA, which Congress enacted as a "check against abusive litigation by private parties" in securities cases. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). It heightens the pleading requirements for securities fraud in two principal respects. *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

*First*, to allege falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361–62 (5th Cir. 2004). Here, because the Securities Act claims fail for lack of traceability, *see* Part IV.A, every challenged statement must satisfy that standard.[4]

*Second*, to allege scienter, the complaint must, "with respect to each act or omission alleged," "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The required state of mind is "an intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319. This requires pleading at least severe recklessness: "not merely simple or even inexcusable negligence, but an extreme departure

[3] Count I incorporates ¶¶1–407, including allegations that Gray "masterminded" a "deceptive scheme," ¶16, and that the State's complaint describes a "fraudulent scheme," ¶15 n.2. "Boilerplate disavowals of an intent to allege fraud," like ¶472, "do not change the analysis." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 619 (S.D. Tex. 2018).

[4] The result would be the same if the Securities Act claims survived. Those claims sound in fraud and so must satisfy Rule 9(b), *see supra* Part III, which likewise requires Plaintiffs to plead with particularity why each challenged statement was false.

from the standards of ordinary care, and that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).[5]

## IV. ARGUMENT AND AUTHORITIES

### A. The Securities Act claims (Counts I and II) must be dismissed because no Plaintiff pleads facts tracing his shares to the S-4 Registration Statement.

Count I is based upon Defendants' purported violation of Section 11 of the Securities Act of 1933, and Count II on purported control-person liability under Section 15. "To bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack*, 598 U.S. at 768. A plaintiff must accordingly "*plead* and prove that he purchased shares traceable to the allegedly defective registration statement." *Id.* at 770 (emphasis added). The pleading obligation is not satisfied by "a general allegation that a plaintiff's shares are traceable to the offering in question." *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016).

Instead, to avoid dismissal, a plaintiff must satisfy his pleading obligation in one of "two ways": (i) by pleading "that [he] purchased [his] shares directly in the . . . offering itself," or (ii) by alleging sufficient facts to show "that [his] shares, although purchased in the aftermarket, can be traced back to the . . . offering." *TransEnterix Inv'r Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 761 (E.D.N.C. 2017) (citation omitted). To satisfy the second approach, a plaintiff must "trace the chain of title for [his] shares back to the . . . offering, starting with [his] own purchases and ending with someone who bought directly in the . . . offering." *Id.* The Fifth Circuit applies this

[5] The Court may consider New Era's SEC filings and the documents on which the Complaint relies without converting this motion into one for summary judgment. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).

rule strictly. In *Krim v. pcOrder.com, Inc.*, for example, it held that the plaintiffs lacked Section 11 standing, even though registered shares comprised 91% to 99.85% of the pool at the plaintiffs' purchases. 402 F.3d 489, 492, 501–02 (5th Cir. 2005). *Krim* held that "accepting such 'statistical tracing' would impermissibly expand the statute's standing requirement," because "general statistics say nothing about the shares that a specific person *actually* owns and have no ability to separate those shares upon which standing can be based from those for which standing is improper." *Id.* at 496, 501.

The Complaint satisfies neither route for any named plaintiff. Count I alleges only that "Plaintiffs in the Securities Act Class acquired New Era Energy common shares pursuant to the Registration Statement." ¶477. Such a bare traceability allegation is "nothing more than a formulaic recitation" of an element and "not sufficient to avoid dismissal." *Ariad*, 842 F.3d at 756.

The named-plaintiff allegations are similarly deficient. The Complaint does not even contend that Plaintiffs Patterson or Westbrook purchased traceable shares. And the one remaining Plaintiff, Oh, merely alleges, without supporting facts, that he "purchased shares traceable to the Registration Statement." ¶22. His own certification shows that he bought 50 shares on January 6, 2025, a month after the offering closed. Compl. Ex.-2. He does not allege that he bought in the offering, received an allocation, bought from a known holder of S-4 shares, or can trace any chain of title. His conclusory traceability allegation thus fails: Plaintiffs "may not rely on a cursory allegation that their stock is 'traceable'" to establish statutory standing. *Shnayder v. Allbirds, Inc.*, 2025 WL 1745596, at *9 (N.D. Cal. June 23, 2025). Count I must, accordingly, be dismissed. *E.g.*, *Johnson v. CBD Energy Ltd.*, 2016 WL 3654657, at *3, *6 (S.D. Tex. July 6, 2016) (dismissing

Section 11 claim with prejudice where lead plaintiff alleged he "purchased . . . shares . . . pursuant to or traceable to CBD's Offering" and nothing more).[6]

As to Count II, Section 15 imposes only secondary liability. Because Count I fails, "Plaintiffs' Section 15 claim must also be dismissed." *Cupat v. Palantir Techs., Inc.*, 2025 WL 1141534, at *19 (D. Colo. Apr. 4, 2025).

## B. Plaintiffs have not pleaded that any challenged statement was actionably false or misleading.

### 1. Category A: The related-party transaction disclosures describe transactions that occurred in 2022 or later—and the 87-well transaction occurred in 2021 (Statements 1 and 7).

Category A consists of two statements concerning past related-party transactions involving New Era:

- **Statement 1** appears in the November 6, 2024 Prospectus, which included the Company's audited financial statements for the years ended December 31, 2023 and 2022. ¶370. Statement 1 is Note 8 to those statements, which provides: "The table below represents transactions with related parties that occurred during the years ended December 31, 2023 and 2022." ¶370. The table lists eleven entries, each with a dollar figure for 2023, 2022, or both.

- **Statement 7** appears in Item 13 of the 2024 Form 10-K, filed March 31, 2025. It provides "a description of each transaction since January 1, 2022 and each currently proposed transaction in which we have been or are to be a participant," in which "the amount involved exceeded or will exceed $120,000," and in which "any of our directors, executive officers or beneficial holders of more than 5% of our capital stock," or their family or household members, "had or will have a direct or indirect material interest." ¶410. Item 13 then describes the transactions New Era identified. ¶411.

[6] Count I also fails as to Rugen because the Complaint does not allege that he falls within any category of persons Section 11 makes liable. The statute reaches those who "signed the registration statement," the issuer's directors (and persons "performing similar functions"), persons named with their consent "as being or about to become a director," consenting experts, and underwriters. 15 U.S.C. § 77k(a)(1)–(5). The Complaint alleges only that Rugen was New Era's CFO. ¶26.

Critically, both statements are expressly limited to transactions that occurred on or after January 1, 2022: Statement 1 covers transactions that "occurred during the years ended December 31, 2023 and 2022," and Statement 7 covers transactions "since January 1, 2022." Plaintiffs allege both Category A statements were false because neither list mentions the 87-well transfer. ¶¶371, 412. But the reason they omit that transaction is simple: each statement concerned only transactions that occurred on or after January 1, 2022—and the 87-well transaction occurred in 2021.[7]

According to the Complaint, in late June 2020, a bankruptcy court approved the sale of substantially all the assets of Remnant, a bankrupt operator Gray had co-founded, to Acacia, an entity owned by Remnant's other two principals. ¶¶77, 118, 121, 124. Remnant's bankruptcy estate received deposits for that sale the following month. ¶121. On December 29, 2020, Acacia's manager authorized the sale of 87 of the former Remnant wells and their leases for $400,000 to Solis, which was formed in June 2020 and became a New Era subsidiary in 2023. ¶¶5, 132, 137, 231. Finally, in July 2021, Acacia and Solis executed an Assignment and Bill of Sale conveying the wells. ¶137. The transaction thus took place before January 1, 2022 and was outside the scope of either Statement 1 or Statement 7.

The only 2022 event that the Complaint identifies is regulatory paperwork. Specifically, because no change-of-operator application had been filed after the bankruptcy sale, OCD's records still listed Remnant as the 87 wells' operator. ¶149. On January 25, 2022, Gray signed a change-of-operator form on Remnant's behalf, and OCD approved it on February 2, 2022. ¶¶150, 153. The Complaint alleges that OCD approval does three things: it "changes the operator recognized

[7] Plaintiffs' own description of GAAP confirms that ASC 850 calls for related-party disclosures "for each of the periods for which income statements are presented," ¶350(b), which for Statement 1 were 2022 and 2023, ¶370.

by the State, moves wells between OGRIDs, and permits the new operator to commence operations." ¶55.

None of those is a sale. The Complaint itself confirms as much: Plaintiffs allege that the wells "had been sold to Acacia in the Remnant bankruptcy" before any change-of-operator form was filed. ¶149. They allege that Acacia then conveyed the wells to Solis by a July 2021 bill of sale, recorded in the county property records that month. ¶137; Compl. Ex.-1 ¶127. That bill of sale itself contemplated that the parties would later make the state and federal filings needed to obtain governmental "recognition of the transfer." ¶137. A regulator cannot "recogni[ze]" a transfer that has not yet happened.

The January 2022 form therefore did not transfer anything. By then, Remnant's Chapter 7 trustee had already sold the wells, and Remnant had nothing left to convey. Instead, OCD's approval updated the State's records to "recogni[ze]" a sale that had already occurred and allowed Solis to operate wells it had acquired months earlier. ¶¶54–55, 137. Indeed, the Complaint itself pleads that "under New Mexico law, the private conveyance of an interest in oil-and-gas properties is distinct from the regulatory transfer of operatorship." ¶54. It also pleads that "parties may privately assign ownership or economic interests before OCD approval." ¶55.[8]

By Plaintiffs' own account, then, the private conveyance occurred in 2021, and only the regulatory transfer occurred in 2022. But Statements 1 and 7 list transactions, not regulatory filings. Statement 1 covers "transactions with related parties that occurred during" 2022 and 2023,

[8] Plaintiffs' contrary assertion that the transfer "was not complete until OCD approved the transfer application on February 2, 2022," ¶420; *see* ¶153, is not a factual allegation at all. It is a legal conclusion copied word for word from the Attorney General's complaint, Compl. Ex.-1 ¶135, and Plaintiffs offer no facts to support it. The Court does not "accept conclusory allegations, unwarranted deductions or legal conclusions," *Southland*, 365 F.3d at 361 (citing *Nathenson*, 267 F.3d at 406), least of all one that Plaintiffs' own allegations refute, ¶¶54–55.

and Statement 7 covers "each transaction since January 1, 2022" in which the "amount involved" exceeded $120,000. The 2022 regulatory transfer was not a transaction: no property changed hands and no amount was involved. The transaction itself, the 2021 conveyance, fell outside both periods, so neither statement is rendered untrue by omitting it.[9]

**2. Category B: The related-party policy descriptions govern transactions New Era enters into, and Plaintiffs plead no facts showing that either policy went unfollowed (Statements 2 and 8).**

Category B consists of two statements describing how New Era reviews related-party transactions.

- **Statement 2** appears in the notes to the audited financial statements in the November 6, 2024 Prospectus. ¶376. It states that "[m]anagement approves all material related-party transactions" and considers "each new, existing or proposed related party transaction." ¶376. In deciding whether to approve one, management weighs whether the terms are fair to the Company, whether "there are business reasons to enter into the transaction," and whether it presents an improper conflict for any officer. ¶376.

- **Statement 8** appears in Item 13 of the 2024 Form 10-K. ¶424. It states that the Company's Code of Ethics "requires us to avoid, wherever possible," conflicted related-party transactions "except under guidelines approved by the Board (or the audit committee)." It adds that the audit committee reviews such transactions "to the extent we enter into" them, and that "[a]ll ongoing and future transactions" with insiders will be on arm's-length terms. ¶424.

Plaintiffs allege that both statements were false because neither policy was applied to the 87-well transaction. ¶¶377, 425. That theory fails both (i) because the policies the statements announced did not apply to the 87-well transaction and (ii) because, even if they had applied, Plaintiffs have alleged no facts to show that the policies were not followed.

---

[9] Plaintiffs also allege that the transaction "remained an existing and economically operative related-party relationship after 2022" because Solis kept and operated the wells. ¶420. This is irrelevant: Statements 1 and 7 list related-party transactions that occurred on or after January 1, 2022, not assets the Company acquired earlier and continues to hold, so Solis's continued ownership of wells it acquired in 2021 cannot render either statement materially false or misleading.

*First*, each statement describes New Era's policy as of the date it was made: November 2024 for Statement 2 and March 2025 for Statement 8. Solis, then a private company that New Era did not yet own, closed the 87-well transaction in July 2021. ¶137. Neither statement says anything about how that company approved a transaction in 2021—years before either statement was made. To the contrary, Statement 8 confines itself to transactions "we enter into," and addresses "ongoing and future transactions." ¶424. It requires "prior approval" by New Era's audit committee, ¶424—a committee that could not even exist when the 87-well transaction closed in July 2021, more than eighteen months before New Era was formed. ¶¶137, 230.[10]

For its part, Statement 2 describes how management decides whether to approve a transaction. Its factors ask whether "there are business reasons to enter into the transaction." ¶376. That question cannot be asked about a purchase another company completed before New Era existed. *See Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254 (S.D.N.Y. 2019) (because related-party "controls post-dated [the insider's] earlier misconduct," statements describing those controls "were not materially misleading" for omitting the misconduct).

*Second*, even if the policies were applicable, Plaintiffs identify no witness, document, or communication suggesting that anyone failed to follow either policy with respect to the 87-well transaction. Instead, they speculate that the processes were not followed because New Era did not issue a separate disclosure saying they were. ¶¶275, 379, 425–26. But neither statement promised

[10] Statement 8 is also not actionable because, as a code of conduct, it "expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017); *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) (similar). As another court put it, "[t]here is an important difference between a company's announcing rules forbidding bribery and its factually representing that no officer has engaged in such forbidden conduct." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 756 (S.D.N.Y. 2017). Statement 8 announces a rule. It does not represent that no conflict ever arose.

to *disclose* how either policy was applied to any particular transaction, so the filings' silence on those details says nothing about whether the policies were followed. *See City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 880, 883 (3d Cir. 2018) (affirming dismissal of challenge to statement that company's policy required chairman's "recusing himself from negotiations regarding . . . transactions with [related] entities," where complaint did not identify "a single . . . transaction in which [the chairman] improperly participated").

In short, Plaintiffs claim that New Era's 2024 and 2025 policy statements were false because of a transaction that closed in 2021, before New Era—let alone the policies in question—existed. And even if the statements had been about a policy that would apply to the 87-well transaction, Plaintiffs plead no facts showing that the 87-well transaction did not receive the kind of review the statements describe. The claims premised on Statements 2 and 8 must, accordingly, be dismissed.

**3. Category C: The acquisition statement accurately describes what New Era acquired (Statement 3).**

Category C consists of Statement 3, a single statement in New Era's November 6, 2024 Prospectus, under the heading "Oil and Gas Properties, Wells, Operations, and Acreage":

> The Company has acquired all of its interests in acreage and wells from acquisitions. In all of its acquisitions, New Era Helium Corp has been assigned all of the rights, title and interests of its predecessors in the leases and wells conveyed. This has included all title research, well files and logs, division of interest records, joint operating agreements and miscellaneous contracts.

¶381. Plaintiffs offer two theories of why the statement misled investors:

(i) They say "acquisitions" implies "typical market transactions," not a related-party transfer, ¶382; and

(ii) They contend that the reference to "predecessors" concealed that the 87 wells came from a portfolio burdened by plugging and remediation obligations, ¶¶383–84.

Both theories fail.

As to the first theory, Plaintiffs themselves concede that Statement 3's use of the word "acquisitions" is "technically accurate." ¶382. They are correct about that: Solis acquired the 87 wells from Acacia under a recorded Assignment and Bill of Sale. ¶137. Plaintiffs thus cannot allege that New Era failed to "acquire" any of the rights or records Statement 3 describes.

Plaintiffs are thus left to fault the statement for not disclosing that the wells came to Solis "through a related-party transfer." ¶244; *see* ¶382. In other words, Plaintiffs do not claim that Statement 3 is misleading. They claim it should have said more about its subject. That is not a securities claim. The securities laws "do not impose liability for 'statements that are simply incomplete,' only those that are 'misleading or untrue.'" *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 503 (3d Cir. 2016) (quoting *Winer Family Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007)). A complaint "must specify the reason or reasons why the statements made by [the defendant] were misleading or untrue, not simply why the statements were incomplete." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). And an omission that "adds nothing to the truthfulness or accuracy of the fact" stated is not actionable. *R2*, 401 F.3d at 642 (quoting *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002)).

For example, in *R2*, SEC filings stated that the company was "obligated to tender" for $160 million of its senior notes. 401 F.3d at 642. The plaintiff alleged those statements were misleading because they did not disclose that the company "did not have the cash to make the payments required or was relying on risky contingencies." *Id.* The Fifth Circuit rejected the theory: "[t]he fact that World Access ***may not be able to complete*** the tender offer on time does [not] make the statement that World Access ***has an obligation to repurchase*** the Senior Notes untrue or misleading." *Id.* (emphasis altered).

So too here. A statement that New Era acquired its wells and received its predecessors' rights and records is accurate regardless of who the seller was. A seller's ties to Gray "add[] nothing to the truthfulness or accuracy" of that statement. *R2*, 401 F.3d at 642.

Plaintiffs' second theory also fails for the same reason as their first. Statement 3 lists the rights and records New Era received; it says nothing about the wells' obligations. Like the seller's ties to Gray, those obligations "add[] nothing to the truthfulness or accuracy" of a statement that New Era received its predecessors' rights and records. *R2*, 401 F.3d at 642.

Moreover, the liabilities Plaintiffs invoke attached to wells New Era did not acquire. Statement 3 addresses only the "leases and wells conveyed." By Plaintiffs' own account, Solis received the 87 "best gas wells," while the "marginal and liability-laden wells," and "their corresponding plugging and remediation obligations," stayed with Acacia. ¶¶8, 209. The State Land Office's 2024 bond claim concerned leases for which "Remnant . . . is the lessee of record" and wells for which "Remnant is also the operator of record." Compl. Ex.-10 at 1, 3. Plaintiffs do not allege that anyone claimed Solis or New Era was responsible for those obligations until the Attorney General sued in December 2025. ¶461. Gray's alleged role in assembling the predecessor portfolio, ¶384, does not change which wells Solis acquired. Liabilities on wells New Era never acquired cannot "alter[] the meaning" of a statement describing the wells it did acquire. *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008).

The claims premised on Statement 3 should be dismissed.[11]

[11] Plaintiffs allege that the December 30, 2024 S-1 Registration Statement (the "S-1 Registration Statement") and the 2024 Form 10-K repeated Statement 3. ¶¶408, 430–31. The analysis is the same.

**4. Category D: The environmental risk factor addresses remediation of releases, and it disclosed the plugging and restoration obligations Plaintiffs say it concealed (Statement 4).**

Statement 4 is a risk factor from New Era's November 6, 2024 Prospectus. Its heading warns that if the Company owns or acquires "lands with . . . releases of materials into the environment, we may be required to remediate such lands." ¶385 (emphasis omitted). Its body explains that the Company's properties "have the potential to release regulated materials into the environment," and that "New Mexico passed rules clarifying the prohibitions on releases and remediation in 2021." ¶385. Immediately thereafter, it states: "Although we are not aware of any remediation for which we may be responsible at this time and we implement spill prevention plans, it is possible with future operation or with the acquisition of new lands, compressors, wells, and pipelines may have had releases subject to such requirements and subject to costly remediation." ¶385 (emphasis omitted).[12]

Plaintiffs say Statement 4's "not aware" clause was false, and that Statement 4 misleadingly described remediation as merely a future possibility. They point to (i) a June 1, 2023 State Land Office request that Solis provide a cleanup work plan for one lease; (ii) two December 14, 2023 emails questioning the adequacy of reclamation work on certain well sites and asking whether two wells had been plugged; (iii) the State Land Office's February 2024 claim on Remnant's bond; and (iv) its November 13, 2024 cease-and-desist notice. ¶¶384, 386–96.

That theory runs together two separate parts of Statement 4. The first, the "not aware" clause, concerns remediation of releases, and Plaintiffs plead no release at any well the Company

[12] Plaintiffs allege that the S-1 Registration Statement and the 2024 Form 10-K repeated Statement 4, and that New Era's 2025 Forms 10-Q incorporated it by reporting "no material changes" to the 10-K's risk factors. ¶¶294, 408, 433–34. The analysis is the same.

operated. The second, a separate passage on plugging and other restorative obligations, told investors that the Company was subject to those obligations and actively performing them.

**a. The "not aware" clause concerns remediation of releases, and Plaintiffs plead no release at any well the Company operated.**

Statement 4's "not aware" clause concerns remediating releases. The risk factor's heading warns of lands "with . . . *releases* of materials into the environment," and its first three sentences all address that risk. The first describes properties with "the potential to release regulated materials," and the second refers to New Mexico's 2021 rules on "releases and remediation." ¶385. Those rules provide that "major *releases* and minor *releases* are prohibited" and require the responsible party to "remediate the *release*." 19.15.29.8 NMAC (emphasis added). They also treat remediating a release as an obligation separate from restoring and reclaiming a site. *Compare* 19.15.29.12 NMAC (remediation and closure), *with* 19.15.29.13 NMAC (restoration, reclamation, and re-vegetation).

The third sentence contains the "not aware" clause, and it is built as a contrast between the present and the possible: "[a]lthough" the Company was "not aware of any remediation for which [it] may be responsible at this time," "it is possible" that properties "may have had *releases* subject to such requirements and subject to costly remediation." ¶385 (emphasis altered). Both halves address the same subject, remediating releases. In context, then, the "not aware" clause told investors that the Company knew of no obligation to remediate a release. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (investor "reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text").

None of the four sets of communications Plaintiffs cite identifies a release at any well the Company operated. The June 1, 2023 email asked who would prepare a "cleanup work plan" for

a lease Solis was acquiring from another operator. ¶¶291, 387. The December 14, 2023 emails questioned the adequacy of "prior reclamation work" and asked whether two wells on an expired lease had been plugged. ¶¶388–89. The State Land Office's February 2024 bond claim did identify spills, but on leases and wells Remnant held and operated of record. ¶¶180, 384, 394; Compl. Ex.-10 at 1, 3. And the November 13, 2024 notice identifies no release at all. It confirms that the earlier "cleanup" involved "reclamation of the well site access roads," including "erosion control repair," Compl. Ex.-15 at 7, and its only reference to spills is a general directive that Solis "remediate any spills" after plugging, *id.* at 3.[13]

That is fatal to Plaintiffs' theory about the "not aware" clause. Indeed, a court in this Circuit rejected a strikingly similar theory on the same grounds in *Firefighters Pension & Relief Fund v. Bulmahn*, 53 F. Supp. 3d 882 (E.D. La. 2014). There, the plaintiff alleged that an oil and gas company had been "unlawfully discharging oil and an unpermitted chemical dispersant into the Gulf of Mexico." *Id.* at 913. The court nonetheless held that a risk factor listing "environmental accidents or hazards, such as natural gas leaks, oil spills, pipeline ruptures and discharges of toxic gases" was not misleading, because it "mentions environmental 'accidents or hazards'—*not* the violation of environmental regulations." *Id.* at 915.

So too here. Communications about reclaiming well sites and plugging wells cannot make a statement about remediating releases false or misleading. And with no release at any Company-operated well, no release risk had "already materialized." ¶392.

[13] Plaintiffs also invoke the notice against later repetitions of Statement 4. ¶¶435–36. That argument fails for the same reasons. And the surface work the notice requires is "not required" "[w]here the State Land Office holds only the mineral estate," Compl. Ex.-15 at 3 (citing 19.2.100.67 NMAC), a limitation the release rule lacks, 19.15.29.8 NMAC.

**b. The plugging passage disclosed the very obligations Plaintiffs say were concealed.**

Statement 4 then turns to a separate subject: "[r]egulations also require the p[l]ugging and abandonment of wells, removal of production facilities, and other restorative actions." ¶385. That statement is indisputably true. Plaintiffs are thus left to argue that Statement 4 framed these obligations as a future possibility. ¶392. It did not. It told investors the Company was "*actively* involved in plugging a few of our wells." ¶385 (emphasis added). And the same Prospectus quantified those obligations: its audited financial statements recorded $1,654,968 in asset retirement obligations for "plugging and abandoning the wells and site restoration." Ex.-1 at F-76–F-77.

Plaintiffs also point to the risk factor's acknowledgment that plugging and restorative obligations can fall on "corporate successors of former operations." ¶393. They argue that, having acknowledged that general risk, the Company had to disclose "the specific predecessor arrangement" (the 87-well transfer from Remnant and Acacia) "that created precisely such a risk for Solis and New Era." ¶393. That is the Category C theory under another label, and it fails for the same reason: the predecessor liabilities Plaintiffs invoke attached to wells New Era did *not* acquire. *See* Part IV.B.3.

**5. Category E: The federal-and-state-lands risk factor accurately described Solis's operations and the eighteen-lease transfer (Statements 5 and 9).**

Category E consists of a risk factor about the Company's operations on federal and state lands. It appeared in the November 6, 2024 Prospectus (Statement 5 (¶397)) and, in updated form, in the March 31, 2025 Form 10-K (Statement 9 (¶441)). Plaintiffs attack two separate portions of this risk factor, but neither attack alleges facts sufficient to plead that Statement 5 or Statement 9 was materially false or misleading when made.

**a. The "although" sentence is accurate, and the facts Plaintiffs identify do not make it misleading.**

Both versions of the risk factor explain that the Company's wells on federal and state lands are "subject to additional regulations." Both then state: "Although we are currently operating these leases on these lands and expect to be able to continue such production, additional delays, costs, and restrictions may be added to these leases." ¶¶397, 441. Plaintiffs challenge this sentence for failing to disclose that some of Solis's wells sat on expired or canceled leases. ¶¶398, 401, 442–45. But the sentence makes three statements, and Plaintiffs plead no facts showing that any of them was false or misleading.

*First*, the sentence states that the Company was "currently operating these leases." Plaintiffs do not dispute that. Their complaint is that Solis operated certain wells without valid leases: they allege it "continued to produce oil and gas from expired leases in trespass." ¶218. In an effort to manufacture falsity, they are thus forced to read the sentence as a representation that every lease was valid and Solis's authority to operate it secure. ¶¶398, 442, 444. But the sentence describes what the Company was doing, not the status of each lease, and in the same breath it warns that "additional delays, costs, and restrictions may be added to these leases." ¶¶397, 441.

*Second*, the Company said it "expect[ed] to be able to continue such production," a statement of opinion about the future. "Reasonable investors do not understand [opinion] statements as guarantees, and [the federal securities laws] therefore do[] not treat them that way." *Omnicare*, 575 U.S. at 188. Rather, to render an opinion actionable, a plaintiff must identify "particular (and material) facts" that were not disclosed and "that cannot be squared" with the opinion. *Id.* at 191, 194. That "is no small task for an investor." *Id.* at 194. Plaintiffs list six omitted facts, but they reduce to three categories, all drawn from the State Land Office's cease-and-desist

notice and Solis's rental correspondence: plugging and remediation demands, pending transfers of operatorship, and expired and canceled leases. ¶¶398, 445.

Those facts must be measured against the opinion itself, which Plaintiffs read as conveying "a reasonable expectation of continued production," ¶402; *see* ¶¶398, 442: an expectation about production from the Company's government leases as a whole, not a promise about any particular well or lease. None of the facts Plaintiffs identify "cannot be squared with" that expectation. The notice's demands to plug inactive wells and remediate plugged sites concerned wells the State Land Office itself described as inactive or as producing "in such negligible quantities as to be considered functionally inactive." Compl. Ex.-15 at 1, 6–7. Plugging those wells says nothing about whether the Company could keep up the production it had. The "pending transfers of operatorship" were transfers Solis chose to make: it was moving certain wells to another operator. *Id.* at 5–7. Those were Solis's business decisions about which wells to keep, not obstacles to producing from the ones it kept. The notice identified only eight wells on expired leases, four of which Solis was still using. *Id.* at 2. And Solis contested the lease cancellations as the result of misapplied rental payments. Compl. Ex.-12 at 2–5. Plaintiffs plead nothing suggesting that any of these issues threatened continued production from the Company's government leases as a whole. *See Omnicare*, 575 U.S. at 191.

*Third*, the sentence warned that "additional delays, costs, and restrictions may be added to these leases." Plaintiffs argue this was misleading because restrictions "had already begun to materialize." ¶401. But the sentence did not suggest otherwise. To the contrary, the word "additional" affirmatively conveyed that some delays, costs, and restrictions already existed. And the sentence warned that more might come. It thus put investors on notice of exactly the risk

Plaintiffs say came to pass: that state agencies would impose further restrictions on the Company's state leases.

**b. Plaintiffs plead no particularized facts showing that either description of the eighteen-lease transfer was false.**

Both versions of the risk factor also address eighteen New Mexico state leases that Solis had received by assignment from another operator.

The March 31, 2025 10-K stated that the State Land Office "did not transfer these leases into our name initially. This finally occurred on February 1, 2023." ¶441. Plaintiffs try to plead that this statement was untrue by asserting that "the process was still not complete" in November 2024. ¶447. Plaintiffs cite only two things after February 2023 to support that contention: a June 2023 email in which Solis's counsel said Solis was "still waiting on the assignments," and the State Land Office's demand for a cleanup plan on a single lease, which remained incomplete when the State Land Office sent its November 2024 cease-and-desist notice. ¶¶290–91.

The email does not help Plaintiffs. Solis's counsel wrote that Solis was "still waiting on the assignments," ¶290, but Plaintiffs never plead which assignments he meant. The email could just as easily refer to other leases Solis acquired from Grizzly Operating, LLC ("Grizzly") in 2020, some of which remained in Grizzly's name. ¶¶289, 447; Compl. Ex.-15 at 2. Nothing Plaintiffs have alleged is inconsistent with a situation in which the eighteen leases transferred on February 1, 2023, and Solis was still waiting on assignments of others.

The cleanup demand concerned one of those other leases. In reply to counsel's email, the State Land Office asked for a cleanup plan for lease V0-0503, which had expired in November 2022 and so was not among the eighteen leases Solis was operating. ¶291; Compl. Ex.-15 at 7. The November 2024 cease-and-desist addressed the same lease. ¶292. Plaintiffs plead nothing

tying the email or the cleanup demand to the eighteen leases, so neither can show that the 10-K's statement about those leases was false. *See* 15 U.S.C. § 78u-4(b)(1).[14]

**6. Category F: The Environmental Matters note makes no representation about the Company's compliance record (Statement 6).**

Statement 6 is the "Environmental Matters" paragraph in the Commitments and Contingencies note to the financial statements in New Era's November 6, 2024 Prospectus. ¶403.[15] It states that the Company, "as a lessee of oil and gas properties," is subject to environmental laws. Those laws "may" impose liability "for the cost of pollution clean-up resulting from operations" and "for pollution damages." "In some instances, the Company may be directed to suspend or cease operations in the affected area." And "[t]here can be no assurance, however, that current regulatory requirements will not change, or past noncompliance with environmental laws will not be discovered on the Company's properties." ¶403.

Plaintiffs do not identify anything in Statement 6 that is untrue. Instead, they argue that it was incomplete, because it did not detail environmental problems the State Land Office had raised with Solis. ¶¶404–06, 439–40.

But, again, "simply incomplete" statements are not actionable under the securities laws. *OFI*, 834 F.3d at 503 (quoting *Winer*, 503 F.3d at 330). Indeed, courts in this Circuit have rejected materially identical theories to the one Plaintiffs advance against Statement 6. For example, in *Del.*

---

[14] The November 6, 2024 Prospectus claimed less. It said the eighteen leases "are being transferred to our name, which we understand this is near completion." ¶397. If Plaintiffs cannot plead that the 10-K's definitive statement was false, they certainly cannot plead that this earlier, more hedged version overstated the transfer's progress. *See* ¶¶399–400. And because Statement 5 also underlies the Section 11 claim, the result does not depend on the PSLRA. Rule 9(b) applies to that claim, *see supra* Part III, and even under Rule 8, an email that may refer to other leases does not make it plausible that the eighteen leases had not transferred. *See Twombly*, 550 U.S. at 570.

[15] Plaintiffs allege that Statement 6 was repeated in the S-1 Registration Statement, the March 31, 2025 10-K, and three 2025 Forms 10-Q. ¶¶408, 437–38, 449. The analysis is the same.

*Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, an oil and gas producer disclosed that its operations were subject to laws "relating to the . . . discharge of materials into the environment" and that noncompliance "may result in the suspension or termination of our operations." 579 F. Supp. 3d 933, 943 (S.D. Tex. 2022). Like Plaintiffs here, ¶¶404–05, the plaintiffs there argued that these statements "generally described what can happen in the case of an environmental law or regulatory violation but did not disclose that [the company] was already facing such risks." *Id.* at 949–50. The court rejected that theory: a "general explaining of some of the risks associated with violating legal or regulatory requirements would not mislead reasonable investors to believe that [the company] was fully compliant with all requirements or free of violations." *Id.* at 950; *see also In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 903–04 (S.D. Tex. 2017) (holding that warning that noncompliance "may result in" penalties "is a truism," despite alleged prior notices of violations); *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (reasonable investor "would be unlikely to infer anything regarding the current state of a corporation's compliance" from a risk disclosure).

The same result should be reached here. Statement 6 describes what the law provides. It says nothing about what the Company had done. And in any event, much of what Plaintiffs say went undisclosed concerns property and contract rights (alleged trespass, missing rentals, and unpaid production proceeds), which have nothing to do with the "environmental laws" Statement 6 addresses. ¶440.[16]

[16] The same is true of the November 13, 2024 notice on which Plaintiffs rely for the 10-K. ¶439. Plaintiffs say the notice "explicitly order[ed] Solis to . . . cease operations on expired leases." ¶439. But that directive rested on lease status, not the "pollution" Statement 6 describes. Compl. Ex.-15 at 2 (operations "in trespass, i.e., after the underlying lease expired").

**7. Category G: New Era's belief that the short seller's claims were inaccurate is not actionable (Statement 10).**

On December 12, 2025, hours after the short seller Fuzzy Panda Research published a report on New Era, the Company issued a press release stating that it "believes the claims made by Fuzzy Panda are factually inaccurate and an attempt to mislead investors about New Era's actual operations, financial position and status of the Company's various projects." ¶¶320, 325, 451. Plaintiffs argue that investors would read Statement 10 to mean that the report "had not uncovered a material undisclosed transaction." ¶452.

Plaintiffs' reading could work only if the report had accused New Era of concealing a transaction, so that disagreeing with the report meant denying the concealment. But the report made no such accusation. It mentions the 87 wells only in recounting Gray's business history and in arguing that New Era's wells were old and unprofitable. Ex.-2 at 2, 10–11. Disagreeing with the claims in a report that never accused New Era of concealment cannot be read as a denial of concealment.

Plaintiffs' own description of Statement 10—which concedes that the statement did not "address the FP Report's specific factual findings"—confirms the point. ¶325. A general disagreement with a short seller's report cannot reasonably be read as a denial of a point the report never made. *See Shaw Grp.*, 537 F.3d at 541 (omission actionable only where it "alters the meaning of the statement"); *see also Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) (press release that "did not address or mention" government investigations "contained nothing concerning the investigations that could be considered inaccurate or incomplete").

Plaintiffs' reading also proves too much. If saying that Fuzzy Panda's "claims" were "factually inaccurate" meant denying every fact the report recites, Statement 10 would deny that

the Company is called New Era Energy & Digital, that its stock trades under the ticker NUAI, and that Gray is its CEO. ¶451; Ex.-2 at 1. No reasonable investor would read it that way. Read in context, Statement 10 disputed the report as a whole without addressing the 87-well transaction, which the report mentions only in passing. *See* ¶325; Ex.-2 at 2, 10; *see also Omnicare*, 575 U.S. at 190 ("The reasonable investor understands a statement of opinion in its full context . . . .").

Nor does the release's suggestion that investors rely on New Era's SEC filings, ¶453, add anything. That sentence could mislead only if the filings themselves did, and for the reasons given above, they did not. *See* Parts IV.B.1–6. The claims premised on Statement 10 should be dismissed.

**C. Plaintiffs fail to satisfy the PSLRA's high standards for pleading scienter.**

Plaintiffs' Section 10(b) claim should also be dismissed because the Complaint does not plead a strong inference of scienter. Because the Section 11 claims fail for lack of traceability, every challenged statement must be tested under Section 10(b), and each requires particularized facts giving rise to a strong inference of scienter "with respect to each act or omission alleged." 15 U.S.C. § 78u-4(b)(2)(A). The inquiry is defendant-specific as well. The Court looks to the state of mind of the officials who made, approved, or furnished each statement, *Southland*, 365 F.3d at 366, and will not impute allegations against "the 'defendants' as a group" to any individual "unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Id.* at 365.

The Complaint makes little effort to meet that standard. It has no section devoted to scienter, and its only express scienter allegations are two boilerplate paragraphs in Count III. ¶¶492–93; *see* ¶27. It cites no confidential witness, no internal report or communication about any challenged disclosure, and no instance in which anyone questioned a disclosure before it was made.

Nor does it allege that Gray or Rugen sold a single share of New Era stock, received compensation tied to any challenged statement, or stood to gain anything from the omissions Plaintiffs identify. The absence of such motive allegations is not a minor point. Courts have consistently held that it raises the bar for Plaintiffs' remaining scienter allegations: "[w]here, as here, the plaintiff[s have] not alleged a clear motive for the alleged misstatements or omissions, the strength of [the] circumstantial evidence of scienter must be correspondingly greater." *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (alterations in original) (quoting *R2*, 401 F.3d at 644); *accord In re CrowdStrike Holdings, Inc. Sec. Litig.*, 816 F. Supp. 3d 683, 715 (W.D. Tex. 2025) (absent a plausible motive, requiring plaintiffs' other scienter allegations "to overcome an even higher bar").

The Complaint comes nowhere close to satisfying this heightened standard. Instead, the Complaint rests its scienter allegations on Rugen's title and Gray's knowledge of certain underlying facts, not on facts showing that either knew any disclosure would mislead investors.

**1. The Complaint pleads nothing about Rugen's state of mind.**

The Complaint all but ignores Rugen. Apart from defining him as an "Individual Defendant," it mentions him only to note his tenure, his signatures on the 2024 Form 10-K and the 1Q 2025 Form 10-Q, and his role in Solis's lease payments. ¶¶26–27, 212–13, 267, 300. None of those allegations says anything about what Rugen knew or believed about any challenged statement.

In an effort to avoid dismissal for failure to plead Rugen's scienter, Plaintiffs instead rely on his title. They allege that, "[b]ecause of their positions and access to material non-public information," the Individual Defendants knew the adverse facts. ¶27; *see* ¶¶492–93. But "[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292

F.3d 424, 432 (5th Cir. 2002); *see id.* at 433 (plaintiffs in *Melder*, 27 F.3d at 1103, "failed to plead scienter adequately" by alleging that, "[b]ecause of their . . . executive and managerial positions," defendants "knew or had access to" adverse information). Nor do Rugen's signatures on the 10-K and the 10-Q help. A signature shows who made a statement, not what the signer knew.

Nothing else in the Complaint fills the gap. When it summarizes who knew the omitted facts, it names "Gray and New Era," not Rugen. ¶¶255, 402. And Rugen "was named the Company's CFO effective November 1, 2023," ¶370 (Note 8 n.1), more than two years after the bill of sale. ¶137. The only allegations about Rugen's conduct, that he asked Gray for a lease-payment schedule to keep an "appropriate bank balance" and set up a monthly approval process for rental payments, ¶¶212–13, describe a CFO managing cash so that rent would be paid. The Complaint does not tie them to any challenged statement or allege that Rugen learned any lease had expired or been canceled. The Exchange Act claims against Rugen should be dismissed.

**2. The Complaint pleads only that Gray knew the underlying facts, which does not establish scienter.**

Plaintiffs' scienter allegations against Gray follow a consistent pattern: Plaintiffs identify a statement, argue that it misled investors by omission, and plead that Gray knew the omitted facts. Plaintiffs repeatedly state that the omission "cannot plausibly be attributed to Gray's lack of knowledge," because Gray "had direct and personal knowledge of the transaction" and the 10-K "bears his signature." ¶281; *see* ¶¶181, 228, 301, 390, 395.

But "[k]nowledge of omitted facts does not itself establish scienter." *Shivangi*, 825 F.2d at 889. Instead, scienter requires "a danger of ***misleading*** buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson*, 267 F.3d at 408 (emphasis added). For example, in *SEC v. Southwest Coal & Energy Co.*, offering sheets for oil and gas interests disclosed that the issuer had bought certain leases from other drilling

companies, but not that those sellers were controlled by the same two directors. 624 F.2d 1312, 1314 (5th Cir. 1980). The directors "conceded knowledge of the omitted facts," but the Fifth Circuit still affirmed the district court's finding of no scienter, explaining that knowledge of the omitted facts is not knowledge that the omission would mislead investors. *Id.* at 1319, 1321 & n.17.

Fifteen years later, the PSLRA made those facts a pleading requirement. 15 U.S.C. § 78u-4(b)(2)(A); *see Nathenson*, 267 F.3d at 408. To survive dismissal, a plaintiff must now plead with particularity not just facts showing that defendants "had knowledge of certain undisclosed facts," but facts showing that they knew the omission would mislead investors, or that the danger was so obvious they must have known it. *Brennan v. Zafgen, Inc.*, 853 F.3d 606, 614 (1st Cir. 2017) (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 758 (1st Cir. 2011)); *Nathenson*, 267 F.3d at 408. For instance, in *R2*, an investor alleged that SEC filings disclosing a company's obligation to repurchase its notes were rendered misleading by the company's failure to also disclose that it "did not have the cash to make the payments required" or "was relying on risky contingencies[ ] to supply sufficient cash for the payments." *R2*, 401 F.3d at 642. The officers allegedly knew those facts, but the Fifth Circuit affirmed dismissal anyway because "[k]nowledge of an omission does not itself necessarily raise a strong inference of scienter." *Id.* at 644; *see also Winer*, 503 F.3d at 330 (that CEO spoke "while cognizant of" undisclosed prior dealings with counterparty "does not satisfy the scienter requirements").

Plaintiffs' claims against Gray fail for the same reason. At most, they plead that Gray knew the omitted facts. They plead nothing showing that he knew, or must have known, that not disclosing those facts would mislead investors.

**a. Category A: Knowing about the 2021 transfer is not knowing that the related-party disclosures had to include it (Statements 1 and 7).**

Plaintiffs' scienter theory as to the Category A statements rests on one fact: Gray signed the January 2022 change-of-operator form for Remnant while managing Solis, so he "possessed direct knowledge of the [87-well] transaction." ¶301; *see* ¶¶270, 281, 372, 419.

But Statements 1 and 7 cover only transactions on or after January 1, 2022. They thus do not "omit" the 87-well transaction at all; it was authorized in December 2020 and conveyed in July 2021. *See* Part IV.B.1. Plaintiffs' argument to the contrary relies on a strained reading of when a transaction has occurred. At a minimum, it is not obvious, even with the benefit of hindsight, that Statements 1 and 7 encompassed that transfer. *See Shivangi*, 825 F.2d at 889 (danger of misleading not obvious where "neither the SEC nor any court had determined" omitted information was material); *Shaw Grp.*, 537 F.3d at 536 (plaintiffs "cannot transform inherently nuanced conclusions into fraudulent misstatements or omissions").

Because the danger of misleading was not obvious, Gray's knowledge of the transfer is not enough. Plaintiffs must instead plead particularized facts showing that Gray actually knew that leaving the 87-well transfer off those lists would mislead investors. *See Sw. Coal*, 624 F.2d at 1321 n.17. They do not. The Complaint identifies no document, conversation, or adviser that told Gray the transfer fell within either window. That is not enough to allege scienter. *E.g.*, *Jackson Inv. Grp., LLC v. Thomas*, 325 F. Supp. 3d 1334, 1348 (N.D. Ga. 2017) (executives' direct involvement in challenged accounting decision did not show scienter where no one allegedly "raised a concern" that "the accounting . . . was incorrect").

**b. Category B: Plaintiffs plead nothing about how Gray understood the approval-policy statements (Statements 2 and 8).**

Plaintiffs' scienter theory as to the Category B statements rests on the same fact: Gray knew of the 87-well transaction because he signed the change-of-operator form for Remnant. ¶301.

But Statements 2 and 8 describe New Era's procedures for approving related-party transactions, including a Code of Ethics provision on "ongoing and future transactions" that "will require prior approval by our audit committee." ¶424. They make no representation about a transfer completed before New Era existed. *See* Part IV.B.2.

To plead scienter, Plaintiffs would have to allege particularized facts sufficient to establish that Gray understood these descriptions as representing that the 2021 transfer had passed through those procedures. As with Statements 1 and 7, they allege nothing of the kind.

Their certification theory, ¶¶300–01, fails for the same reason. Signing a Sarbanes-Oxley certification does not itself establish scienter; otherwise, "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company." *Shaw Grp.*, 537 F.3d at 545 (citation omitted). Plaintiffs must instead plead facts showing that the signer had "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,'" that the filing was materially misleading. *Id.* They plead only that Gray knew about the 87-well transfer. ¶301. As shown above, that is not knowing that a filing had to disclose it.

**c. Category C: Plaintiffs concede the acquisition statement is accurate (Statement 3).**

Statement 3 told investors that New Era "acquired all of its interests in acreage and wells from acquisitions" and that it had been "assigned all of the rights, title and interests of its predecessors." ¶381. Plaintiffs' scienter theory as to the Category C statement rests on the same knowledge of the 87-well transfer, plus one more fact: Gray was copied on the State Land Office's 2024 bond claim against Remnant. ¶¶382–84. Neither alleges scienter.

Plaintiffs concede that "acquisitions" is "technically accurate"; they argue only that investors would read the word to mean "typical market transactions," not related-party

transactions. ¶382. To plead scienter, they would have to allege particularized facts showing that Gray knew, or must have known, that investors would read the word that way. They allege none. As with Statements 1 and 7, Gray's knowledge of the transfer does not fill that gap.

And Plaintiffs' bond-claim allegation is beside the point. Plaintiffs allege that in February 2024 the State Land Office copied Gray on a claim against Remnant's bond. ¶¶178–79, 384. But that claim concerned leases and wells for which Remnant, not Solis, was the lessee and operator of record, Compl. Ex.-10 at 1, 3, and no one claimed Solis or New Era was responsible for those obligations until December 2025, ¶461. *See* Part IV.B.3. Even accepting that Gray knew of the claim, it gave him no reason to think a description of the wells New Era did acquire would mislead anyone about wells it did not.

**d. Category D: The risk factor disclosed the obligations Gray allegedly knew about (Statement 4).**

Statement 4 is the environmental risk factor discussed in Part IV.B.4. It warned that the Company might have to remediate releases, and it disclosed that regulations require plugging and that the Company was plugging some of its wells. ¶385. Plaintiffs' scienter theory as to the Category D statement rests on Gray's receipt of State Land Office correspondence about cleanup, reclamation, and plugging, and of the State Land Office's claim on Remnant's bond. ¶¶384, 386–96, 435–36. Neither can show scienter as to either part of Statement 4.

Statement 4's "not aware" clause told investors that the Company knew of no obligation to remediate a release, and none of that correspondence identified a release at any well the Company operated. *See* Part IV.B.4.a. Knowing about requests to reclaim well sites and plug wells does nothing to suggest that Gray had reason to think a statement about remediating releases was false. Nor does Gray's notice of the bond claim. The spills it identified were on wells Remnant

held and operated of record, ¶¶384, 394; Compl. Ex.-10 at 1, 3, and those obligations attached to wells New Era did not acquire, *see* Part IV.B.3.

In the sentences that follow, Statement 4 disclosed that regulations "require the p[l]ugging and abandonment of wells, removal of production facilities, and other restorative actions," and that the Company was "actively involved in plugging a few of our wells." ¶385. The same Prospectus recorded $1,654,968 in asset retirement obligations for "plugging and abandoning the wells and site restoration." Ex.-1 at F-76–F-77. Such disclosures telling investors that the Company was "actively" plugging wells and putting a dollar figure on those obligations undercut any inference of scienter regarding this portion of Statement 4. *Cf. Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) (defendants' "disclosure of the 'red flags'" and candor about uncertainty "neutralize any scienter inference" from them).

**e. Category E: Plaintiffs plead no facts suggesting Gray disbelieved the lands risk factor (Statements 5 and 9).**

Statements 5 and 9 consist of two core assertions: the Company's expectation that it would "be able to continue such production," and the 10-K's statement that the transfer of eighteen state leases "finally occurred on February 1, 2023." ¶¶397, 441. Plaintiffs plead no particularized facts suggesting that Gray made either assertion with scienter.

The expectation of continued production is an opinion. To plead scienter, Plaintiffs must allege facts showing that Gray did not believe it, or that he knew facts that "cannot be squared with" it. *Omnicare*, 575 U.S. at 191. They do neither. Plaintiffs point to three things Gray knew, all drawn from the State Land Office's correspondence: plugging and remediation demands, pending transfers of operatorship, and expired and canceled leases. ¶¶399–401, 444–45. As shown in Part IV.B.5.a, each is consistent with an expectation of continued production from the Company's government leases as a whole.

The "February 1, 2023" statement fails for a similar reason. Plaintiffs rely on a June 2023 exchange on which Gray was copied. ¶¶290–91. But the email could just as easily refer to other leases Solis acquired from Grizzly, and the cleanup demand concerned a lease outside the eighteen. *See* Part IV.B.5.b. An email that may or may not concern the eighteen leases does not suffice to plead scienter with the particularity the PSLRA requires. *See Tellabs*, 551 U.S. at 326 ("omissions and ambiguities count against inferring scienter").

**f. Category F: Plaintiffs plead no facts suggesting Gray knew the contingency note would mislead investors (Statement 6).**

Statement 6 is the "Environmental Matters" note to the Prospectus's financial statements, which warned that there could be no assurance that "past noncompliance with environmental laws will not be discovered." ¶¶403, 405. Plaintiffs' scienter theory as to the Category F statement rests on the same agency correspondence they invoke for Statement 4. ¶¶215, 217, 387–89, 404. But Statement 6 is a standard contingency note describing a lessee's potential liability under environmental laws. It makes no representation about whether any regulator had raised compliance issues with Solis. *See* Part IV.B.6. To plead scienter, Plaintiffs would have to allege particularized facts showing that Gray knew, or must have known, that investors would read the note as such a representation. They allege none.

**g. Category G: Plaintiffs plead no facts suggesting Gray disbelieved the press release (Statement 10).**

Statement 10 is the Company's same-day response to the Fuzzy Panda report. It expressed the Company's belief that Fuzzy Panda's claims were "factually inaccurate and an attempt to mislead investors about New Era's actual operations, financial position and status of the Company's various projects," and it referred investors to the Company's SEC filings. ¶¶451, 453. Plaintiffs' scienter theory as to the Category G statement rests on the same fact as Category A: Gray knew of the 87-well transfer. ¶¶452–54. Knowing about the transfer could allege scienter

only if Gray understood that investors would read a general disagreement with the report as a denial of every fact it recites, down to its passing reference to the 87 wells. *See* Part IV.B.7. That reading is implausible on its face, and Plaintiffs plead nothing suggesting Gray anticipated it. Plaintiffs themselves concede that the response did not "address the FP Report's specific factual findings." ¶325. And New Era's 2024 Form 10-K disclosed Gray's roles at both Solis and Remnant, undercutting any inference that he was trying to hide his ties to the transfer. ¶418.

**3. Because neither Individual Defendant acted with scienter, the claim against New Era fails.**

Because Gray and Rugen are the only officials Plaintiffs identify, and the Complaint pleads scienter as to neither, the Section 10(b) claim against New Era fails as well. *See Southland*, 365 F.3d at 366.

* * *

Much of the Complaint retells the State's allegations about how wells moved from Remnant to Acacia and Solis between 2020 and 2022. ¶¶119–66. Those allegations fail to establish scienter for two reasons. First, they are borrowed from an adversary's pleading, and "unproven allegations clipped from other complaints do little, if anything, to establish scienter." *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 966 (6th Cir. 2026); *see also Southland*, 365 F.3d at 383 (similar). Second, even taken at face value, they answer the wrong question. Whether Gray dealt properly with a state regulator before New Era existed says nothing about whether he made New Era's later disclosures with scienter. On that question, Plaintiffs plead only that Gray knew the underlying facts—which does not suffice to allege scienter under well-settled law.

Considered together, as *Tellabs* requires, the allegations support an inference of good faith, not fraud. *See* 551 U.S. at 322–23. The more compelling inference is that a newly public company, having disclosed Gray's ties to Solis and Remnant and Remnant's bankruptcy, treated a transfer

completed before it existed as outside reporting windows that began on January 1, 2022; described its regulatory and plugging risks in general terms while disclosing its plugging work and booking its plugging obligations; and answered a short seller's opinions with a contrary opinion. That is, at most, a dispute about disclosure. It is not a strong inference of fraud, and Count III should be dismissed as to every Defendant.

### D. The Section 20(a) claim (Count IV) fails because Plaintiffs plead no primary violation.

"Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland*, 365 F.3d at 383. Because Plaintiffs have not stated a claim under Section 10(b), *see* Parts IV.B–C, their Section 20(a) claim against Gray and Rugen (Count IV) also fails. ¶¶497–98.

## V. CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice. In the alternative, Defendants request that the Court dismiss all statements and Defendants for which the Complaint fails to state a claim.

Dated: October 20, 2026

Respectfully submitted,

**VINSON & ELKINS LLP**

/s/ *Robert Ritchie*
Michael C. Holmes (admission pending)
Texas Bar No. 24002307
Robert Ritchie
Texas Bar No. 24079213
K. Virginia Burke DeBeer
Texas Bar No. 24097437
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Tel: (214) 220-7700
Fax: (214) 220-7716
mholmes@velaw.com
rritchie@velaw.com
vdebeer@velaw.com

*Counsel for Defendants New Era Energy & Digital, Inc., Everett Willard Gray II, and Michael J. Rugen*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

/s/ *Robert Ritchie*
Robert Ritchie
*Counsel for Defendants New Era Energy & Digital, Inc., Everett Willard Gray II, and Michael J. Rugen*